# AFFIDAVIT IN SUPPORT OF SEARCH WARRANT APPLICATION

**F I L E D**

APR 1 8 2013

Clerk, U. S. District Court
Eastern District of Tennessee
At Knoxville

**IN THE MATTER OF THE SEARCHES OF:**
the office building located at
**5500 Lonas Drive, Knoxville, Tennessee;**

the office building located at
**5508 Lonas Drive, Knoxville, Tennessee;**

the commercial building located at
**1339 E. Weisgarber Road, Knoxville, Tennessee;**

the residence located at
**4302 Dakota Avenue, Nashville, Tennessee;**

the residence located at
**2211 Blair Drive, Hebron, Kentucky; and**

the residence located at
**3317 Westminster Road, Bettendorf, Iowa.**

**UNDER SEAL**

Case No. **3 : 13 - MJ - 2028**

I, Robert H. Root, being first duly sworn, hereby depose and state as follows:

1.     I am a Special Agent with the Federal Bureau of Investigation (FBI), United

States Department of Justice, and have been since November 12, 1995. My primary duties are to

conduct investigations of violations of federal criminal laws. From approximately 2008 through

2011, I served as a Supervisory Special Agent for Complex Financial Crimes, Cyber Crime, and

Public Corruption. During that time I served as the Knoxville Field Office's CART (Computer

Analysis Response Team) supervisor. I also have served in supervisory positions in

Counterterrorism and Intelligence initiatives. Prior to serving in a supervisory capacity, I was

assigned to investigate Cyber Crimes against children. I have also received training from the

National Infrastructure Protection Center on computer networks, network security and intrusions.

Currently, I am assigned to the Knoxville Field Office and am specifically assigned to work

Complex Financial Crime and Public Corruption investigations. As part of my official duties, I

Page 1 of  120
Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

have participated in investigations wherein most traditional law enforcement techniques, including the drafting and execution of search warrants, have been utilized. I have also been involved in investigations that required the drafting and execution of search warrants for computers. I have been assigned to an investigation of employees of Pilot Corporation, Pilot Travel Centers, LLC, and PilotFlying J (hereinafter "Pilot," which is again defined below) for devising and conspiring to devise a scheme to defraud by use of the mail and the transmission of wire communication in interstate commerce, in violation of 18 U.S.C. §§ 371 (conspiracy), 1341 (mail fraud), 1343 (wire fraud), and 1349 (conspiracy).

2.     This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. This affidavit is based on my personal knowledge and observations made during the course of the investigation of possible violations of 18 U.S.C. §§ 371, 1341, 1343, and 1349, arising from a conspiracy and scheme to defraud executed by various Pilot employees to deceptively withhold diesel fuel price rebates and discounts from Pilot customers (a term which is defined below), without the knowledge or approval of the customer, for the dual purposes of increasing the profitability of Pilot and increasing the diesel sales commissions of the Pilot employees participating in the fraud, information conveyed to me by other law enforcement and government officials, including my review of interview and investigative memoranda prepared by myself and other law enforcement agents during the course of this investigation, information provided by a person acting as a Confidential Human Source (referred to herein as CHS-1), information provided by former Pilot employee Cathy Giesick and a current Pilot employee who is referred to herein as CHS-2, and information obtained from consensually recorded conversations and the

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

transcriptions thereof. This affidavit does not recount all of the investigative activities that have occurred in conjunction with this investigation. Additionally, while this affidavit contains numerous transcript excerpts from numerous consensually recorded conversations, this affidavit does not excerpt or summarize every conversation that has been consensually recorded during the course of this investigation.

## I. Purpose of Affidavit

3.      This affidavit is made in support of applications under Rule 41 of the Federal Rules of Criminal Procedure for warrants to search the following:

a.      the office building located at 5500 Lonas Drive, Knoxville, Tennessee (hereinafter "the 5500 Lonas Drive Property") further described and depicted in Attachment A1, for the items described in Attachment A2. The 5500 Lonas Drive Property is identified as Building 1, 5500 Lonas Road, on the Pilot Park office park directory sign.

b.      the office building located at 5508 Lonas Drive, Knoxville, Tennessee (hereinafter "the 5508 Lonas Drive Property") further described and depicted in Attachment B1, for the items described in Attachment B2.

c.      the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee (hereinafter "the 1339 E. Weisgarber Road Property") further described and depicted in Attachment C1, for the items described in Attachment C2.

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

d.  the residence located at 4302 Dakota Avenue, Nashville, Tennessee (hereinafter "the 4302 Dakota Avenue Property") further described and depicted in Attachment D1, for the items described in Attachment D2.

e.  the residence located at 2211 Blair Drive, Hebron, Kentucky (hereinafter "the 2211 Blair Drive Property") further described and depicted in Attachment E1, for the items described in Attachment E2.

f.  the residence located at 3317 Westminster Road, Bettendorf, Iowa (hereinafter "the 3317 Westminster Road Property") further described and depicted in Attachment F1, for the items described in Attachment F2.

4.  This affidavit contains facts that show probable cause to search the above-named properties, and for evidence related to violations of 18 U.S.C. §§ 371, 1341, 1343, and 1349 arising from a conspiracy and scheme executed by Pilot employees to defraud certain Pilot customers by deceptively reducing discounts and rebates due to Pilot customers, without the customers' knowledge or approval, for the dual purposes of increasing Pilot's profitability and the sales commissions of the Pilot employees participating in the conspiracy and scheme to defraud, and to seize any such found evidence.

**II.   Terms**

5.  For the purposes of this affidavit, the attachments hereto, and the search warrant, and supporting application, the following terms have the following meaning:

a.  Pilot. The term "Pilot" refers collectively to Pilot Corporation, Pilot Travel Centers, LLC, PilotFlying J, and any other name under which Pilot Corporation sells diesel fuel to commercial customers through its direct sales team of Regional Sales Directors,

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

Regional Sales Managers, Regional Account Representatives, and Inside Sales Representatives. Pilot operates truck care facilities and travel plazas throughout the United States, and is one of the largest suppliers of diesel fuel to over-the-road truck carriers in the United States.

b.  Customers.  The term "Customer" or "Customers" refers to Pilot customers who purchase diesel fuel for commercial use from Pilot's stations and travel-plazas, and includes Direct Billed Customers and Funded/Restricted Customers, which are defined below.

c.  Direct Billed Customers.  Based on information provided by CHS-2, the term "Direct Billed Customers" refers to Customers to whom Pilot has extended credit for the purchase of diesel fuel.  Direct Billed Customers purchase their diesel from Pilot on credit extended by Pilot, and Pilot sends these Customers an invoice for the cost of the diesel purchased on credit, including any agreed upon discount, on a periodic basis, sometimes on a daily basis, but typically no longer than a weekly basis.

d.  Discount Fraud.  The term "Discount Fraud," which is a term that was not used by Pilot employees, is a short-hand reference used in this affidavit to mean the intentional and deceptive reduction of a diesel discount agreement with a Customer, without the Customer's knowledge or approval, for the purpose of increasing Pilot's profitability and the sales commissions of Pilot employees. Based on information provided through the cooperation of CHS-2, internally at Pilot, this deceptive practice has been referred to at various times as "managing the discount," and "jacking the discount."

e.  Funded/Restricted Customers.  Based on information provided by CHS-2, the term "Funded/Restricted Customers" refers to Customers who purchase their diesel fuel from

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

Pilot using a credit source other than Pilot. Funded/Restricted Customers who receive an agreed upon discount from Pilot for the purchase of diesel fuel typically receive that discount in the form a monthly "rebate" check.

f. "Price Fetch" and "Reflection." Based on information provided by CHS-2, the term "Price Fetch" is what Pilot internally refers to as the daily diesel price information that Pilot has the capability of sending to its Customers that shows the diesel fuel price that each Customer is supposed to be receiving at each travel plaza specified. Based on information provided by CHS-2, the term "Reflection" is what Pilot internally refers to as the daily diesel price information that Pilot has the capability of sending to a Customer's credit card billing company.

g. Rebate Amount. Based on information provided by CHS-2, the term "Rebate Amount" refers to the amount of money that a Pilot Customer should be credited or refunded pursuant to terms of the diesel price discount deal and agreement between Pilot and the Customer.

h. Regional Account Representatives. Based on information provided by CHS-2, Regional Account Representatives are Pilot direct sales employees who work at Pilot's business headquarters, which is located in a three-building office park named "Pilot Park" located off Lonas Drive in Knoxville, Tennessee, a depiction of which is attached to this affidavit as Attachment G. Regional Account Representatives support Regional Sales Managers and Regional Sales Directors who do not live and work in Knoxville, Tennessee.

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

i.      Based on information provided by CHS-2, Regional Sales Managers are Pilot direct sales employees who typically do not work at Pilot's Knoxville headquarters, but work remotely, so that they can make sales calls on Customers within their assigned sales region.

j.      Based on information provided by CHS-2, Regional Sales Directors are Pilot direct sales employees who typically do not work at Pilot's Knoxville headquarters, but work remotely, so that they can make sales calls on Customers within their assigned region and can manage the Regional Sales Managers within their region.

k.      Rebate Fraud. The term "Rebate Fraud," which is a term that was not used by Pilot employees, is a short-hand reference used in this affidavit to mean the intentional and deceptive reduction of a Rebate Amount due to a Customer, without the Customer's knowledge or approval, for the purpose of increasing Pilot's profitability and the sales commissions of Pilot employees. Based on information provided through the cooperation of CHS-2, internally at Pilot, this deceptive practice has been referred to at various times as "manual rebates," "manuel," "manwell," "manuals," "manny," "manually calculating the rebate," "cutting the rebate," "adjusting," and "trimming," "cost-plussing," "screwing," and "fucking."

l.      Sales Force – "Sales Force" is a software program that provides an electronic platform for Pilot's diesel sales employees to memorialize what occurred during each Regional Sales Manager's visit with a Customer. Every week, Sales Force automatically generates a report that shows what each Regional Sales Manager noted regarding that week's visits or contacts with a Customer. That report is automatically sent by e-mail to the Regional Sales Manager whose weekly contacts are being reported, the Regional Sales Director over that

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

Regional Sales Manager, the Regional Account Representative who supports that Regional Sales Manager, as well as to Pilot's President Mark Hazelwood, Vice President of Sales John Freeman, and Director of Inside Sales Vickie Borden.

m. Documents. The term "documents" means and includes writings or records of every kind or character, conveying information by mechanical, electronic, photographic, or other means, whether encoded, taped, stored or coded electrostatically, electromagnetically, or otherwise, and includes, but is not limited to correspondence, e-mail, facsimiles, notes, memoranda, minutes, summaries, telephone records, telephone message logs or slips, calendars, date books, interoffice communications, results of investigations, videotapes, audiotapes, microfiche, microfilm, any electronic media, accounting and financial records of any kind (including checks (front and back), wire transfers, cash payments or receipts, and check requests), and refers to any record in the organization's possession, custody, or control, and includes all drafts, unfinished versions of documents, and material similar to any of the foregoing however denominated, by whomever prepared, and to whomever addressed that relate to the violations of 18 U.S.C. §§ 371,1341, 1343, and 1349 described herein.

## III. Summary

6. On or about May 4, 2011, CHS-1 contacted the FBI to report his/her knowledge of fraudulent activity by certain Pilot employees directed at Pilot's Customers. CHS-1 advised that a current Pilot sales employee, CHS-2, had confided to him/her that certain Pilot employees had been intentionally defrauding some of Pilot's Customers by deliberately charging these Customers a higher price than the contractually agreed upon price, and then concealing the fact and nature of this increased price from these victimized customers. CHS-1 agreed to assist the

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

FBI in the investigation of the Pilot employee conduct described by CHS-2. CHS-1 agreed to record conversations with CHS-2 regarding the fraudulent conduct of Pilot sales personnel.

7.    During recorded conversations between CHS-1 and CHS-2 beginning in June 2011 and continuing into 2012, CHS-2, who did not know he[1] was being recorded, advised CHS-1, in summary, that John Freeman, who is Pilot's current Vice President of Sales, and Brian Mosher, who is Pilot's current Director of National Sales, had been fraudulently withholding a portion of the Rebate Amount due to their Customers who received monthly rebate checks. From these recorded conversations, it was also determined that Cathy Giesick, a former Pilot Regional Sales Manager, might have information relevant to the investigation.

8.    On October 2, 2012, Giesick, was contacted by special agents of the FBI and Internal Revenue Service-Criminal Investigation (IRS-CI), and she agreed to cooperate with the investigation. Giesick confirmed that during her employment with Pilot, and while she was under Mosher's supervision, Mosher intentionally reduced monthly Rebate Amounts due to his Customers, without the Customers' knowledge, for the dual purposes of increasing the profitability of Pilot and increasing his sales commissions. As detailed below, Giesick explained the mechanics of Mosher's fraud on his Pilot Customers, including the roles of Pilot's Regional Account Representatives, who are based at Pilot's headquarters in Knoxville, Tennessee, in determining and mailing the fraudulent rebate checks to Pilot's Customers. Giesick explained that she was encouraged to participate in this fraudulent conduct, and that her discomfort with it was one of the reasons for her departure from Pilot. To encourage Giesick's cooperation during the course of this initial contact, Giesick first executed a *Kastigar* letter agreement, and

---

[1] Masculine pronouns are used in connection with CHS-2 for convenience. All pronouns related to CHS-2 should be considered gender neutral.

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

ultimately entered into a non-prosecution agreement with the United States Attorney's Office for the Eastern District of Tennessee.

9. On October 4, 2012, CHS-2, a current Pilot Regional Director of Sales, was contacted by the FBI and IRS-CI, and he agreed to provide information to the agents. CHS-2 confirmed the existence of the above-described Rebate Fraud, that it continues, and has involved the active participation for years of his supervisor, John Freeman, Pilot's current Vice President of Sales and its former Director of Sales for the South/Southeast Regions, and Brian Mosher, Pilot's current Director of Sales for National Accounts and its former Director of Sales for the Midplains Region. CHS-2 explained that Freeman had just directed one of the employees whom CHS-2 supervises, Kevin Clark, to engage in fraudulent activity with a Customer during the week of September 24, 2012. CHS-2 also explained that following a corporate reorganization, his sales team absorbed Pilot employee, Rob Yuronich, whom Mosher supervised until August 2012 – the approximate time of the corporate reorganization. Yuronich advised CHS-2 that Mosher engaged in Rebate Fraud with many Customers that Yuronich oversaw. CHS-2 also explained that Pilot's Rebate Fraud is directed at both Direct Billed Customers and Restricted/Funded Customers. CHS-2 further advised that the Rebate Fraud has occurred with the knowledge of Pilot's current President Mark Hazelwood and Pilot's Chief Executive Officer James A. "Jimmy" Haslam, III, due to the fact that the Rebate Fraud-related activities have been discussed during sales meetings in Knoxville, Tennessee, in which Hazelwood and Haslam have been present. CHS-2 voluntarily provided the agents with two documents that he had previously pinned to his bulletin board behind his desk. CHS-2 told the agents that he had printed the documents and placed them on his bulletin board, so that he would know where to find them, in

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

the event he was ever contacted by law enforcement. (Your affiant notes that CHS-2's statement regarding these documents was consistent with what CHS-2 told CHS-1 during a recorded conversation prior to law enforcement's initial contact with CHS-2.) One of the documents appeared to be a printed spreadsheet which CHS-2 described as an example of a listing of accounts that are provided manual rebates. The other document was a printed e-mail thread dated May 24, 2012 through June 4, 2012, that CHS-2 described as an example of a Customer discovering that its Rebate Amount had been reduced without its knowledge. The e-mail thread's senders and recipients were Pilot employees Kevin Clark, Brian Mosher, CHS-2, and Ashley Judd. The affected customer was W.N. Morehouse Truck Line, Inc. To encourage CHS-2's cooperation, during the course of this initial contact with CHS-2, CHS-2 executed a *Kastigar* letter agreement.

10. On October 5, 2012, special agents of the FBI and IRS-CI met with CHS-2. At that time, a non-prosecution agreement was entered into between the CHS-2 and the United States Attorney's Office for the Eastern District of Tennessee. CHS-2 then provided additional information, as summarized below, about the manner and means by which Pilot employees have been executing the Rebate Fraud scheme.

11. Since October 5, 2012, agents with the FBI and IRS-CI have had additional contacts and meetings with CHS-2 and Giesick.

12. Additionally, since October 5, 2012, the FBI and IRS-CI have secured numerous consensually recorded conversations involving Pilot employees. Due to the volume of recordings and the immediate need to execute the requested warrants, every minute of every consensual recording has not been listened to by a law enforcement agent. For some

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

consensually recorded conversations, law enforcement agents have been able to listen to every minute of the recording. But, for some other recorded conversations, law enforcement agents have been able to listen only to a portion of the recorded conversation, the significance of which was identified to law enforcement agents by one of the conversation's participants. With respect to the transcripts of consensually recorded conversations that are excerpted in this affidavit, in some instances your affiant has personally listened to the recording upon which the transcript excerpt is based, while in other instances, your affiant has relied exclusively on a transcription prepared by another law enforcement agent, government personnel or contractor. Where a speaker's name is identified in a transcript excerpt or summary of a consensually recorded conversation, any such named speaker's voice has been identified by CHS-2 during the course of the investigation.

13.     Based on the information obtained thus far in the investigation, your affiant has determined that there is to be probable cause to believe that Pilot employees have conspired and schemed to engage in Rebate Fraud for many years. To be sure, your affiant is not suggesting that Pilot employees have conspired and schemed to defraud all of Pilot's Customers. Instead, your affiant has determined that there is probable cause to believe that certain Pilot employees have conspired and schemed to defraud, in violation of 18 U.S.C. §§ 371, 1341, 1343 and 1349, Pilot Customers that certain Pilot employees deemed to be too unsophisticated to catch that their agreed-upon discount deal with Pilot was being changed to benefit Pilot without the knowledge of those Customers. Additionally, there is probable cause to believe that there is evidence, which is discussed in detail below, of these criminal violations located in the 5500 Lonas Drive Property, the 5508 Lonas Drive Property, the 1339 E. Weisgarber Road Property, the 4302

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

Dakota Avenue Property, the 2211 Blair Drive Property, and the 3317 Westminster Road Property.

14.     Based on information obtained from CHS-2 and Pilot's website, the following current and former Pilot employees are or have been involved in, supervised, overseen, or supported, the direct sale of diesel fuel to Pilot Customers since January 1, 2008:

a.     Chris Andrews (Andrews). Andrews is a current Pilot employee. His title is Regional Sales Manager. Andrews works remotely and lives in Dallas, Texas. He is currently supervised by Regional Sales Director Vincent L.Greco.

b.     Katy Bibee (Bibee). Bibee is a current Pilot employee. Her title is Regional Account Representative and she works at Pilot headquarters in Knoxville, Tennessee. She is supervised by Vickie Borden and supports John Freeman.

c.     Vickie Borden (Borden). Borden is a current Pilot employee. Her title is Director of Wholesale and Inside Sales and she works at Pilot headquarters in Knoxville, Tennessee. She is supervised by Scott Wombold.

d.     Ron Carter (Carter). Carter is a current Pilot employee. His title is Director of Sales for Canada. Carter works remotely and lives in Canada. He is supervised by John Freeman.

e.     Kevin Clark (Clark). Clark is a current Pilot employee. His title is Regional Sales Manager. Clark works remotely and lives in Lee Summit, Missouri. He is supervised by Regional Sales Director Vincent Greco.

f.     Karen Crutchman (Crutchman). Crutchman is a current Pilot employee. Her title is Senior Account Representative, and she works at Pilot headquarters in Knoxville,

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

Tennessee. She is supervised by Vickie Borden and supports Vincent Greco and a portion of accounts managed by Regional Sales Manager Kevin Clark.

g. Campbell Dillion (Dillion). Dillion is a current Pilot employee. Her title is Regional Account Representative, and she works at Pilot headquarters in Knoxville, Tennessee. She is supervised by Vicki Borden.

h. Jonathon Duvall (Duvall). Duvall is a current Pilot employee. His title is Regional Sales Manager. Duvall works remotely and lives in Naperville, Illinios. He is supervised by Regional Director of Sales Kevin Hanscomb. Before joining Hanscomb's sales team, Duvall was supervised by Brian Mosher. He is the son-in-law of Mitch Steenrod, Pilot's Chief Financial Officer.

i. Scott Fenwick (Fenwick). Fenwick is a current Pilot employee. His title is Regional Sales Manager. Fenwick works remotely and lives in Salt Lake City, Utah. He is supervised by Regional Sales Director Vincent Greco.

j. John Freeman (Freeman). Freeman is a current Pilot employee. His title is Vice President of Sales, and he works at Pilot Headquarters in Knoxville, Tennessee. Freeman supervises Pilot's three Regional Sales Directors in the United States, Vincent Greco (West), Arnie Ralenkotter (Northeast), and Kevin Hanscomb (Southeast). Prior to being promoted to Vice President of Sales, Freeman was a Regional Sales Director. Freeman is supervised by President Mark Hazelwood. Freeman's nickname at Pilot is "Stick."

k. Cathy Giesick (Giesick). Giesick is a former Pilot employee. During her tenure with Pilot, she was supervised by Brian Mosher and Vincent Greco. She was also known as Cathy Sokalowski during her employment with Pilot.

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

l.     Vincent Greco (Greco). Greco is a current Pilot employee. His title is Director of Sales for the West Region. Greco works remotely and lives in Bedford, Texas. He is supervised by Vice President of Sales John Freeman.

m.     Wendy Hamilton (Hamilton). Hamilton is a current Pilot employee. Her title is Senior National Account Marketing Manager and works at Pilot headquarters in Knoxville, Tennessee. Hamilton is supervised by Vice President of National Sales Scott Wombold.

n.     Kevin Hanscomb (Hanscomb). Hanscomb is a current Pilot employee. His title is Director of Sales for the East Region. Hanscomb works remotely and lives in Nashville, Tennessee. He is supervised by Vice President of Sales John Freeman.

o.     James A. "Jimmy" Haslam, III (Haslam). Haslam is Pilot's Chief Executive Officer. Haslam works at Pilot headquarters in Knoxville, Tennessee.

p.     Mark Hazelwood (Hazelwood). Hazelwood is a current Pilot employee. His title is President. Hazelwood works at Pilot headquarters in Knoxville, Tennessee. Hazelwood is supervised by Chief Executive Officer James A. "Jimmy" Haslam, III.

q.     Kevin Herman (Herman). Herman is a current Pilot employee. His title is National Account Manager and he works at Pilot headquarters in Knoxville, Tennessee. He is supervised by Vice President of National Sales Scott Wombold.

r.     Kevin Hite (Hite). Hite is a current Pilot employee. His title is Regional Sales Manager. Hite works remotely and lives in North East, Pennsylvania. He is supervised Director of Sales Arnie Ralenkotter.

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

s.     Lexie Holden (Holden).  Holden is a current Pilot employee.  Her title is Regional Account Representative, and she works at Pilot headquarters in Knoxville, Tennessee.  She is supervised by Vickie Borden and supports Brian Mosher and Andrew Schimmel.

t.     Jason Holland (Holland).  Holland is a current Pilot employee.  His title is Regional Sales Manager.  Holland works remotely and lives in Nashville, Tennessee.  Holland is supervised by Director of Sales Kevin Hanscomb.

u.     Heather Jones (Jones).  Jones is a current Pilot employee.  Her title is Regional Account Representative, and she works at Pilot headquarters in Knoxville, Tennessee.  Until 2012, Jones supported Regional Sales Director Brian Mosher. At some point in 2012, she was transferred to Vincent Greco's sales team.  Jones continues to support Regional Sales Manager Rob Yuronich.

v.     Brian Mosher (Mosher).  Mosher is a current Pilot employee.  Mosher's title is Director of Sales for National Accounts.  Mosher works remotely and lives in Bettendorf, Iowa.  Until 2012, Mosher was the Director of Sales for the Midplains Region and was supervised by Vice President of Sales John Freeman.

w.     Karen Mann (Mann).  Mann is a current Pilot employee.  Her title is Regional Account Representative, and she works at Pilot headquarters in Knoxville, Tennessee.  Mann is supervised by Director Inside Sales Vickie Borden, and she supports Ron Carter.

x.     Jacquelyn Pearl (Pearl).  Pearl is a current Pilot employee.  Her title is Regional Sales Manager.  Pearl works remotely and lives in Chicago, Illinios.  Pearl is supervised by Director of Sales Arnie Ralenkotter.

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

y.    Holly Radford (Radford). Radford is a current Pilot employee. Her title is Regional Account Representative, and she works at Pilot headquarters in Knoxville, Tennessee. Radford is supervised by Vickie Borden and supports Kevin Hanscomb.

z.    Arnie Ralenkotter (Ralenkotter). Ralenkotter is a current Pilot employee. His title is Director of Sales for the Northeast Region. Ralenkotter works remotely and lives in Hebron, Kentucky. Ralenkotter is supervised by Vice President of Sales John Freeman.

aa.    Andrew Schimmel (Schimmel). Schimmel is a current Pilot employee. His title is National Account Sales Manager. Schimmel works remotely and lives in Brentwood, Tennessee. Schimmel is supervised by Vice President of National Sales Scott Wombold.

bb.    John Scott (Scott). Scott is a current employee of Pilot. His title is Regional Sales Manager. Scott is supervised by Director of Sales Vincent Greco.

cc.    Joe Sigurdson (Sigurdson). Sigurdson is a current employee of Pilot. His title is Regional Sales Manager. Sigurdson works remotely and lives in Canada. Sigurdson is supervised by Director of Sales Ron Carter.

dd.    John Spiewak (Spiewak). Spiewak is a current Pilot employee. His title is Regional Sales Manager. Spiewak works remotely and lives in Centerville, Ohio. Spiewak is supervised by Director of Sales Arnie Ranlenkotter.

ee.    Mitch Steenrod (Steenrod). Steenrod is a current Pilot employee. His title is Chief Financial Officer. Steenrod works at Pilot headquarters in Knoxville, Tennessee.

ff.    James Studor (Studor). Studor is a current Pilot employee. His title is Regional Sales Manager. Studor works remotely and lives in St. Louis, Missouri. Studor is supervised by Director of Sales Anrie Ralenkotter.

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

gg.     Scott Wombold (Wombold). Wombold is currently a Pilot employee. His title is Vice President of National Accounts. Wombold works at Pilot headquarters in Knoxville, Tennessee. Wombold is supervised by President Mark Hazelwood. Wombold's nickname at Pilot is Scooter.

hh.     Andrea Woodall (Woodall). Woodall is currently a Pilot employee. Her title is Regional Account Representative, and she works at Pilot Headquarters in Knoxville, Tennessee. Woodall is supervised by Vickie Borden, and she supports Joe Sigurdson.

ii.     Rob Yuronich (Yuronich). Yuronich is a current Pilot employee. His title is Regional Sales Manager. Yuronich works remotely and lives in Omro, Wisconsin. Until 2012, Yuronich was a Regional Sales Manager under Mosher's supervision. Yuronich is currently supervised by Director of Sales Arnie Ralenkotter.

**IV.     There is probable cause to believe that certain Pilot employees have devised and conspired to devise a scheme to defraud Pilot's Customers by deceptively reducing Rebate Amounts and deceptively changing agreed upon diesel price discounts for the purpose of increasing Pilot's profitability and sales commissions for Pilot employees, in violation of of 18 U.S.C. §§ 371, 1341, 1343, and 1349.**

15.     As referenced above, on October 2, 2012, federal law enforcement agents interviewed Cathy Giesick at her home in Temple, Texas. Giesick advised that she is a former employee of Pilot and until approximately January 2012 worked as a Regional Sales Manager selling diesel fuel to trucking companies. She worked under two directors of sales – first, Brian Mosher; and, second, Vincent Greco. While based out of Illinois and working under Mosher, Giesick's territory included Illinois, Wisconsin, Minnesota, North Dakota, South Dakota, and

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

Iowa. While based out of Texas and working under Greco, Giesick's territory included Texas, Oklahoma, Arkansas, and New Mexico.

16.     Giesick explained that the Regional Account Representatives with whom she worked were Heather Jones and Karen Crutchman. Giesick explained that when a Customer entered into an agreement with Pilot, Giesick contacted either Jones or Crutchman and told them the agreed-upon diesel discount deal.

17.     Giesick explained that Pilot permitted her to offer price discounts to trucking companies that varied based on the quantity of diesel fuel purchased by the company – the more diesel fuel purchased, the better the discount.

18.     Giesick explained that some Customers received their discounts at the point of sale, while other customers received their discount in the form of a monthly rebate check. She further explained that all monthly rebate amounts were calculated at and mailed from Pilot headquarters in Knoxville, Tennessee. However, by the time she left Pilot in January 2012, some monthly rebate Customers were receiving their rebates via direct deposit.

19.     At first, Giesick stated that she was 99.9% sure that she was aware of only two instances in which Customers had not received their agreed upon discounts. After Giesick was advised that federal law enforcement had reason to believe that a number of Pilot Customers had not received their agreed upon discount and that Pilot employees had purposefully reduced that amount, Giesick asked to speak with her husband privately. After returning a few minutes later, Giesick explained that she was concerned about whether the non-disclosure agreement she had entered into with Pilot upon her departure from Pilot prevented her from discussing her concerns with Pilot's business practices related to rebates. Giesick was advised that no one present could

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

give her advice about the non-disclosure agreement. Giesick was offered a *Kastigar*/proffer letter, which she signed.

20. After executing the *Kastigar*/proffer letter, Giesick then explained that one of the reasons she left Pilot was because of her discomfort with Pilot's practice of intentionally lowering Customer Rebate Amounts. She stated that while working for Mosher, she discovered that he was intentionally lowering the agreed upon discount rate for diesel fuel purchases and directing a reduced rebate payment to his Customers. For example, if a Customer, who at the end of the month, based upon an agreed upon discount rate, was due a rebate of $10,000, Mosher would cut the payment to approximately $7,500. Giesick explained that Mosher cut the rebates to the customers because it made more money for Pilot and it increased the commission that Mosher and any other Pilot sales person responsible for the Customer would receive.

21. Giesick further explained that Mosher asked her not to inform Jonathan Duvall when Duvall joined Mosher's team. Duvall, as noted above, is the son-in-law of Pilot's Chief Financial Officer Mitch Steenrod. However, Duvall advised Giesick that he already knew about the Rebate Fraud process.

22. Giesick further explained that Heather Jones, who also worked as Mosher's Regional Account Representative, would once a month send by e-mail an Excel file to Mosher that listed all of the Customers who were due a Rebate Amount and that listed the actual Rebate Amount due to the listed Customer pursuant to the price discount deal between the Customer and Pilot. Mosher would then engage in Rebate Fraud by typing into the Excel file the reduced amounts to be paid to Customer and returning the Excel file back to Heather Jones for her to execute the Rebate Fraud as directed by Mosher by having rebate checks prepared and sent to the

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

Customer for the reduced amount inputted by Mosher. Giesick was copied on these e-mails and believes that she saved them in her Pilot e-mail account and may have saved them under a folder entitled "manual rebate."

23. Giesick advised that approximately three to four years ago, she was a participant in a meeting at Pilot's headquarters in Knoxville, Tennessee, that included Mosher, Hazelwood, Duvall and Haslam. During the meeting Haslam thanked Mosher for saving Pilot money. Later on during the meeting, at a time when Haslam may or may not have been present, Giesick recalled that Mosher told Hazelwood, and that Hazelwood acknowledged, that other employees within the organization were being promoted and that Mosher was making more money for Pilot by reducing Customer rebates.

24. Giesick approximated that Mosher was engaging in Rebate Fraud for twenty (20) of the accounts that she was responsible for, including JKC, Unlimited Trucking, and CDN Logistics. Giesick explained that the Rebate Fraud was typically directed at smaller accounts where the customer would not have the capability to catch the reduction in the Rebate Amount.

25. Giesick advised that after she moved to Texas due to a change in her husband's job, Greco became her new regional supervisor in late 2009/early 2010. At that time, Karen Crutchman was the Knoxville-based Regional Account Representative with whom Greco primarily worked. Therefore, Crutchman also became Giesick's Regional Account Representative. Giesick stated that at some point, Crutchman admitted to Giesick that Crutchman was engaging in Rebate Fraud with Giesick's Customers at Crutchman's own discretion. Giesick advised that Crutchman e-mailed her spreadsheets that detailed the amount by which a Customer's rebate had been deceptively reduced. Giesick also advised that

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

Crutchman would on occasion telephone her and verbally advise her of the amounts by which Giesick's Customers' rebates would be deceptively reduced.

26.     Giesick provided a document entitled "Discount Addition/Change Form." Giesick explained that this document was generated by a Pilot Regional Account Representative based on information provided from a Pilot Regional Sales Manager. This document appeared to memorialize an agreed upon diesel discount deal between Pilot and a Customer.

27.     On November 1, 2012, Giesick voluntarily submitted to an interview at the United States Attorney's Office in Fort Worth, Texas. Giesick explained that Pilot used Sales Force which is a cloud-based account management program that she accessed through www.salesforce.com using a username and password. Giesick advised that at the time that Giesick transferred from Mosher's sales region to Greco's sales region, Mosher asked Giesick to input into Sales Force what rebate deals her customers were supposed to receive and what they actually were receiving. Giesick entered that information into Sales Force as requested.

28.     Giesick further explained that Jones told her that after she cut a Customer's rebate as directed by Mosher, Jones would manufacture back-up data to support the reduced rebate amount.

29.     Giesick explained Mosher taught that if a Customer caught that she was deceptively cutting a Rebate Amount, Giesick should blame the error on a computer glitch.

30.     Giesick explained that Greco required that his team generate letters to customers outlining the terms of diesel discount deals with Customers, while Mosher did his deals on a handshake, and once Mosher finalized his diesel discount deal with a Customer, Mosher

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

informed Jones about the deal by way of e-mail or a telephone call. According to Giesick, Jones kept her e-mails from Mosher in a "Brian" folder.

31. Giesick also stated that when she first transferred to Greco's sales region, Giesick asked Greco about manual rebates, and Greco told Giesick that Crutchman handled Manual Rebates.

32. On December 18, 2012, Giesick voluntarily submitted to an interview again at the United States Attorney's Office in Fort Worth, Texas. Giesick advised she told Mosher that rebate reduction activities were not right. Mosher told her that it was okay to do because the Customers did not know what they were getting. Giesick admitted that eventually she began to deceptively cut rebates herself by cutting rebates on the spreadsheet that Jones provided and sending the spreadsheet back to Jones. Giesick also advised that Jones made deceptive rebate cuts on spreadsheets and sent them to Mosher for approval.

33. Giesick further advised that during the time that she worked under Mosher's supervision, she generally memorialized a discount deal with an e-mail and sent a copy to Jones for Jones to input the deal into the computer.

34. Giesick advised that Mosher worked out of his home in Iowa.

35. Since October 4, 2012, CHS-2 has met and communicated with your affiant and other federal law enforcement agents on multiple occasions.

36. CHS-2, who, as noted above is a Pilot Regional Director of Sales, provided the meaning for the terms Direct Billed Customer, Funded/Restricted Customer, and Rebate Amount set forth above. CHS-2 also explained the various titles and organizational structure for the current Pilot employees listed above. CHS-2 has explained that a letter memorializing the diesel

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

price discount agreement between Pilot and the Customer should exist for each of his Customers. CHS-2 has also explained that he receives packages addressed to him from Pilot's Knoxville, Tennessee headquarters at his remote office location in Bedford, Texas, by way of commercial carrier, that include these letter agreements for the Customers that are managed by his regional sales team.

37.     CHS-2 explained that the Rebate Fraud at Pilot is not limited to Funded/Restricted Customers, but also reaches Direct Billed Customers. Some Direct Billed Customers choose to receive their price discount by way of a monthly rebate check in lieu of a credit on the periodic invoices they receive. For those Direct Billed Customers, the Rebate Fraud is executed by deceptively reducing the monthly rebate check. For Direct Billed Customers who have their price discount applied as a credit at the time of periodic invoicing, the Rebate Fraud is executed by a Pilot employee deceptively directing a change to the price discount without the Direct Billed Customer's knowledge or approval and waiting to see if that Customer ever notices that it did not receive the full discount credit on its subsequent periodic invoices.

38.     CHS-2 confirmed that Customer rebate checks are generally sent from Pilot headquarters in Knoxville, Tennessee.

39.     CHS-2 advised that Rebate Fraud has been occurring at Pilot for more than five years. CHS-2 admitted that approximately eight years ago, he and Crutchman executed the Rebate Fraud scheme against Mesilla Valley Trucking for about two years. CHS-2 stopped once Messilla became a Direct Billed Customer and obtained optimizing software that enabled it to better track the rebates it was due.

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

40.     CHS-2 stated that an example of Rebate Fraud directed at a Direct Billed Customer occurred during the week September 24, 2012 when Vice President of Sales John Freeman directed Regional Sales Manager Kevin Clark, in CHS-2's presence, to change Direct Billed Customer Schrock Trucking's price discount without alerting Schrock Trucking, and to just wait and see if Schrock Trucking catches it. Later in October 2012, Freeman told CHS-2 that if Clark was uncomfortable with changing Shrock's discount he did not have to do it.

41.     After Giesick transferred to CHS-2's region and supervision, Giesick advised CHS-2 that Mosher had been engaging in Rebate Fraud with many of her Customer accounts. Giesick also advised CHS-2 that Crutchman at that time maintained a spreadsheet of the Rebate Fraud affected accounts. Giesick asked CHS-2 how he wanted to handle the rebates. CHS-2 advised investigative agents that he ignored Giesick's question and asked Crutchman to forward him the spreadsheet. Crutchman forwarded the spreadsheet by commercial carrier in a package addressed to CHS-2 at CHS-2's remote office.

42.     CHS-2 advised that he receives weekly packages that are shipped to him by commercial carrier and addressed to him at the location where he works remotely for Pilot. These weekly packages usually contain a current list of Pilot Funded/Restricted Customers.

43.     CHS-2 advised investigative agents that Pilot generates a monthly profitability report that CHS-2 receives each month by e-mail from Vickie Borden. The profitability report ranks Pilot's sales representatives by their profitability. The profitability report was requested by Haslam to be sent monthly beginning in July 2007. CHS-2 advised that he has saved all of these reports in his e-mail files on his computer. CHS-2 further advised a Pilot employee's

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

participation in Rebate Fraud will directly affect his profitability ranking, in that the greater the Rebate Amount is reduced, the greater the profit to Pilot for the affected Customer.

44. CHS-2 also advised that Pilot generates monthly Profit & Loss Statements, referred to internally as a P&L statements, related to all the Funded/Restricted Customer accounts and the Direct Billed Customer accounts.

45. Based on my training and experience in financial crimes investigations, the above-described P&L statements will likely assist in determining the extent by which Pilot benefitted from the Rebate Fraud, and will likely assist in defining the universe of potential Customer victims of the Rebate Fraud.

46. CHS-2 explained that Pilot issued him a new laptop in approximately Spring 2012. CHS-2 stated that he has received a number of replacement laptop computers from Pilot over the years of his employment, and each time, including the most recent Spring 2012 replacement, Pilot has sent CHS-2 his new laptop with all of his preexisting data already loaded and saved on the new computer. CHS-2 has advised that his Pilot-issued laptop remotely connects to a Pilot server to send and receive e-mails among Pilot employees.

47. In 2012, after a Pilot corporate reorganization, Mosher changed positions and many of the Customer accounts he was overseeing were transferred to CHS-2 and to the sales representatives under CHS-2's supervision. One of those accounts was Morehouse Truckline. In June 2012, Morehouse Truckline discovered that it had been shorted, over a period of seven years, rebates totaling $146,564.55 arising from 4,187,558.44 gallons of diesel fuel purchased from Pilot. Morehouse Truckline complained about the shorted rebates and requested a check in the amount of the shortfall from Pilot. CHS-2 was copied on e-mails related to the Morehouse

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

Trucking complaint, but at that time did not know how the complaint had been resolved, because it was Mosher's problem.

48. After Mosher's position changed in Pilot in 2012, CHS-2's sales team also absorbed employees Heather Jones and Rob Yuronich. After Yuronich transferred to CHS-2's supervision, in approximately August 2012, Yuronich advised CHS-2 that Mosher had been engaging in Rebate Fraud with many of his customers. Yuronich advised CHS-2 that Mosher usually told Jones how to reduce the Rebate Amount. Yuronich asked CHS-2 how CHS-2 wanted to handle the rebate reductions now that Yuronich was under CHS-2's supervision. CHS-2 told Yuronich that he did not participate in the rebate reduction activity, but asked Yuronich to send him whatever document Yuronich was talking about during their discussion. Jones, apparently at the instruction of Yuronich, sent a page from a spreadsheet by commercial carrier to CHS-2 related to Yuronich's customers affected by Rebate Fraud. CHS-2 ignored Yuronich and never responded to his question after he received the spreadsheet from Jones. Later, Yuronich told CHS-2 that Yuronich and Jones took care of it, meaning the Rebate Fraud decisions that Yuronich had previously raised.

49. On October 17, 2012, the following conversation between CHS-2 and Rob Yuronich was consensually recorded in or about Lakeville, Minnesota:

**CHS-2**: Right. You know something you might want to be prepared, and I don't know for sure but I mean… John, I don't know how much of the manual rebate stuff he does. I think he does, he kinda encourages that or change in prices you know.
**YURONICH**: He's on that, that school of thought where you can ..
**CHS-2**: Yeah. What I mean, […] you seem uncomfortable talking about it, and I you know, admire what you said, you don't, know, like doing that, but I need to understand what Brian was doing and how he was doing it.
**YURONICH**: Well there wasn't any rhyme or reason you know. His first and foremost, his thought process was, was that he felt honestly that, that somebody doesn't know and isn't smart enough to know what their deal is and checking it and follow up, should I be

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

really be giving them the uh, the deal if I had to. You know if you asked me that question I tell you "yeah you should" because that's (unintelligible, hereinafter "UI").

**CHS-2**: I agree with you. I'm not, trust me, I'm not encouraging you to do that.

**YURONICH**: The other thing is that you will eventually get caught. Somebody's gonna hook you up on it, whether it's a competitor or a fuel card, and I'm more worried about a fuel card.

**CHS-2**: Right. Right.

**YURONICH**: Showing you're wrong on that.

**CHS-2**: How does he, what does he do when it does come up?

**YURONICH**: He'll blame it on, "oh we made this mistake and that mistake," or whatever, and we'll make it right with you, sorry about that.

**CHS-2**: Has he gotten caught very often?

**YURONICH**: Well didn't he get caught with some big guy down in Iowa just recently?
**CHS-2**: Oh did he?

**YURONICH**: Yeah

**CHS-2**: What that like last week?

**YURONICH**: Whe, well when he was traveling with me he told that he was fixing, had to fix an issue, had to take some time to go and handle this issue with (UI) that he had. When he told me about it, it was a customer who uh, I don't know if was uh Kevin Clark or whatever.

**CHS-2**: Morehouse

**YURONICH**: Was that the customer?

**CHS-2**: Yeah, Kevin, yeah.

**YURONICH**: And uh that was a deal where he lied to the customer. He got caught, and I don't want that to happen with these accounts that we're switching over and that we had and stuff like that. And you know that the thing is, and not a knock on me, but I can't tell lies 'cause I'm not smart enough to keep them straight. So you always stay in the ... always say what it is you don't have to worry about it. I always want to have a good time.

**CHS-2**: Right

**YURONICH**: You know if, if we're not making the right amount of revenue that we should make then uh, we got to adjust our deals.

**CHS-2**: Right

**YURONICH**: And do business that way. But uh, you know when he would do the rebates he'd say see you know I just put forty thousand dollars more in your, in your, on your P & L, it's what you get paid by, so.

**CHS-2**: So he would have Heather collect the accounts ...kinda... because you've got a spreadsheet

**YURONICH**: Yeah that's, I actually sent it to you tonight, so.

**CHS-2**: Oh, I never saw it

**YURONICH**: You probably did (UI) I'm going to, it's one of those things that's on my list to do for you tonight, but so here's your accounts these are all on your manual rebates. You need to go thru and (UI) ok this one's good, this one's good, well this wasn't eighteen thousand make it fifteen thousand. This one's hundred and twelve

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

thousand, make it ninety thousand. And you go down thru and just do that, then some (UI) say you will change this, 'cause uh you know they're watching it. They're, they know they know what OPIS is and they use an optimizer. You know they can't do that with an optimizer.

**CHS-2**: Right

**YURONICH**: What have you, (UI) um then at the end you, (UI) say send it in, and you'd use round figures, and Heather would adjust it to make it look like you know, instead of fifteen thousand, fifteen thousand two hundred dollars fifty eight cents.

**CHS-2**: But Heather keeps that spreadsheet and sends it to uh you now?

**YURONICH**: Right look at ..

**CHS-2**: Man I think Cathy told me one time he had like seventy accounts or he ever tell you how many he had just total?

**YURONICH**: Not that I mean what I have I've got seven or eight, but uh I'm just a small piece of what he was doing could very well could be, I mean he always felt if you could sell somebody the manual rebate before you do a off-invoice reflecting.

**CHS-2**: Um

**YURONICH**: So do it that way

**CHS-2**: Yeah. I mean I managing this now so I need to understand..

**YURONICH**: Oh sure and your butt's in the kettle with mine, you know.

**CHS-2**: Exactly, exactly you know.

**YURONICH**: My uncomfortableness is, is just the mere fact, that I just I don't see it unethical, because I get it a little bit. So I wouldn't say it's unethical. I'm just uncomfortable with it, and the fact that when you get caught you have to do so much back peddling, you lose you lose a ton of credibility whether you can cover it with a story or not. It's hard to operate that way.

**CHS-2**: Yeah

**YURONICH**: I always, I go with whatever place calls. I know where my check comes from. (laughing)

**CHS-2**: Right, right.

**YURONICH**: Sometimes you have to do the things that are uncomfortable as well.

\*\*\*

**YURONICH**: (UI) there's so much that I'm still wrapping my head around, but I don't want to do anything that's outside of what the norm normal program should be, and I can't get that creative until I learn more as well but..

**CHS-2**: I'm not encouraging you to do that.

**YURONICH**: Nope.

**CHS-2**: I don't know, I don't know for sure what John Freeman's feel is on it, and you know, I'm still making sure I'm in my comfort zone with John so you know how to play that.

**YURONICH**: Yep.

**CHS-2**: I mean and you know so..

**YURONICH**: He's uh he's the overall boss [CHS-2 name], so if he condones that, wants it done that way, when the shit hits the fan he can't come back on us.

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

**CHS-2**: Right and then again all these are checks sent from us, the manual rebates?

**YURONICH**: Yep.

**CHS-2**: Cause I didn't think we'd wire anything or..

**YURONICH**: No it's all?

**CHS-2**: It's all a physical check?

**YURONICH**: Physical check.

**CHS-2**: Interesting. And I'm just curious how much Brian is doing now. Well, because you know we all get, we all get graded on our profitability

**YURONICH**: Right

**CHS-2**: And that's in the P&L right?

**YURONICH**: Yeah, it is, because your rebates are taken out and so if you add you know one hundred and ten thousand dollars worth of rebates and you've saved yourself fifty thousand dollars.

**CHS-2**: But we've built a column into the P&L for manual rebate amount so the actual that we physically paid the account not what they were due

**YURONICH**: Right

**CHS-2**: Is in the P&L?

**YURONICH**: Yep, it is, that is that I did verify cause (UI) just curious how it all reflected on the rebates, cause it was just a little while ago that we started see that in the P&L. Cause I had never seen that and then they started reflecting the manual rebates in the P&Ls. That was like five months ago.

**CHS-2**: Yeah, yeah.

**YURONICH**: (UI) they weren't in there before

**CHS-2**: Right. Now you said you don't have any notes of the discounts that they're supposed to get?

**YURONICH**: Not unless I wrote them. I mean sometimes there's uh there's, there's no formal, uh, there's no formal, a lot of these account there's no formal letter of proposal and I totally get why we're doing it. And why you want me to do it, one, its good practice, it's a contract between you and me as a customer first and foremost but also there's a paper trail and I can tell you, you know like that deal I'll show you that one deal (UI) Road Ready (UI)? It's just a fucking note that he made what the hell does that mean?

\*\*\*

**CHS-2**: What is Heather say when you talk about this stuff?

**YURONICH**: She would so much, she just wants it to be what it supposed to be. If we're giving the guy this, then that's what it should be worth. She doesn't like uh the playing games with it and ...

**CHS-2**: She ever talk about their any, 'cause all the other sales reps are doing it, right? Don't they have a big, what's that?

**YURONICH**: I think so, yes.

**CHS-2**: She never talks about that though, uh. Cause I'm curious I need to talk to Karen about whether or not she needs to be doing any of that or ..

\*\*\*\*

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

**CHS-2**: Brian gave you no files, paper files?

**YURONICH**: He never kept a fuckin' note one.

**CHS-2**: He didn't?

**YURONICH**: No, not on any of his accounts. Well, look at H.O. Molding here?

**CHS-2**: Well Heather has to know what the deals are supposed to be though, right?

**YURONICH**: Yeah, I mean sometimes she's got, ah, a "Brian" folder and her deal where she'll fold it over and put in here.

**CHS-2**: So she knows what the deal supposed to be, right? 'Cause that what it, that's how she comes up with the number, and then, you go back in..

**YURONICH**: Wait, yeah..

**CHS-2**: So she knows what the deals are.

**YURONICH**: Right, for the manual stuff, and that, yeah.

**CHS-2**: So something must have. I mean, Brian must have told her what they were supposed to be at one point

**YURONICH**: Um, they are in the system, I mean, so let's say we are giving a guy cost plus 5, retail minus five, and on a manual rebate

**CHS-2**: Right

**YURONICH**: So, you know with some of them reflecting , uh retail minus five and we take the difference out of the cost plus five, uh

**CHS-2**: So they are getting retail minus five?

**YURONICH**: On the front side, and then you then you subtract that from

**CHS-2**: And they're set as reflected funding or they could be doing this as direct bill

**YURONICH**: They could be doing this as direct bill

**CHS-2**: Oh, then we'll tell them we are going to go back in and do a month end average or..

**YURONICH**: Or a cost plus five, monthly average.

**CHS-2**: Of all the business, not just the actual.

**YURONICH**: Less his five cent rebate he already got, and, and, that's the stuff that drives her nuts ...so, well, any way, he said, I don't make notes and, uh, on sales reports.

**CHS-2**: Why is that?

**YURONICH**: I have no idea.

**CHS-2**: Well, he's got to create a trip report, right?

**YURONICH**: No, he doesn't do any of it.

**CHS-2**: Yeah he did

**YURONICH**: Here's H.O. Molding, there aint a trip report written up.

\*\*\*

**YURONICH**: No, but he's, well, he will say that, 'I don't do any of those', 'cause I will always say you know, 'What's your history on this account is it here?' I've never done

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

that before, I don't do that. But Heather will do a job of a keeping some notes and attachments. She does a pretty good job of keeping that but there's some stuff from Cathy's era and stuff like that that's not in here. ...

50. Consistent with what Yuronich told CHS-2 on October 17, 2012 during the recorded conversation, CHS-2 advised investigative agents that Yuronich indeed sent CHS-2 via e-mail a copy of the spreadsheet maintained by Jones that contains information related to Yuronich's Customer accounts affected by Rebate Fraud.

51. On October 17, 2012, CHS-2 advised that Regional Account Representative Lexi Holden at that time provided support to Mosher, and that Regional Account Representative Katy Bibee at that time provided support to John Freeman.

52. On or about October 23, 2012, CHS-2 traveled to Knoxville, Tennessee for the purpose of visiting Pilot's headquarters and attending a meeting for Pilot Regional Directors at John Freeman's lake house on October 25, 2012.

53. On October 23, 2012, CHS-2 had dinner with Karen Crutchman at a Knoxville, Tennessee restaurant, and the following conversation was consensually recorded:

> **CHS-2**: You know we were in, uh, I was riding with John, and Kevin Clark called me about Shrock Trucking.
> **CRUTCHMAN**: Oh, that was..that's on the agenda. What about Shrock Trucking? Something about relationships?
> **CHS-2**: Well, Ben was out with Todd Wilson.
> **CRUTCHMAN**: Umm hmm.
> **CHS-2**: And they came in and offered some stupid discounts. Uh, like in Oklahoma City all across forty and forty-four.
> **CRUTCHMAN**: Right, right.
> **CHS-2**: And basically what John said was..I mean on the phone, I was on the phone on the phone, on my speaker phone in my car in Seattle, was we'll match the discounts in certain places and then after about three or four months, change the discounts in some other places and hope they don't catch 'em.
> **CRUTCHMAN**: Right.

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

**CHS-2**: You know what I'm saying?

**CRUTCHMAN**: Right.

**CHS-2**: And Kev..I think Kevin was like, Wow! But I mean that's all John told them to do.

**CRUTCHMAN**: That's what we tell them to do all the time. Kevin knows that.

**CHS-2**: Yeah.

\*\*\*

**CHS-2**: You know something else that I haven't done a lot of, is the manual rebates and all that. I mean is that-

**CRUTCHMAN**: We can't do any cuts on our manual rebates. You know that. I told you that UI. Can't do it. Everyone wants a backup. You know Don Doak. I can't do anything with him.

**CHS-2**: Umm hmm.

**CRUTCHMAN**: We only had Don Doak, uh, now we have Bill Davis. He gets a backup. Um, any of..they all get backups. I can't do anything with those.

**CHS-2**: Well, that's good.

**CRUTCHMAN**: We don't have that many. Honestly, (snaps finger) we can get ours done like this and we have no...Ashley's the one that's got, uh, I know Scott and Kevin, and Kevin doesn't cut his very much, but I think Scott's getting to where he can't cut his very much now either, cause they're wanting backups, cause..

**CHS-2**: Umm hmm.

**CRUTCHMAN**: Cause Arabic companies are going in and saying, hey this ain't right. They're getting consultants in McDonald's.

**CHS-2**: McDonald's.

**CRUTCHMAN**: UI, you know we got Bob Joyner and all that shit. Like...

**CHS-2**: But I meant the rest of the guys, I mean doesn't..doesn't Katie keep track of... Well, I guess she's not UI.

**CRUTCHMAN**: You get UI, I send something in your packet every week. Which is on your rebate card.

**CHS-2**: Right, but I don't know what's getting..if there's any difference from what they're suppose to get versus what they get.

**CRUTCHMAN**: We don't cut any. The only one we..we don't, we don't cut any. We can't.

**CHS-2**: Well I mean I went through with uh...

**CRUTCHMAN**: And we don't have that many.

**CHS-2**: Rob Yuronich. I didn't realize..

**CRUTCHMAN**: For ABC?

**CHS-2**: I didn't realize how many that Brian was doing that he inherited. So now I understand how that's doing..

**CRUTCHMAN**: For Rob?

**CHS-2**: Rob, that Brian was doing. But then again I don't know if that's been held against us that we weren't smart enough to do that.

**CRUTCHMAN**: It wasn't that we weren't, we did. We got busted is what it was.

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

**CHS-2**: Yeah.

**CRUTCHMAN**: We got busted on all of our..

**CHS-2**: Umm hmm.

**CRUTCHMAN**: It's, the thing is, if you can get by with a twenty truck fleet with these one-fifty's. You know between a..a like a seventy to a two hundred and fifty truck fleet. You can't get..you can't do that.

**CHS-2**: Umm hmm.

**CRUTCHMAN**: If you can, they're stupid.

**CHS-2**: Right.

**CRUTCHMAN**: Or they're just holding the rebate and they don't give a shit.

**CHS-2**: Remember they used to like joke around about that at sales meetings and stuff.

**CRUTCHMAN**: It ain't that. It's…honestly it holds up commissions. We have to worry about it and…

**CHS-2**: But I mean we're not…

**CRUTCHMAN**: Brian is the only one that used to do it. And I honestly, I don't know how long that's going to survive in today's time, um, with the price of fuel is. Somebody's going to catch on sooner or later. And, and, do you know what's happening now? Is they're coming back and they're going, Oh, you owe me six months of…

**CHS-2**: Are they getting guys getting caught?

**CRUTCHMAN**: Oh, yeah.

**CHS-2**: I know when I was in Vegas, Brian was saying he got busted with some big one.

**CRUTCHMAN**: Yep.

**CHS-2**: What do they normally just…what do they normally tell them?

**CRUTCHMAN**: They say, oh it's the UI. I've told them, like sorry, it was a computer glitch. I'll fix it.

**CHS-2**: Yeah, that's what Cathy did, because she told me that Brian.

**CRUTCHMAN**: She was at the UI.

**CHS-2**: Brian told her to do it. And she..

**CRUTCHMAN**: Yeah.

**CHS-2**: She told me that he had like sixty-eight accounts. That's crazy. But I mean John…John used to do a bunch of that, too and Jay.

**CRUTCHMAN**: Yeah, and got busted. Western Express is the biggest one. They had to pay over six hundred or…no, it's probably more than that. Probably like over a million dollars UI account. Yeah, remember when they made them do that?

**CHS-2**: Oh, yeah.

**CRUTCHMAN**: They were fucking them big time.

**CHS-2**: But they're not still doing that now?

**CRUTCHMAN**: No, no, they can't.

**CHS-2**: But, I mean, in other accounts.

**CRUTCHMAN**: I don't think so, don't think so. They are on the phone, but they're going to get caught. Just like Katy used to say, "Oh, I just had to calculate something that was…it's going to cost us uh…we're going to have to pay back, probably about eighty-thousand dollars." Just the other day. Oh yeah. See, they're…everybody's getting caught. That's what I'm saying. Be straight up in all of it.

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

**CHS-2**: Yeah, I mean that's why I've always..

**CRUTCHMAN**: paying..

**CHS-2**: Right.

**CRUTCHMAN**: And we did. But our guys were just..they just wanted backup. They're like, hey we want to know what we're getting paid.

**CHS-2**: Umm hmm.

**CRUTCHMAN**: And I'm like you get it on a daily basis. They said no, we want it monthly, know what our rebates are going to be, because I think they apply it to their cash to their company.

**CHS-2**: Right.

**CRUTCHMAN**: So, they want to know what it's going to be, cause they want that before their check gets there. They want to know how much it cost.

**CHS-2**: Well, who..who keeps track of it all?

**CRUTCHMAN**: We do.

**CHS-2**: Because when I was talking to Rob…

**CRUTCHMAN**: We got a spreadsheet. I got a spreadsheet.

**CHS-2**: But everybody keeps a spreadsheet on the…

**CRUTCHMAN**: I don't know. Everybody does their own thing.

**CHS-2**: Yeah. Cause I remember you sent me Cathy's.

**CRUTCHMAN**: Umm hmm.

**CHS-2**: And you sent it to...to portal or something, and that's where…

**CRUTCHMAN**: That's all everything, yeah. Whatever goes in there is what gets…gets on your commission and you get that on your P and L now. It comes on your P and L now.

**CHS-2**: Alright, I just didn't know if...

**CRUTCHMAN**: Now, Rob's...I don't much about, cause I don't have that…

**CHS-2**: No, I'm not asking you…I just didn't know…

**CRUTCHMAN**: I don't know. I like Rob. I like him. I hope he's...

**CHS-2**: He's a good guy. He's very uncomfortable with it.

**CRUTCHMAN**: I know he is. He's a good guy.

**CHS-2**: Yeah.

**CRUTCHMAN**: He's like Karen, hey I got caught on the rebate. What can I do? And so, I went ahead and did a check request for him.

**CHS-2**: When did he get caught?

**CRUTCHMAN**: When you were with him. When you were all UI state. On uh, Folk..Folks Trucking.

**CHS-2**: Oh really?

**CRUTCHMAN**: Oh yeah.

**CHS-2**: He never told me.

**CRUTCHMAN**: Yeah.

**CHS-2**: Shit.

**CRUTCHMAN**: Yeah, he got caught.

**CHS-2**: Like I said, we were in Vegas..

**CRUTCHMAN**: UI he said what do I..he said what do you all..I said oh, you got caught

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

didn't you? He said, yeah. I said, what did you say to him? He goes well I didn't know really what to say. I said, well baby let me tell you, here's what to say. And I told him. He said, well thanks Karen. I said well…

**CHS-2**: He's a good guy.

**CRUTCHMAN**: He is and goes thanks for letting me know. He said I could really get in a tight spot.

**CHS-2**: Yeah.

**CRUTCHMAN**: I just thought you knew, that you were with him. I should have told you that day.

**CHS-2**: When was it? What day?

**CRUTCHMAN**: Um, Thursday.
\*\*\*

**CRUTCHMAN**: …. And I did that on Friday. I did the check request for him on Friday. I sent him the same…the paperwork, cause the customer wanted…I remember now. I'm sorry, I'm thinking of something else. No, this was…it wasn't the rebate. His customer, he'd just got one signed up on direct bill and they didn't have discounts, Folks Trucking. And he goes Karen, how's this work out and explained to him. And I said, well, I…we can't do anything before his billing, but here are the price fetches. Send it to the customer and have him fill out the information in it. That's what it was, it wasn't about the rebate. I'm sorry.
\*\*\*

**CHS-2**: A..Again, I'm trying to figure out how John operates, and what he's expecting. And…you know I sense the profit stuff and besides Roger, I mean is he expecting us to try and change stuff to the customer on the…

**CRUTCHMAN**: By customer, by customer, by customer.

**CHS-2**: Without telling the customer?

**CRUTCHMAN**: I don't know about that. Probably so.

**CHS-2**: Cause like Shrock Trucking. He flat out told Kevin…

**CRUTCHMAN**: Just change it.

**CHS-2**: Just get them going. We'll get the new discount, where you got to lower it in Oklahoma City and then after a few weeks…

**CRUTCHMAN**: Pull it back.

**CHS-2**: No, go change some of their other discounts, cause he's going to be watching that.

**CRUTCHMAN**: Right.

**CHS-2**: And I didn't know how much of that was going on. And I mean, are we looking like dumb asses?

**CRUTCHMAN**: They don't tell it…No, they don't tell them. They don't tell…he never told them. Then they get caught and they have to go back and repay it. So, it makes more work for us to do it. It makes more work for us.

**CHS-2**: Umm hmm. But they're doing it on direct bill, now. They're doing it more on direct bill.

**CRUTCHMAN**: And John has not been on direct bill. He hates direct bill.

**CHS-2**: Why?

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

**CRUTCHMAN**: I don't know.

**CHS-2**: I think it's because he wants to do more manual rebates.

**CRUTCHMAN**: Yeah.

**CHS-2**: And be able to…

**CRUTCHMAN**: But he thinks he can fuck somebody.

**CHS-2**: Right. Cause he's told me a hundred times.

**CRUTCHMAN**: Yeah.

**CHS-2**: Why do you always have to go sell direct?

**CRUTCHMAN**: Yeah, ha…

**CHS-2**: All your guys, all they want to do is sell direct bill. You need to move them to funded if you can.

\*\*\*

**CRUTCHMAN**: Yeah. So, now it's completely fucking different.

**CHS-2**: And..and that's because John thinks he can monkey with the..

**CRUTCHMAN**: Finagle. Right.

**CHS-2**: Monkey with the discounts.

**CRUTCHMAN**: And you can't. You can't. You know what it does? It makes more work for us.

**CHS-2**: Right.

**CRUTCHMAN**: Inside. And then it makes us look like were fucking the customer when they really find it out. They're like, we trusted you, you know.

**CHS-2**: Yeah. So who's doing all John's old accounts that he was doing nothing with?

**CRUTCHMAN**: I think Katy and Holly are still doing them.

**CHS-2**: So, Katy keeps a list?

**CRUTCHMAN**: And Campbell.

\*\*\*

**CHS-2**: And she knows what's going on now? As far as the manual rebates?

**CRUTCHMAN**: Naw, she's…not yet. Not yet.

**CHS-2**: So, Holly's still doing it?

**CRUTCHMAN**: Yeah

**CHS-2**: Cause Katy's not doing anymore manual rebates.

**CRUTCHMAN**: No, Katy does. Katy and Holly does still work on them a lot. They...they still work together. They're...they're like a tag team. See Holly going to take up Katy's slack when she goes on maternity leave. I don't know how, but…

\* \* \*

**CHS-2**: Well, again if you think we need to try to monkey with…with discounts more to get ahead.

**CRUTCHMAN**: No, we can't. We can't. I mean we can...if you want to on the manual rebates...that's fine. I'm the one that's going to have to...

**CHS-2**: No, I'm not saying we should. I don't think we should at all. I just didn't know if John was expecting that or…

**CRUTCHMAN**: Well, um, no. What he...I think what he wants to do, is for your guys to mange P and L and say ok, here you go. You've got nobody's killing and ok, a thousand gallons or less. They're still getting that rebate. Get it out there. Why should

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

they get...be getting the cost plus two with a hundred gallons?

**CHS-2**: Right.

**CRUTCHMAN**: See what I'm saying?

**CHS-2**: Yeah.

**CRUTCHMAN**: That. I think that's what he's meaning. If we cut back that much for our whole territory, it's a lot of money, think about it...

**CHS-2**: And it should be. And I talk to my guys all the time about managing. I mean if the guys not doing the..but..

**CRUTCHMAN**: They're not doing it though.

\*\*\*

**CHS-2**: What John's wanting us to send letters out and do all that or just switch it?

**CRUTCHMAN**: No, he...he don't send letters.

**CHS-2**: Well, what does the customer say when he...takes...

**CRUTCHMAN**: He just pays it back if they... no, what you do is say, well you only did a hundred gallons there. How much did it save you? Two cents, or not even two cents a gallon, not a penny.

**CHS-2**: So, it's all the small stuff.

**CRUTCHMAN**: Right. I think, I think if we went..I think if we went through, and had our guys do all the work, like sort it through the profit and get rid of anything... Do that first and then go...then to have them look at the profit and see where we need to lower it. And then send letters out to the high, where it's really going to effect people.

\*\*\*

**CHS-2**: My point is I want to understand all the things John's done.

**CRUTCHMAN**: Well, you need to ask Ashley about that. About Kevin and Scott. Cause I don't know how they do it.

\*\*\*

**CHS-2**: I don't know, I just...you know like I said in those sale meetings...three, four years ago and I'd be running around with Mark and we'd be out bringing gallons in and Mark would be you know, it's low in the NOC, you don't realize how much that helps the whole company when you bring big gallons into a stop. And then John's over here, never above on quota, but more worried about profit.

**CRUTCHMAN**: But do you know why? Because none of his manual rebates hit the P and L until now.

**CHS-2**: What do you mean?

**CRUTCHMAN**: We just got it to where the manual rebates, all those manual restricted rebates that he was doing just started hitting the P and L now.

**CHS-2**: None of them? I mean as far as...

**CRUTCHMAN**: None of them.

**CHS-2**: whether it was the right..

**CRUTCHMAN**: None. Zero.

**CHS-2**: the right amount or the wrong amount?

**CRUTCHMAN**: Zero.

**CHS-2**: When he was cutting them?

**CRUTCHMAN**: As far as I knew.

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

**CHS-2**: Well, now there's a..

**CRUTCHMAN**: We were getting by with, yeah-

**CHS-2**: Well, now there's a manual rebate entry in the P and L for direct bill as well as restricted.

**CRUTCHMAN**: Umm hmm. Right. Right. Yeah. He did that for years and years.

**CHS-2**: And he was doing the bunch funded and then throwing out..

**CRUTCHMAN**: He never went direct bill. He never went direct bill.

**CHS-2**: So he could get more profit without his commission?

**CRUTCHMAN**: No, I don't think on his commission, but when he...when the report went to Jimmy, because they couldn't report it right. It went to Jimmy and oh yeah, I'm making this much money.

**CHS-2**: And that's before he cut the rebates.

**CRUTCHMAN**: No, he'd already cut the rebate. Cause we couldn't...we couldn't put it on the P and L.

\*\*\*

**CHS-2**: He was cooking the books pretty good?

**CRUTCHMAN**: Oh yeah.

**CHS-2**: And why wasn't Jimmy smart enough to figure that out?

**CRUTCHMAN**: Does he care?

**CHS-2**: What?

**CRUTCHMAN**: He just wants numbers.

**CHS-2**: But he knew Jim...and John was monkeying with the rebates.

**CRUTCHMAN**: He don't know anything about our business.

**CHS-2**: Well, he knew about Western, cause I remember sitting in sales meetings.

**CRUTCHMAN**: Western, because it got called out because of Knight. That's the only reason. He didn't know about the others. I'm telling...

**CHS-2**: So did I get blamed for the Knight finding out or...?

**CRUTCHMAN**: Maybe. I don't know. Never heard. Oh yeah, Knight, that's Knight. Oh, you all giving them this kind of discount. Oh yeah I heard, you didn't hear it, I heard it.

54. On October 24, 2012, CHS-2 visited Pilot headquarters which is located within an office park named "Pilot Park" off Lonas Road in Knoxville. Exhibit G to this affidavit includes a photograph of the Pilot Park building directory sign at the entrance of the office park and an aerial photograph of the office park with each building labeled.

55. Law enforcement surveillance of Pilot Park has determined that Pilot Park consists of three buildings with the following street addresses: 5500 Lonas Drive, Knoxville, TN

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

(hereinafter "the 5500 Lonas Drive Property"); 5508 Lonas Drive, Knoxville, TN (hereinafter "the 5508 Lonas Drive Property"), 5516 Lonas Drive, Knoxville, TN (hereinafter "the 5516 Lonas Drive Property").

56.     On October 24, 2012, while inside the 5508 Lonas Drive Property, CHS-2 stated that he observed Senior National Account Manager Wendy Hamilton electronically scanning documents and then shredding the documents in her office which is located on the top floor of the 5508 Lonas Drive Property.

57.     On October 24, 2012, after visiting the 5508 Lonas Drive Property, CHS-2 visited the 5500 Lonas Drive Property. While inside the 5500 Lonas Drive Property, CHS-2 met with Lori McFarland, whose title at Pilot is Discount Coordinator. CHS-2 met McFarland at her work station cubicle inside the 5500 Lonas Drive Property. During that consensually recorded conversation, McFarland explained the process by which discounts are entered, stored, and changed in Pilot's various software and database systems for discount and billing management. She also explained the process by which information is electronically forwarded to Pilot's Regional Account Representatives so that they can be aware of diesel pricing information, and so that rebates can be adjusted by them. Additionally, McFarland indicated that some Pilot sales personnel, including Freeman and Ralenkotter have changed discount deals without a Customer's knowledge:

> **CHS-2**: Okay, if you don't mind, explain to me, like, I mean, I've always let Karen take care of everything and I don't understand how, you know, the ins and the outs of our system, so we produce the discount sheets.
> **MCFARLAND**: Mmmhmm. And, …
> **CHS-2**: And then you go into the billing system and…
> **MCFARLAND**: …and set it all up.
> **CHS-2**: …and set it all up.

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

**MCFARLAND**: Mmmhmm. Um, this one is one that I just did for, uh, John, that's for Canada.

**CHS-2**: Mmmhmm.

**MCFARLAND**: We have different companies that tell whether it's U. S. or Canada.

**CHS-2**: Mmmhmm.

**MCFARLAND**: And then we can tell it like how we want to price it, um, that's where we put the (UI) choose OPIS or access or whatever.

**CHS-2**: Mmmhmm.

**MCFARLAND**: And then we just (UI) the site and tell it what pump fee we want to give it, um, or what freight rate or whatever and the effective date, end date, um, this is like the pricing screen, but we also have like a discount screen for retail minus if they have a retail minus deal, a rebate screen for if they get a rebate and, um, but yeah, that's pretty much, they, they give you all the information on the discount form and then I plug it all into the system depending on, you know, if it's U.S. or Canada, global, site specific, whatever kind of deal that they have.

**CHS-2**: And then if we want to change any of the components, we can do that as well?

**MCFARLAND**: UhHuh. Um, you can do, we can do freight exceptions on the account level and then we have what's called reference site pricing where I can tell it, you know, for this company, you need to pull off of the different rack for this location.

**CHS-2**: Mmmhmm.

**MCFARLAND**: And, it's only for that particular company.

**CHS-2**: And this is all in Ascend, is that?

**MCFARLAND**: Mmmhmm. This is Ascend.

**CHS-2**: Okay.

**MCFARLAND**: That's the database that has all of, well, in any direct bill, all the direct bill this kind of information is in Ascend. The restricted side, um, we don't really have, of course, PRS calculates all that for us. But, we have a, a portal that they generate P&Ls from that the discounts are housed in...

**CHS-2**: Okay.

**MCFARLAND**: It is all, it all kind of fed from PRS, so they...

**CHS-2**: Do we tell PRS the discounts that the funded accounts we're supposed to get or do we...

**MCFARLAND**: Mmmhmm.

**CHS-2**: And then they calculate and tell us...

**MCFARLAND**: Mmmhmm.

**CHS-2**: ...what the rebates are supposed to be.

**MCFARLAND**: Yeah, like I have a, um, we have a spreadsheet that I send PRS, like this is, um, October and this is like where I tell her what the accounts are, um, if they're

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

to be or not, who the salesman is, two flag means they get a discount and one flag means we track it, if we need a text file, all that. She, she inputs all this information, Jean, into their system and they do all the calculations of all the rebates.

**CHS-2**: Mmmhmm.

**MCFARLAND**: And then, we actually, Pilot pays the discounts for the funded accounts, but it's not based on any calculations that we do, um, PRS does all the calculations, figures up all the rebates and then they send that file to our accounts payable department to be paid, um, I input the funded discounts in that database for the PNLs, you guys can kinda see the profitability based on the discount, but we don't actually calculate anything like we do in direct bill.

**CHS-2**: What do you mean, cal-, you mean...

**MCFARLAND**: Like for a direct bill account, we price everything, we handle all the accounts, but the funded side, PRS does it.

**CHS-2**: But, there's some direct bill accounts that we also do a manual rebate to based upon...

**MCFARLAND**: Yes. And that and we do handle that, um, PRS sends the text file up to the sales group and then they'll go in and use that in price fetch to calculate the manual rebate, so we drive those. It's just the strictly, you know, straight rebates, um, with no manual process involved that PRS handles.

**CHS-2**: Mmmhmm. Okay.

**MCFARLAND**: But, yes, Ascend does everything for direct bill.

**CHS-2**: So, on a direct bill, though, you know, every account that has any kind of a discount change, this form has to come in from somebody for you to...

**MCFARLAND**: Yes.

**CHS-2**: ... there's nobody else that can get in there and change discounts?

**MCFARLAND**: Um, no, and actually, really, the only other person that knows how to change discounts is Tanya when she's my backup.

**CHS-2**: Oh, okay.

**MCFARLAND**: Other than like, um, our IT people that are our support for Ascend, so no, it's really just me unless I'm out, then Tanya does it, but nobody, like Sales has access to Ascend for viewing, but they can't change anything in it, they don't have Read/Write access, so...

**CHS-2**: Yeah, I just want to, I mean 'cause I know I get these in my, in my Friday package and I follow what the guys do, but I just wanted to make sure that, you know, that's ...

**MCFARLAND**: Yeah, because they, you know, I have to know, you know, all of this and like if they want it reflected or not. The only way, this is the best way for me to have all of the information in one place, so that I can process each piece of it.

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

**CHS-2**: Is it a pain in the butt, I mean is it just like one or two locations to change the discount or (UI)?

**MCFARLAND**: No, what's a pain is when I get 'em that are like eight pages long, that have like 200 lo- or 300 locations on 'em that have different deals that I have to go in one at a time and change (laughs).

**CHS-2**: Mmm.

**MCFARLAND**: The global ones, the ones that are basically just kind of across the board, those are real easy to do and I don't know that I have any, these are just ones I'm waitin' on (UI) you know, I mean, these aren't that bad, but I mean, there are some of 'em that I get that I mean literally I have like, you know, six, seven, eight pages…

**CHS-2**: Geez.

**MCFARLAND**: …that, um, it's kind of painstaking to do. We do have a way that we can copy discounts and, which that helps, and like if somebody says, okay, I want all of Alabama, Tennessee, you know, North Carolina, whatever, then I can go ahead and pull them all over by state, so that's easier, but the global ones are definitely the easiest that are across the board for sure.

**CHS-2**: And then ComData gets sent the exact same discounts if requested or is that just an automatic?

**MCFARLAND**: If, if requested.

**CHS-2**: Okay.

**MCFARLAND**: Because sometimes we don't want to send them the deals and then so basically what I do is take this information, plug it into a spreadsheet for ComData that has their station codes on it and send that to them and they implement it, um, like for TCH and TCheck, we, um, we do that one price file.

**CHS-2**: Mmmhmm.

**MCFARLAND**: So, I don't actually have to communicate anything to them. I just go to our portal and click on the customer to add it to the price file and then whatever is in our system automatically goes to them. I don't have to communicate with them or send them a list of discounts.

**CHS-2**: But, you still gotta, uh, if it's a new account and it's going to a single price file, you still have to enter the discounts in like you do?

**MCFARLAND**: Oh, absolutely.

**CHS-2**: But, it would just go to them as a single end price?

**MCFARLAND**: Right. They don't, they don't know what the deals are. They just see the end price for each store.

**CHS-2**: Mmmhmm.

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

**MCFARLAND**: Well like ComData, I'll have to send them and say this location gets cost plus zero. ComData's in the know of everything right now. TCheck and TCH are not.

**CHS-2**: Mmmhmm.

**MCFARLAND**: There's the only difference. And, eventually, we'll get to where we're that way with ComData, but that's a Mark call. I think we're ready to do that now.

**CHS-2**: Yeah, I think we are too.

**MCFARLAND**: We do that with a few people now.

**CHS-2**: Mmmhmm.

**MCFARLAND**: Um, but Mark kinda said put the brakes on it. So, we'll just have to wait and see what he says on that, but that'll make it easier for us.

**CHS-2**: You said sometimes we don't want ComData to see it just 'cause they're (UI) or....

**MCFARLAND**: Um, sometimes it's like, um, well, I can show you. I've got a, the spreadsheet that I just updated for ComData for, um, whenever we open new stores, I have to send them our deals and like I have, um, and this is my little list here like, um, these customers we don't reflect their discount, um sometimes we reflect like one ID has a rebate, the rest of them have a discount to reflect, um, like sometimes, we only want to reflect cost minus, so I kinda have to keep up with what we, what we do and we don't and a lot of times, the reason they do that is for like owner/operators and stuff...

**CHS-2**: Mmmhmm.

**MCFARLAND**: ...like they want to get the full discount off of their invoice that they pay, but they don't want their owner/operators to see the discount on their ComData invoice, 'cause they have access to look at the ComData report...

**CHS-2**: And, and then they'll turn around and give owner/operators whatever discount...

**MCFARLAND**: A portion of it, yeah, not all of it, so, and we have a lot of that, um, so yeah, sometimes and sometimes we reflect something totally different. Like sometimes we tell, we have site specific deals but we tell ComData you just reflect retail minus three, but we're gonna have 'em like all over the board on our side and that gets really confusing when the customer calls and says, my ComData invoice doesn't match Pilot and we're goin' okay, why is that?

**CHS-2**: Is that mostly Brian, though?

**MCFARLAND**: Um, you know, Brian does it some, but it's really probably more, um, well John Freeman used to do a lot of it, but if you notice that he doesn't have accounts anymore. We don't have a ton of that, but we do have some. But, I would probably say like Hanscomb's team is probably the ones that have inherited the most of those.

**CHS-2**: Which were John's accounts?

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

**MCFARLAND**: Yeah, which were John's, yeah. And, that again, that may be, most of the time, it's what the customer requests, sometimes the sales person is kind of jackin' around with 'em ...

**CHS-2**: Mmmhmm.

**MCFARLAND**: ...and not wantin' 'em to know. I mean Arnie's done of that too, but for the most part, it's just that the customer's requested us to do that.

**CHS-2**: Just the customer, Arnie's not wanting the customer to know, reflected directly through ComData what the real discount is?

**MCFARLAND**: Yeah.

**CHS-2**: Yeah.

**MCFARLAND**: Sometimes. We don't have a lot of that.

**CHS-2**: Right.

**MCFARLAND**: But, we do have some, but primarily it's because of, the customer's come to us and said we don't want you to share all of that with ComData because are owner/operators, we don't want to pay them the whole discount, we only want to pay them a portion, we don't want them to know whatever, so we accommodate that, so...

**CHS-2**: Okay, cool. Like I've said, I've kind of always let Karen do all this and it helps me to understand and I thought I knew what you did and how, you know, it actually got to direct bill, but this helps a ton.

**MCFARLAND**: Yeah, it's, um, I mean, and I don't even really know if, if sales, inside group up the hill really understand the ins and outs of how it's set up, but they can come and go in and like, look at what deals are in there or they can download what deals are in there to send to the customer, whatever, I'm not sure that they really know the ins and outs of, you know, what, what a certain flag, what a certain flag mean or, you know, what, what this is versus this or whatever, but they kindof have a general idea of it, but uh...

58.     On October 25, 2012, CHS-2 attended a Pilot Regional Directors meeting at Vice

President of Sales John Freeman's lake house in the vicinity of Rockwood, Tennessee. CHS-2

consensually recorded this meeting. In attendance at this meeting, which began in the morning

and continued into the evening, were Pilot employees Ron Carter, John Freeman, Vincent Greco,

Kevin Hanscomb, Brian Mosher, Arnie Ralenkotter, and Scott Wombold. Pilot President Mark

Hazelwood arrived at Freeman's lake house at approximately 8:30pm on October 25, 2012.

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

59.    During this October 25, 2012 meeting, Freeman and Ralenkotter stressed the

importance of Pilot's Regional Account Managers creating "Trip Reports" within Pilot's

"SalesForce" software program that document what occurred during their sales calls with

customers.  Freeman confirmed that some Trip Reports are forwarded to Jimmy Haslam and

Mark Hazelwood, and Ralenkotter advised that through the Trip Reports Pilot's Regional

Account Representatives, referred to as "inside girls" can stay informed about Customer

developments:

> **FREEMAN:** Okay, on the trip reports. I think you could not ride with one of your sales
> guys for six months and you can glean from his trip reports how he's doing, what he's
> done, alright? And so, I think it is vitally important -- and I want Ron to hear this, I don't
> understand -- I think it's vitally important for you guys each week to not only read your
> guys' trip reports but to comment on specific accounts based on what you read.
> \*\*\*

> **FREEMAN:** And I'm fine with that, I don't have to see it but, you know, I've actually
> forwarded some of your all's trip reports and our guys' trip reports to Jimmy, or to Mark,
> when I've seen things that, "This is how it's supposed to friggin' work right here."

> **FREEMAN:** So, but the trip reports, the way I've advised everybody, do not write a trip
> report for us. Sales force is designed for you to make notes on your calls so that you can
> reference 'em the next time you go in, right? I mean, if you've got 250 guys, and you're
> seeing a guy, if you're not totally engaged with a guy doin' some business deal, shouldn't
> you be reviewing your notes in sales force to figure, okay, this is what we talked last
> time, you know?

> \*\*\*

> **RALENKOTTER:** Well, but the story here is, guys, you got to put this stuff in sales
> force. You know, I mean, you've got to put this, we need it in there. Janet needs to see
> what I put in there about the same account, the inside girls need to know what you're
> talkin' about.

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

60.     During this October 25, 2012 meeting, Freeman recognized that he and his

regional sales directors were shaping and leading the next generation of Pilot's diesel fuel

salespeople:

> **FREEMAN:** Okay. So, well, on the teaching part, guys, we are the knowledge, we're
> the elder statesmen, we have guys, our jobs have changed, so we have got to find out if
> we are great teachers. That is fuckin' part of it. That is, we've got to create the next
> generation. I'm sure we all think we're gonna be here the next X years but I don't have
> plans to (UI.) more years if we do not teach you new people the same thing, we just (UI.)
> tell the stories. That's how I taught Kevin, its how we've taught Chris. It's an osmosis, it's
> windshield time, and you just gotta tell the stories and you gotta teach. And this is, I
> think covers two big parts, gets our sales meeting, maybe a great idea for Mark and
> Jimmy so that they know we're gonna gauge these guys and then (UI)

61.     During the October 25, 2012, it was decided by Pilot's regional sales directors

that Brian Mosher would teach manual rebates to their subordinate regional account managers at

Pilot's annual sales meeting in November 2012:

> **FREEMAN:** ....So, you know, Jimmy [Haslam] is pushing us to have a teaching
> meeting, and I just said I don't think a setting, where you've got 80 fucking people in a
> room, you can do a lot of teaching.
> So, we've got a two-day meeting coming up on Monday and Tuesday, the Monday and
> Tuesday of Thanksgiving. This kind of conversation is exactly what we need to have,
> whether it's breakouts -- 'cause I know we kinda did a breakout last time, I know, I don't
> know, but we've gotta figure out a way -- go ahead.
> **STINNETT:** You break out to your team –
> **FREEMAN:** Maybe its Arnie takes OPIS and he takes something --
> **STINNETT:** That's what I would do.
> **FREEMAN:** -- and everybody goes to three. Arnie teaches three different sessions
> of –
> **STINNETT:** Whatever.
> **FREEMAN:** Whatever you've got, whatever your category is, they teach it.
> **STINNETT:** Whatever Brian's best thing is, he does. Whatever Kevin, Ron --
> **FREEMAN:** Manuel.-
> **MOSHER:** Manual rebates.
> **FREEMAN:** He never had to buy an airplane, so.... I had to buy an airplane one time to
> correct Manuel.

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

**STINNETT:** The best thing, too, is Brian speaks to the Vince's team, Arnie speaks, you know, and you rotate. These guys rotate to each region, you know, division, whatever you call it.

**FREEMAN:** Yeah. We have a room, and Brian teaches his deal and he teaches it three different times to three different groups, Vince does what he does, Arnie does what he does. Maybe that's a way that we can create more of an open discussion, you know, by teaching sessions.

\*\*\*

**STINNETT:** Yeah.

**FREEMAN:** Well, I don't disagree with that; I would like Brian to call about manual discounts. And understand now, Brian, I'm not tellin' you to teach people how to fuck up and buy an airplane like I did, [Group Laughter] but I think you gotta talk about the dynamics of the manual and what it means to the customer, what it means to us.

**STINNETT:** And manual versus off invoice.

**FREEMAN:** Yeah.

62.     After Hazelwood arrived to the October 25, 2012, meeting at approximately

8:30pm, Freeman and Stinnett sought approval from Hazelwood for their plans for breakout

sessions at the November annual sales meeting, including the plan for Mosher to teach a manual

rebates breakout session:

**STINNETT:** We actually talked about that today in our November sales meeting, do we breakout sections with teachin' and..

**FREEMAN:** Yeah, we're going, we would like to propose that in our meeting each of us is gonna take a category, whatever that category is, guys are gonna break out and then we're gonna go 30 minutes, 45 minutes, you're gonna know what the deal on that situation is. (noise) what all the categories are, then we're gonna (noise), whatever the fuck that is.

**MALE VOICE:** Yeah. (Laughter.)

**STINNETT:** Fuck, it hadn't ever started, really.

**MOSHER:** (unrecognizable)

**FREEMAN:** Brian's gonna talk to 'em about what a manual discount is. Facetiously, we're not going to buy any airplanes, he's gonna tell him, he's going talk to everybody-

**MOSHER:** What's the difference in off-invoice.

**FREEMAN:** Right. Off-invoice, whatever.

**HAZELWOOD:** Yup.

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

63. Prior to Hazelwood's arrival, during the October 25, 2012, meeting, Freeman also said the following to his assembled regional sales directors regarding his manual rebate practices at Pilot, which provided context for Freeman's earlier statement to Mosher about not teaching his break-out session about "how to fuck up and buy an airplane like [he] did":

**FREEMAN:** Okay, so, again, just kind of going through this, my next comment was say what you do and do what you say, -- on the surface. Say what you do and do what you say. Meaning again, I'm the biggest manual guy, well maybe not the biggest, I've had the biggest blunder in manuals but I am a huge fan of, when you're in front of a customer and you get his fuel report and you say you're gonna do something, you fucking have to do it.

You cannot have a case where you don't do what you say in that business. And I am not talking about manual stuff. Hey, this is a game. We're playin' fuckin' poker with funny money, and its liar's poker with funny money because of all this cost-plus stuff. So, you know, I'm not, I don't want to get into a moral or ethical conversation, because I believe that if a guy's gonna butt-fuck you then we got to go to butt-fuckin' him harder than (UI).
***

**FREEMAN:** I know everybody says fuck, I'm doin' it, but just say what you do and do what you say.

**STINNETT:** Don't get too cute.

**FREEMAN:** Yeah, I mean, there's different levels of cute. Some people are tits and some people are ass guys and some people want their discount managed through the system and some people like a big check. I mean, fuck, sell it to 'em the way they wanna buy. And understand, the fucker's got the ability to know what the hell you're doing to 'em. Okay?
Does everybody know what I'm talking about 'bout the airplane? I know you do, everybody know, do you know what I'm talking about an airplane?

**WOMBOLD:** I figure it's something to do with Western

**FREEMAN:** Yeah. Yeah, Western Express liked -- they were not on direct-bill, they bought fuel from us, they were on a cost-plus/retail-minus deal, and I manually calculated the discount. And for life, you know, my pencil probably wasn't as sharp maybe as it could've been, but in July of '8, July of '08 when crude was $147, on July the 6th or whatever it was, was it '08 when the market dumped?

**CHS-2:** Um-hum.

**FREEMAN:** And it went from $147 to --

**CHS-2:** 32.

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

**FREEMAN:** -- by the end of the month, down to about $90, and the next month down to $60. And it wasn't, you know, it dropped just dramatically. That average versus the day to day, I mean, mother fuck, it was (UI.) I mean it, whatever. So, everything was golden, really for the next year. Until Western, for whatever reason, contracted Knight Transportation to help them. They did a management contract --

**CHS-2:** Well Knight was gonna buy it.

**FREEMAN:** Yeah, that's right, that was, that was the start of an acquisition. So coming here for twelve months and helping manage my business and gettin' my operating ratios and stuff in line, blah, blah, blah. And I guess it was Dave Jackson that discovered that during a three -- I mean, every month leading up to that and every month after that three-month strip we were pretty close to where Knight was when they got their deal managed through the system.

Anyway, that three months I basically cost them almost $1 million. I mean, I was playin' with 4-1/2 million gallons and there was, you know, a 13-cent spread between the average and the actual during that huge down turn. And it was like $300,000 a month. And I sent the fucker a $2 million check, but there was 3, I just kept the $300,000 part of that, and so, at the end of three months, you know, I owed 'em. I owed 'em a million bucks, wasn't it? It was some number. But anyway, I'm like, oh fuck, you know. It crushed me and it hurt his feelings, but we got past all that.

And I said, alright, I'm gonna get you a check. And he said, "Nah, I've got this airplane over here on the books for $7 million, I owe $1 million bucks on it, why don't you just buy this airplane?" And I'm like, "What....." So I bought the fuckin' airplane.

**MALE:** He couldn't fly to Knoxville, he --

**FREEMAN:** It was so broke; it was so broke the mother-fucker wasn't air-worthy, so we had to sell it in Nashville. So when I make my manual comments about havin' to buy an airplane that was me, so....

**CHS-2:** That's funny.

**FREEMAN:** Yeah.

**RALENKOTTER:** But you do have to kinda almost, though, sometimes you have to be careful. Because if you set the expectation, if you have a blowout, most of 'em don't know where the numbers come from --

**FREEMAN:** That's right.

**RALENKOTTER:** If the guy's been getting $100,000, $100,000, $100,000, now you send him $180,000, and then the next month you send him 75.

**FREEMAN:** He thinks you're fuckin' 'em.

**RALENKOTTER:** He thinks you're fuckin' em. So you might as well be fuckin 'em.

**FREEMAN:** See. Fuck 'em early and fuck 'em often..

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

64.     Later during the October 25, 2012, meeting, but before Hazelwood arrived, as each Regional Sales Director was discussing the Regional Account Managers they oversaw, Kevin Hanscomb offered the following about Pilot employee Chris Andrews:

> **HANSCOMB:** Yeah, he does struggle, though, getting that connection, that personal connection with the customer. And um he does get a little too -- I mean, he he makes manual rebates calculus. He makes it a little harder than he needs to. And he's gotten burned a few times by over complicating it and gettin' busted.
>
> **FREEMAN:** Busted. No airplanes, but --
>
> **HANSCOMB:** Yeah, he hadn't had to buy an airplane yet, but he had a couple of hang-gliders. (Laughter.)

65.     During the same October 25, 2012 meeting, but before Hazelwood arrived, Freeman recounted to the assembled group of regional sales directors his recent instructions to Pilot Regional Account Manager Kevin Clark relating to Pilot Customer Schrock Trucking, which corroborated what CHS-2 advised law enforcement agents on October 4, 2012. At a time when Clark was facing losing Schrock business to Pilot competitor Love's, Freeman suggested to Clark that he should consider inducing Schrock to stay with Pilot by telling Schrock that Pilot would improve the existing diesel discount deal in the city where Love's was trying to compete, but then, without telling Schrock, unilaterally raise the diesel price in other locations:

> **CHS-2:** The Schrock deal?
>
> **FREEMAN:** Schrock, yeah. He's got a deal, 100,000 gallons with 'em, he's on TCH on direct-bill. He does 20,000 gallons in Oklahoma City of his 100. Love's came in at some crazy-ass deal in Oak City, and of course the customer came to us, "You gotta do this deal." "Well, Kevin, fuck him. What about the other 80,000 gallons, is there no value there? I mean, we're savin' him a bunch of money over here." Well Love's didn't go after the other 80, they just wanted this one truck stop and this customer wanted him to adjust.
>
> **STINNETT:** And by the way, the truck stop that he was showin' the lowest price --
>
> **FREEMAN:** Yeah, it was on 35.
>
> **STINNETT:** Yeah, was on 35.
>
> **FREEMAN:** Yeah. But anyway, so, I said to Kevin, I said, "What are we doin' here?" He's on TCH, he's on direct-bill. I said, "Well, you know, try to sell him on the value of the network, and don't bend us over in one market. You know, we may cost you a penny in this market but, you know, we're savin' you 10 cents over here." And the guy was just totally unreasonable. "Sorry, you gotta give me this deal or I'm takin' these gallons

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

away." I said, "Okay. Well, on the single-price file, fuckin' raise his price on the other 80,000 gallons a penny, if you've gotta give him an extra 3 cents in Oklahoma City." You know, you don't have to tell him. Tell him you're gonna do it, or you tell him there's values, and if he's gonna butt-fuck us then we need to be better butt-fuckers. (Laughter, some comments.)

**STINNETT:** So what ended up happenin'?

**FREEMAN:** He ended up gettin' the deal and not changin' his price at other places. But that, Kevin didn't feel comfortable doin' it, so.... He changed it back.

**WOMBOLD:** All you're doin' is takin' advantage of the advantages without havin' to sell the customer on doin' it. You're just pullin' back in some place and give another. That's the game you wanna play, that's the --

66.     On October 25, 2012, while at Freeman's lakehouse, Ralenkotter related privately to CHS-2 and Mosher a situation in which he deliberately misrepresented a discount agreement to a Customer to prevent the Customer from leaving Pilot in favor of competitor Love's.

**CHS-2:** Who were you with?

**RALENKOTTER:** He shows me -- it's an Illinois guy, a fuckin' Russian mafia guy -- and he says, you know, "Love's has gotta deal cost-minus-2." I said, "Pavo, let me tell you what we're gonna do. We're gonna do cost-minus-3, at about 300 locations. We're gonna do cost-plus-4 at about 300 locations." He goes, "That doesn't work for me." I said, "Well, I don't know what to tell you. You can put all your gallons into their 200 -- I mean, I'm givin' you, their 200 locations, I'm givin' you 100 more. You don't like that?" He goes, "No." I said, "Well, I guess we've reached an impasse.". "So I'm gonna beat 'em by a penny where they are. I'm gonna cost you more where they're not. Help me understand. I mean, you don't price freight the same way, do you?"

**CHS-2:** Well no, you're givin' him a better deal now than what he's got, where they're not, is what I would say.

**RALENKOTTER:** I'm givin' him a better deal where they are.

**CHS-2:** And a better deal --

**MOSHER:** And where they're not. Both.

**RALENKOTTER:** Well no, he was on like cost-plus-0 to begin with.

**CHS-2:** Oh, okay. I gotcha, I gotcha.

**RALENKOTTER:** And I said, I mean, listen, if "We talkin' 'bout street fightin' here? Is this the conversation we're gonna have?" He goes, "Well, I tell my guys to go either to Love's or Pilot/Flying J." I said, "Well, I don't think that's a good way to run your business, but, that's fine. I mean, we'll do the deal, I'll beat 'em a penny where they are." He goes, "Hmmph. I don't like that deal." I said, "Well, alright. What are you gonna do

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

with it?" He goes, "Hmmph. Humph, humph. You give me ah cost-minus-3 everywhere." I said, "That wasn't, I'm sorry, did I stutter? I mean, I'll give you 300 locations at a penny better, and at that 300 locations at 4 cents or worse. I mean, what's this conversation, I don't understand. How you evaluatin' this?" "Hmmph. Hmmph." Remember that?

**MOSHER:** I know exactly how he does it, yeah, you're right on the money.

**RALENKOTTER:** "Not a good deal, we're not gonna do it!" I said, "Okay. Hey listen, you gotta make the best decision for your company that you have to make right now and I gotta make the best decision I can for my company right now, so, why the hell do I have to compete with them where they're not?"

**MOSHER:** How'd it end up?

**RALENKOTTER:** Well, we agreed to the across-the-board deal. And we didn't change a thing.

**MOSHER:** He doesn't fuckin' have a clue. He doesn't have a clue.

**RALENKOTTER:** But he slid that, he slid the, you know, the Love's offer letter, where they kinda lay it all out? Walked out of there, I said don't change a thing. Let him believe whatever the hell he wants.

**MOSHER:** He didn't have any fuckin' clue.

**RALENKOTTER:** Dumbass.

67. On October 30, 2012, CHS-2 advised that a Pilot P&L statement is sent to him once a month by FedEx and organizes both Funded/Restricted and Direct Bill Customer accounts by salesperson.

68. On November 19, 2012, CHS-2 attended a sales meeting at the 5508 Lonas Drive Property. As discussed during the October 25, 2012 regional sales directors meeting at Freeman's lake house, the November 19, 2012 sales meeting included break-out sessions, including multiple break-out sessions led by Mosher regarding manual rebates. CHS-2 attended two of Mosher's manual rebates break-out sessions and recorded Mosher's presentation and the questions and comments of attendees. In the first Mosher manual rebates break-out session, CHS-2 consensually recorded the following:

**MOSHER**: -- he's got me on cost-plus-3, and Love's just came in and said they'll do cost-minus-2 for this business, okay? What dya gonna do? Question is, is

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

it off invoice, is it a rebate, what does the customer know about his pricing? Does he know ANYthing about his pricing? 'Cause I then bring in the argument of, he doesn't know what his pricing is. All he's leveraging through is a number; cost-plus-2, cost-minus-2. He wants cost. Is cost OPIS average? I don't know. I don't know what the Love guy's presented the customer, all I know is what the customer's telling me. But it could bring an opportunity for you to bring the guy in on a manual rebate program, the inside ladies hate this, but the savings is humongous. Some of these guys have been introduced to cost-plus in the past by Schneider program, which a year and-a-half ago changed to a capped program. So again, all I'm saying is, a lot of these guys that talk cost-plus don't know what cost-plus is, okay? If they don't know what cost-plus is, do they deserve cost-minus-2? Maybe they do, maybe they don't, it depends on how that guy manages his business, okay? So, this is a great activity to go through anyway, just to see where things are at. Even if you never make a change to the customer's discount, it's a great activity to see how the variance is, okay? So what I want to do is ..

**SCHIMMEL**: Let me ask a question. Even though, do we have an idea of what percentage of people out there truly know, have an understanding of discounts? I mean...

**MOSHER**: I would tell you it's, I'm gonna say way less than 50%. I'm thinking it's 25% or less, that really, really know on a day-in-day-out basis. Now, again, that depends, right? Because if you're sending that customer a daily price fetch, he doesn't have to know, all he has to do is save his e-mails, okay? Because he can go back and recalculate this stuff. (Laughter.) But the guy that doesn't -- huh?

**WELCH**: Some of 'em. (Laughter.)

**MOSHER**: Some of 'em, some of 'em don't know what a spreadsheet is. I'm not kiddin'. So, again, my point is this: Know your customer. Know what you're sending him, know what his preferences are, know how sophisticated he is, okay? If the guy's sophisticated and he truly has gone out and gotten deals from the other competitors and he's gettin' daily prices from us, don't jack with his discounts, 'cause he's gonna know, okay? But the guy that's just sayin' "Cost-plus, cost-plus, cost-plus, I need cost-plus." "Why do you need cost-plus and what do you know about cost-plus? How's cost-plus compare to retail-minus over the last three months?" "I don't know, but Love's is sayin' it, so I need it." Solution: Tell him we can do it. Tell him we can do it on a rebate.

**HOLLAND**: Does Love's ever do a manual rebate?

**MOSHER**: I have no idea.

**HOLLAND**: I don't know that in the last eight years I've ever seen 'em do other than –

**MOSHER**: And it's only, and it's only manual rebate amongst, in this room, amongst our folks. To the customer it's just a rebate, okay? It's just rebate, okay?

**HAMILTON**: I would think that if they didn't do -- Peyton probably X, he did a year-to-year here -- but I doubt it.

**MOSHER**: Yeah.

**WOMBOLD**: Everything I ever seen him do was always point of sale.

**MOSHER**: My guess is he might've tried to open that can of worms, but you have to understand, at Love's, they are not held on a P&L specific to a carrier, you know, every

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

month and their pay based on that, that doesn't happen over there. So there's really no incentive. Why would they do it, okay? What's the point?

**CHS-2**: They'll do a rebate –

**MOSHER**: They'll do rebates.

**CHS-2**: -- a month-end cost-plus number, and then show you you've got a 25-cent discount. I've seen that.

**MOSHER**: Yeah. They'll produce a big backup report.

**RADFORD**: They also have one that's by point-of-sale customers, by state, by stop, and it just shows you. And we built one to be competitive to that, I don't know why people would want that.

**MOSHER**: Yeah, some guys do.

**RADFORD**: For them to see a 25 cents on there, I mean, that's why.

**MOSHER**: Right. And you know, some of these guys, you know, this is all over the board. There's guys that I move a penny, there's guys that I move 15 cents. I mean, it's an art, it's a feel, it's what you can. It's not do more, don't, you know, don't ever expose yourself. If our margin went from 12 cents to 37 cents, don't give the guy 14. 'Cause he's probably gonna pick up on that. 'Cause the competitors are gonna pick up on that, "Hey, I understand you're on a cost-plus program," et cetera, et cetera. Do what you can do. But again, this is just a take their gallons -- and I encourage you guys to use this spreadsheet in this fashion, for one reason and one reason alone; you keep a running history that you can look at every month, too, okay? You guys know what our margin is every month, alright? You know what the number is. You'll know when this sheet comes out, you know, what the margin was. (Laughter.) If you didn't know before. (Laughter.) Mirror it up to your P&L, you know? Don't make changes on this 'til you see your P&L and you know what your P&L's said on that account. Keep in mind the P&L,

you know it'll tell you what you have. And there's been times on here where the rebate's bigger than the P&L numbers show, on a guy doing cost-plus, something or other. That can't be right. But, you know, it is.

**WELCH**: And now that the manual rebates are tied back to your actual P&L, for a long time they weren't. So now they really show up on your final summary P&L that you get. Not the detail but on the summary.

**JONES**: The final summary?

**WELCH**: Yes.

**MOSHER**: Hello, Arnie.

**RALENKOTTER**: Hi.

**CHS-2**: Hey Arnie.

**MOSHER**: So, in summary, discounting, and all the ways to discount, you can do point of sale, yes?

**STUDOR**: Before we jump to that part, help me understand exactly what you do when you do the spreadsheet.

**MOSHER**: Okay. So, let's go to, let's just go to the first column after customer, okay? and you've got August accounts, right? So make a number up; 100,000. Customer did 100,000 gallons, right? In August of '12 that customer did 100,000 gallons and his price

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

fetch for the month was runnin' at, whatever it is, cost-plus-4, okay? And at cost-plus-4 in August of '12, this customer's rebate would've been $25,000. Okay? 25 cents a gallon at cost-plus-4, $25,000. BM means you, you, me.... gosh. And again, I'm lookin' at history back here, so I can see July's numbers when I'm doin' this. Add it up. He did 110,000 gallons in July and his rebate was

only $12,000. "Hmm. Okay." And then I ask myself, is this customer a customer that I send a daily price fetch to? Does he buy from anybody else? Does he have any idea what cost-plus-4 means to his business? Nope. Has no clue. Absolutely no idea. Well, do I want to pay him $25,000? Maybe. Am I trying to get any business from him today, am I trying to, you know, is there something goin' on with the guy that I really wanna wine? Maybe not. Or, is he a guy that's buying 35% from me, 35% from TA and 35% from Love's, and I just don't wanna pay him $25,000.

**JONES**: And you look at your P&L.

**MOSHER**: And I look at my P&L, and my P&L says, "Huh. I'm payin' him $25,000 and we made $25,000 on it. That's not a very good deal for me." I'll probably cut this one down to like 21. This customer is not a very sophisticated buyer and he doesn't know what we've done here, right?

**RADFORD**: Right.

**MOSHER**: But, he is sophisticated enough to ask me to provide him a backup. That's why we have to go through this gyration, because then I send this back to Heather and Heather makes a backup equate to $20,996.63. And it shows all the discounts on each location, because that's what the customer's asked for.

**WELCH**: And you never send a backup unless you absolutely -- get hinky.

**MOSHER**: They gotta ask it three times, right?

**WELCH**: Yeah.

**MOSHER**: (Laughing.)

**RALENKOTTER**: 'Cause they have no way to go back and trace this? Most of these guys have no way of tracing.

**RADFORD**: But I will tell you, in our territory Love's is out there saying you need to ask for that backup.

**MOSHER**: Sure they will.

**RADFORD**: Because --

**MOSHER**: That was Danny Peyton.

**RADFORD**: Yeah.

**MOSHER**: That was Danny Peyton going' back. Because, I mean, John and I started doin' this about the same time. He chose to do it on a different scale than I did. (Laughter.) I never bought an airplane. (Laughter.)

**RADFORD**: Nope. Didn't run.

**MOSHER**: And again, this, you gotta get your arms around the thought process here, and the thought process to me is extremely simple. I've clearly made peace with it. I'm sending cost-plus pricing to a guy that has absolutely no idea what cost-plus pricing is. He's heard it, he doesn't have a clue what it means to him, or his business, other than he's heard it from ComData, he's heard it from EFS in the past, TCheck in the past, Love's, TA, he doesn't know what it means. And he's not gonna take the time to know what it

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

means, 'cause, frankly, he's lazy, and he doesn't care. But he's heard the buzz word long enough to know, "This is valuable and I should have cost-plus pricing." That guy does not deserve premium pricing from us, in my opinion, because he's not willing to go back and do all the work on it. We buy very good at Pilot, and I'm sure a lot of our buying is indexed to Platt's and OPIS low, I'll guarantee our guys go back and check what we're buying versus those indexes. All we're doing is providing index pricing to people, okay? When we go cost-plus, it's index-based pricing. If that customer's not willing to go back and check the index.... maybe we should've said, "Here's the options, Mr. Customer, I'm sorry you're not somebody we're gonna give cost-plus pricing to." And at that point he's probably gonna say, "And I'm probably not gonna do business with you, 'cause these other guys will only give me index-based pricing, cost-plus pricing, so I'm gonna buy it from them." Not having any idea. I took it to the level of, "I'll do cost-plus pricing for you, how do you feel about a rebate check?" He says, "I feel pretty good about a rebate check. I'd like to have a rebate, how much is it gonna be?" I say, "That's the beauty; we have no idea. It could be $5,000 one month, it could be $25,000 the next month, we have no idea. We have no way to know because it's index-based pricing, it changes every single day." And the guy goes, Really? Well how would I know that?" "Well there isn't really any way for you to know that, you just gotta trust me." And he's like, "Okay! I'll go with that!" (Laughter.) "Heather, we've got a new manual rebate!" (Laughter.) Again, just because they're on manual rebates, it can just be a check-and-balance for you. You don't have to make changes because somebody's on a manual rebate program, okay? It's a check-and-balance, it's a guide that it's a fairly deep deal for us and he wants to be on a rebate. And rather than have, you know, the folks down in credit just run the number and send the check without us takin' a look at it, I'm gonna say, "I want to see this." You know, if we've got a history of the guy, you know, line one. We've got a history of the guy's P&L, he did $25,000, we sent him a $25,000 check, I wanna look at that. I don't want to practice, I don't want to sell fuel for nothing. And I'm, you know, I don't have to make 20 cents a gallon every time, but, I don't want to sell it for nothin'. If it's inevitable, it is.

**WOMBOLD**: Say I want to be quiet -- think of it this way -- Nastic, they do cost-plus with a cap. And let's say a guy's doing $25,000 rebate, $25,000 rebate, and all of a sudden your gross market goes up to 75 cents because something happens and the market tanks. We're payin' that guy $25,000 this month, $25,000 that month, and all of a sudden he's gonna get a $75,000 rebate, you gotta look at that and go, "Man, I don't know." You take that guy to 35,000, he's gonna say, "I feel pretty good," we don't need to pay that guy $75,000.

**MOSHER**: That's exactly right.

**WELCH**: Your Schneider, Nastic, all those aggregated ones are gonna cap 'em now.

**HOLLAND**: Okay, Nastic for sure is capped. Do we know what the number is? It varies?

**WELCH**: It varies.

**WOMBOLD**: It's cost-plus?

**MOSHER**: It's cost-plus. It's all over the board.

**WOMBOLD**: And what do they call it, it's a fair sale?

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

**MOSHER**: It's a fair price. You're getting a fair price. And I'll tell you this: If I send this guy $21,000 instead of 25, and he's buying hasn't changed? Well that's a pretty fair price. I sent the guy 21 cents a gallon, you know. And he has no earthly idea what the hell he did to get 21 cents a gallon. Has no clue. But that's when this whole thing started for me, was back when Flying J filed for bankruptcy, that's when we started. And I had a handful of guys on rebates. And when you put something on paper or on a computer screen in front of me that says last month you paid $278,000 in rebates, this month you're gonna pay $798,000 in rebates, I'm goin', "Oh whoa whoa, that's not good, we're not gonna do that." And that's when we really started doin' manual rebates and lookin' at it and goin', "Psst, here's the real number."

**JONES**: And to the point of them not knowing, I mean, on a percentage-wise, very few of 'em actually ask for backup. I would say less than 10%.

**MOSHER**: Yeah, you're only gonna have a handful. And usually, guys, the guys that are asking for backup are the guys that are asking for pricing up front.

**RADFORD**: Um-hum.

**MOSHER**: They want a daily price "So I can see what my price is." Now, to Scott's point, I think you said this, is there any way possible for them to take that monthly, you know, 30 days' worth of price fetch, put together an average, and have an average price that they should've paid for that month? No. Absolutely not. They can't weight that fuel purchase by what day they bought it on. They have an index, so they can get close, but they can't weight that. There's (noise.) 15 cents.... beginning of the month 'til the end of the month, there's no way they have any idea what they're close to payin'. Or what they paid. Again, this is simply a tool. And this works for some folks, mainly the smaller ones that, I'll be honest with you, couldn't put 'em on cost-plus, we shouldn't have 'em on cost-plus. But, at the point of we're not gonna have their business if we don't put 'em on cost-plus, or part of their business. Because, consequently, that guy doesn't have the best network management skills either, probably, right? So, you're still gonna get some business. But if this is a case where the guy's willin' to take a rebate check, again, and he is not sophisticated, he got the buzz word from ComData guys went in there and said, "Hey, you oughta be buyin' our cost-plus, all the guys your size are buying on cost-plus." This is an avenue you can go down. Uh, you know, be careful, 'cause you can get confused on this. 'Cause I do have some guys that want 5 cents off on their invoice, but they'll take a cleanup, a cost-plus, at the end of the month. So that's another way to do it. You got a guy that's got 50 company trucks, 50 owner/operators, he thinks he has some kind of cost-plus deal but he needs to have 3 cents off to give to his owner/operator. He'll take the 3 cents off his invoice, pass it through the billing card, then you give him the cost-plus side as a rebate. Make sure you figure that in when you're looking at, you know, total spent on a monthly basis. Because it's easy to forget.

\*\*\*

**MOSHER**: (Laughing.) You guys have any questions on the manual rebate basis?

**HOLLAND**: So, from my -- and I'm sure everybody feels the same way -- coming from ComData, everything was black-and-white, an x-amount, your basis point, here it goes.

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

**RADFORD**: And what did I tell you? Welcome to the gray side. (Laughing.)

**HOLLAND**: And I'm learning it. And I'll be honest, I'm struggling with the gray part. I mean, it's not seven years of black-and-white and you go into some grays, I'm comfortable with. But, a light bulb really clicked on when you just said that you look at Nastic's program, it's a cap. So, in my mind, when you do this, it's capping that rebate. It's making sure they don't have unrealized expectations and then they go from 25, 25, 75, and back to 15, you've got a guy that's pissed off wantin' to know why he got 75 last month, now he's got –

**MOSHER**: He completely forgot that three months prior to that he was gettin' $12,000 or $17,000 every month. All he remembers now is he got 75 and he went back to 15 and "Why the hell did that happen?" So my answer is, why put him in that situation, where he needs to even ask? (Laughing.) Don't ever pay him the 75! (Laughter.)

**RADFORD**: We're here to benefit you, that's what we're here for, right?

**WOMBOLD**: Jason, you gotta get your mind comfortable with that. Brian and I work as close together as anybody, I might be a little more in your camp, but here's what I might do with that: I might just wrap my mind around and say, "Hey --", maybe you talk to the customer and say, "Hey, if our margins blow out, I'm gonna cap your rebate." I might just tell 'em that. And say, "Hey, this is a fair thing. If our margins blow out, it's only fair that we should get some of that back." And you gotta wrap your mind, Brian's point, what works best for you and how you utilize this information. The spreadsheet is a great tool. It gives, if nothing else, keeps you in tune with what's happenin' with this customer's margin. You got a guy that has 50 trucks and all of a sudden he's gettin' a 50-cent rebate and you're makin' 10 cents a gallon, something in your head ought to go, "There's something not fair about this. I've got a $9 million facility here, and now all of a sudden this guy's gettin' 50, 60, 70, whatever, cents a gallon rebate and I'm gettin' 9 cents." And I may just tell your customer that, "I'm gonna give you cost-plus up to a certain amount, and then I'm gonna have to call some back."

**MOSHER**: It –

**WELCH**: And on your price spread there's a column that you can run an average on to tell you, okay their average discount is gonna be 25 cents. And you know it's there and you can work off to what you need that average to be.

**MOSHER**: Now, also remember this, okay? the Schneider Logistics program is already capped on about 95%. They've gone out to a handful of carriers and said I'll take the cap off, 'cause they scream, you know, bloody murder. But 95% of 'em cap it, okay? so you've got that. And a carrier doesn't hear that point. They don't know they're capped, they know they're on cost-plus. Do they know cost-plus what? They have no idea. They know it's cost-plus and they have no clue that it's capped. Okay? The guys don't even know the tiers, 'cause there's three tiers in Schneider Logistics. You know that. The customer has no idea. He may not even be on cost-plus yet because he's not doin' a large enough percentage. But he knows that number. He knows that lingo. Nastic, and that's the guys where you're gonna use this, those guys don't get a cost-plus number. They know they're on cost-plus, there's no number. So, a fair way to do this, and, I mean, it's just playin' in the same area that the Nastic folks, the Schneider Logistic folks are. And they'll tell the carrier, "I'm gonna give you cost-plus-3," just tell 'em I'm gonna give you

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

cost-plus. At that point, it's cost-plus, you know. Might be cost-plus-19 sometimes but it's cost-plus.

**HOLLAND**: And again, to your point I was looking for is, to hear that term –

**MOSHER**: Yeah.

**HOLLAND**: -- and you have to give 'em the warm and fuzzy, you know. "I have cost-plus pricing."

**MOSHER**: And don't think this is the way to up to a guy that you're doin' 200,000 gallons a month with and, you know, you're doing 200,000 gallons a month and he's backed you into doin' cost-plus, you know, minus 1 because all competitors have come down to do it, and there's a chance that can work here, but it's small, it's a real small chance. Those guys typically are gonna have a little more sense than that, you know. Don't ever be foolish when you do this, be extremely cautious whenever you're doing something of this nature. But, at the same time, you guys gotta know your customers to be able to do this. Of course, there's this type of program, there's the off-invoice program, and that's, you know, on all spectrums. There's point-of-sale now available to you, a non-direct bill on retail-minus situation. There's loyalty points to use.
\*\*\*

So, but these are all different ways you can go about doin' it. The big thing I wanted to get across to you, you know, use this form, it's good to look at a history, you gotta know your customers, you gotta know what you can do and what you can't do. If nothing else, have the numbers come out and benchmark. You know, it's good to look at a number on here to see what your discount is BEFORE it goes out, and then look at your P&L and figure out, send this guy a check. If you do rebates just through the system, the rebate's gone, you get the P&L, you have no idea.

**HOLLAND**: So is there a difference between a rebate and a manual rebate?

**MOSHER**: Yes. Just a standard rebate -- the girls don't do anything with it. It gets sent over to, you send it to Lori McFarland, she plugs it in the system. At the end of the month a check's generated, it's shipped out to the customer, you don't know anything about it. You'll see it on your P&L, it takes that off on a per-gallon, per-site basis, okay? But you probably won't know what the total dollar amount is. So, until it's too late, the check's gone.

69.     In the second Mosher-led manual rebates break-out session that CHS-2 attended

on November 19, 2012, CHS-2 consensually recorded the following:

**MOSHER**: The main thing I want to talk about is manual rebates, and you all got a separate sheet. Manual rebates is a ton of work from an inside standpoint, but it's a huge benefit to you and to the company. I guess here's how I would go about looking at a manual rebate: I like this report because I've got a running total, I've got running history, right? So I know how many gallons a guy did this month, last month, month before, et cetera, et cetera. What his rebate was last month, the month before, blah blah blah. Now, obviously, manual rebates, we don't need to put rebates down for retail-minus

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

environments, 'cause we can do the math in our head. These are cost-plus fields. So, where do these come from? This can come from, you know, one of two places; in my mind, I always want to do a rebate rather than an off-invoice discount. Always. There's a couple of reasons: One, we get to keep the money, right? We're not sending the money out right away, so we can keep the money for a longer period of time. That's the no-brainer of all of it. But two, I then have the ability to do several things; I may just want to benchmark Casson's Transport. Let's say they bought 100,000 gallons, and Lexie runs a report, says, "We owe these guys $25,000." I might want to look at the P&L to know how much I made on him, just so I know. It's just a benchmark for him, just a tool. If I go to Laurie McFarland and put in a cost-plus-3 deal, let's say, that check's gone, I get the P&L, I have no control, I have no say in it whatsoever. I know at the end of the time what we made on the account but I have no ability to do anything. So, the other part of this is, you've got Casson Transport that buys 40% from us, 40% from TA, and 20% from Love's. They have absolutely no idea what cost-plus is. No clue. But ComData came in and says, "Hey, you guys are big enough, you should be buyin' on cost-plus." And the Love's guy says, "I'll give you cost-plus-3," and the TA guy says, "I'll give you cost-plus-3 –"

**STINNETT**: I'll give you cost-plus-plus.

**MOSHER**: And you walk in and you say, "I'll give you cost-plus as well." I was gonna say too but that's T-O-O -- "as well. I'll give you cost-plus as well." Cost-plus-what? Most of the time the guy's not even gonna say cost-plus-what? he'll say, "Oh okay, good." So cost-plus-what means I'm gonna run your 100,000 gallons against a fair price, let's call it cost-plus-5, and then I have the ability to benchmark every month. When you put a guy on a standard rebate and give him cost-plus and he doesn't know what cost-plus is, absolutely no, no clue. He's not gettin' pricing from anybody, he's not on EStop, he's not getting anything from OPIS, he has no idea, okay? And you give him cost-plus-5, and you're rollin' along and you're sendin' him checks for $15,000 every month. Then our margin goes to 48 cents and you send him a check for $52,000. And the next month you come back and you send him a check for $12,000 again? He's pissed, 'cause you just screwed him. So, my fix to that is, I never send him the check for $52,000. (Laughter.) Why piss the guy off by givin' him extra money? It's really, you know, this is a combatant against the Nastic guys, and the Schneider Logistic guys, and the guys that, you know, just want to play, you know, John from Loves, me from TA, you from Pilot, against each other to get the lowest low-ball possible number we can get.

**SPIEWAK**: And never direct a gallon.

**MOSHER**: And never direct. I mean, maybe he does, and I'm okay. I do this with guys that direct their direct. But he never ever looks at an index. He has no idea what OPIS plus-1 or OPIS plus-48 is, he has no clue. He doesn't even know, probably, what the DOE price is. He's probably got somebody that does, but his goal in life was to negotiate you down to cost-minus-1 and he's got 150,000 gallons all day long. Does he deserve cost-minus-1. My answer is this: He does, probably, if he's gonna be looking at the pricing every day. And he's gonna look at his rebate every month -- and by the way, this guy's probably not gonna get a rebate for his cost-plus if he's sophisticated, he's gonna want it off his invoice. So, you ask the initial question and the guy says,

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

"Yeah, I'll do a rebate, no problem." And you start goin' down the line; does he do this, does he do this, does he do this, does he do this? Should I give this guy this deal? Yeah probably, on an average month. But when it blows out? Hell no! (Laughter.) You share in it, 'cause I always share in it, and there's gonna be some variance. Again, this goes back to this is a great tool, because you can go back month, month, month, month, and see what's goin' on. You've got different levels of sophistication out there with your buyers. Some of these guys, well they don't know what cost-plus really is, they do hear enough out there on the street and they may have, you know, they may have, uh, point-of-sale discounting from TA at a cost-plus-4. So, you can't cut the guy from 52,000 on that one month back to 17, you gotta share in that with him. Because if you don't, he may know. But there are guys that just absolutely don't know anything about it.

**BIBEE**: I have a question. Um, last month I had every one of my rebates, I guess I was doing a total of 40 rebates, maybe, for Chris, and had everybody that used Fleet One, request the backup, and want to know when I sent it to the customer. And then they even went as far as to get the customer to send me an e-mail with them a tag saying when am I gonna get my rebate backup. Can they go back in to like for a customer–. Can they go back?

**MOSHER**: There was one could.

**MALE**: Really?

**MOSHER**: Oh yeah.

**MALE**: X people try every single purpose

**BIBEE**: -- rebate backup. And they're - (noise.) I'm just trying to figure out –

**MOSHER**: They could. They could back into it. I've had one carrier in all the years I've been doin' this that was smart enough to back into it. And I will tell you this; they did it in the second month of the program. And I was shavin' like 2 cents off, okay? so I wasn't really X. They called me and said, "You're 2 cents off." And I said, "How the hell you'd figure that out?" Well we get pricing, you know." And that's when, ding! I'm sendin' the guy the price every single day. And they took it and they built this monumental spreadsheet.

**BIBEE**: Every day....

**SPEIWAK**: -- your daily price?

**MOSHER**: The carrier's not gonna do it. And here's why: If the carrier knows how many gallons they purchased this month in this location, and even if we send them daily pricing, you can't get there from here because you don't know the weighted. You gotta weight it, right? it's not just an aggregate. If you bought 500 gallons in 30 days, unless you bought the exact same amount on each of the 30 days, that's the only way that average holds true. You also have the ability to say, "Well this is an average price and you're tryin' to compare me to a daily index price. And my rebate's an average price." So that's take away number 2. But, that would concern me a little bit about FleetOne, 'cause they have that data. (Comments around.)

**BIBEE**: Well they've done it a lot lately.

**DILLON**: They've done it a lot lately, like –

**SPEIWAK**: -- they would pick the lowest volume and then check, and that would be their profit, right?

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

**DILLON**: And Katy just started this, and we've gotten like calls this month.

**BIBEE**: This month I got like sixteen of 'em straight in a row.

**DILLON**: Yeah, I did too, they called us too. They're like, One of the Fleet One reps called and lie "Why are you taking so long --"

**BIBEE**: Yeah, it's Diane, it's Diane from, (noise) But she's like, "Can you go ahead and approve the rebate, please?" Like she's pushin' us to get the rebate.

**MOSHER**: Yeah, it's none of her business!

**BIBEE**: But I just wish, too, I mean, I think it's the outside rep's job to know which customers are sophisticated enough to be –

**MOSHER**: You gotta, yes. You gotta know your customers before you do this.

**BIBEE**: You gotta know who they are or you can't do that.

**MOSHER**: Yeah, exactly. Look, I've got guys on here that I, you know, that forced me to go from cost-plus-0 to cost-minus-2, and they give us 95% of their volume. And at the time they did it, the reason they did it was a, you know, B.S. deal. And I told 'em it was a B.S. deal. I still had say, "Okay, I'm gonna do it." And I just didn't, I mean so I shaved a couple cents off, you know, on a monthly basis.

**DILLON**: We had an account we had a customer that called us out on his rebate, and we just had to go back and pay him. That's only happened one time since I have been doing it–

**MOSHER**: Yeah, I've done it once. It's, look, it's gonna happen.

**DILLON**: Yeah.

**MOSHER**: It's gonna happen. And it, it was a fairly, I mean, we've had in the history here a big, big one of these happen, but it wasn't anybody in here, it was John's deal. (Laughter.) But, you know what? That, a little bit of that is knowin' your customer, a little bit of that is it's easy to get carried away.

**BIBEE**: Yeah.

**MOSHER**: I mean, I've had guys you have a terrible phonecall with them the day before, you start lookin' at their manual rebate and you wanna say, "Watch this!" (Laughing.)

**BIBEE**: And it's hard to send. When we see the log of rebates and we go in order and put 'em in, it's hard to say, "Oh, your rebate check's $25,000 more than it was last month."

**DILLON**: Yeah.

**BIBEE**: Because you know you're settin' yourself up for failure. So it's really hard --

**MOSHER**: And that carrier doesn't remember the last three months when it was 12 and now it's 37.

**CHS-2**: Especially if their gallons remain consistent.

**BIBEE**: Yeah.

**MOSHER**: If their gallons remain consistent.

**BIBEE**: Yeah.

**MOSHER**: Part of this is protecting yourself, the other part of this is -- and I'm at peace with it. because Nastic customers know that they have cost-plus. They don't know cost-plus-what. They have no friggin' idea what their cost-plus is. You know why? Because the Nastic guys sit back in a computer room every single night and go just like

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

this: CRS or BM, or it would say RY or, you know, it's gonna have your all's initials on it, right? They do that every single night, they put their own number in. The Nastic guys do that every night. Schneider doesn't do that, they price to like cost-plus-6 or cost-plus-8. And oh by they way, they cap it at 15 cents. The carriers never remember that, they just remember cost-plus. This is no different than that. When we have significant margins we choose to cap our rebate at set amount. That's exactly what our competitors are doing when they do it, they just do it in a different way, okay? So, the other part of this equation that I kinda of look at is, if I've got a guy that calls me and says I need a cost-plus deal, he's not on any index, right? he's not EStop, he's not on anything, we're not sending him any pricing.... why does he deserve cost-plus pricing? Because the ComData guy came in or because a Love's guy came in and said they'd give it to him, when we're sittin' here rollin' along with the same guy and doin' 80% of his volume with 3 cents off retail, now he deserves cost-plus? This guy looks at his fuel only when we would come in in the past, and now he's heard some buzz words and thinks we're screwin' him and we've gotta come in and do the deal. He's never ever gonna go back and match up to an index, it's just not gonna happen. The guy's not gonna spend the time to do it. And then you go into one of your other guys that you're givin' cost-plus-3 on an off-invoice basis, and you know that guy's managin' his drivers and tellin', you know, exactly where to go, and he's, you know, lookin' at our pricing that we send him on a daily basis, and he's occasionally, you know, doin' some benchmarking, the guy deserves cost-plus. He's doin' the work to deserve cost plus. I may not wanna give it to him but he deserves it. The first guy that doesn't do any of that stuff? He does not deserve a true cost-plus price, okay? This is no different than any other buying situation out there, it's just, you know, maximizing our profitability while we're tellin' the customer what he wants to hear.

70.     On November 19, 2012, CHS also met with Heather Jones at Jones' work station

cubicle on the third floor of the 5508 Lonas Drive Property. Jones discussed the manual rebates

calculation process with CHS-2 and showed CHS-2 where and how she electronically stores the

spreadsheets and other data related to her manual rebate calculations and reductions on and

accessible through the computer device located at her cubicle:

**CHS-2**: You know Rob's workin' for me, and manual rebates, I guess you know what Brian's doing with those or kind of what he's expecting? I don't know if you need my approval on those or if you guys have a pretty good idea.
**JONES**: Well, what I do is I send out spreadsheets to Rob, and Brian went over the account, kind of the logic that he uses. Rob doesn't change (unknown), and if he does, it's not a lot. Do you want me to (unknown)
**CHS-2**: If you think you guys got it?

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

**JONES**: We've been kinda rolling, yeah, we've been rolling and make it read (unknown) I've got the history (unknown) So you think be kind of like (unknown) rebate, you can see that. So, I've got all that history through there so that they can look at it and (unknown).

**CHS-2**: You do have it?

**JONES**: I (unknown) also.

**CHS-2**: Oh.

**JONES**: Yeah, and

**CHS-2**: Well how do you know when – what was the deal pitched at, is it just arbitrary? Or where does it come in to it, is it gross?

**JONES**: Well, the deal is, you know, the deal is you know priced in price fetch. So the deal is in price fetch, and it never changes.

**CHS-2**: Which it was supposed to be.

**JONES**: And what it's runnin'. So when I do an adjustments, I go -- and my goal is to make it meet -- I add to the cost-plus, basically, to make it meet the dollar amount we're trying to get to. So I never mess with the price fetch. But I do keep a copy of the file of where I arrived at that number. 'Cause if somebody wants to see the backup, I had the backup.

**CHS-2**: So you know price change there would be an e-mail at some point, or a verbal agreement?

**JONES**: Verbal agreement. Yeah.

**CHS-2**: Most of 'em?

**JONES**: Most of 'em, yeah, they're like (unknown).

**CHS-2**: And how many are left over (unknown)? Is it like 68 or something, you think? (Noise.)

**JONES**: Well, hang on a second. Okay, so these are Jane, 'cause you know I handled Jane's, and these are Jackie's. And Rob's –

**CHS-2**: Those are all ones that are manual?

**JONES**: Those are all manual rebates. And then Rob, Rob's are all these.

**CHS-2**: Um-hum.

**JONES**: And so it's that same logic that he showed you. So for example, this is October gallons, that was the originally-run rebate. That's what Rob adjusted it to and that's what I paid 'em.

**CHS-2**: Oh, okay. So the difference for the whole territory was... or you don't look at it that way?

**JONES**: Well, I don't, I don't sum it.

**CHS-2**: Oh, okay.

**JONES**: I'm, I'm basically just going by –

**CHS-2**: And Jackie's, is hers similar?

**JONES**: Yeah. She only changed two; she changed that one and that one. So that's Rob's column where he said change this one, this one, this one. These were new, so those actually were not changed, that was a new account. He changed that one and he left that one okay. Does that make sense?

**CHS-2**: Um-hum.

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

**JONES**: Yeah.

**CHS-2**: Perfect. Okay.

**JONES**: So, so look, I've got the history back to 2008. And I've actually got, I used to keep track of, you know, the discount that was used -- you know he was saying some of 'em do an off-invoice discount and then they do a cost-plus cleanup? So I have to make sure, if that's the case, that I set up the price fetch that should run to where it backs out that that we've already given 'em.

71. On November 20, 2012, CHS-2 attended a diesel sales meeting in which all direct

sales personnel were present, including all regional directors, regional sales managers and

regional account representatives. Also present were Jimmy Haslam, Mark Hazelwood, and

Mitch Steenrod. During Hazelwood's presentation to the entire group, a male voice interrupted

Hazelwood to make reference to Freeman's previous deceptive conduct in connection with

Customer Western Express, which was the same deceptive conduct that Freeman recounted to

the regional sales directors who met at Freeman's lake house on October 25, 2012:

**HAZELWOOD**: …because what David Owens really tells them is its cost plus five. That's what he tells them with no idea what cost plus five is. We're going to go into the marketplace at four with a zero fee and we are going to give you credit. You're going to pay three times a week. That's going to…

**Male Voice #1**: – like Stick's old deal with Western …

**HAZELWOOD**: Yeah, [laughter] Well, we're gonna, we're gonna intro, going to introduce him to a guy by the name of Manuel.

**Male Voice #2**: No planes in this deal.

**FREEMAN**: Yeah, ah, some of us, rich and famous, we have our own, own planes.

**HAZELWOOD**: …[continues presentation to assembled group]

72. On November 28, 2012, CHS-2 engaged in a consensually recorded conversation

with Pilot Regional Sales Manager Kevin Clark regarding Rebate Fraud and Discount Fraud:

**CLARK**: And here's another one that's -- and I don't know what to do 'bout this -- but fuckin' this, W.M. Moorehouse is still, this is the one that Brian was screwin'. He caught

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

him screwin' him, we cut him a check for $80,000 or whatever it was. Which I ended up payin' half of, which I think is bullshit. Well then they're -- Brian's givin' him a 3-cent rebate, and has not grown gallons at all since I've taken over the account and he's done that. So I yanked it from him. Well he got all pissy with me again and then said, "You're screwin' me again," and "Brian told me that he's gonna leave us in place for his screwup," blah blah blah. But Brian didn't tell me that, Brian just said he gave it to 'em to put an optimizer to see if we could pick up some gallons, and we didn't. I'm like screw 'em. I'm not gonna give 'em a 3-cent rebate if we're not gettin' any gallons out of it.

**CHS-2**: Yeah.

**CLARK**: So, it's just another rough situation, and I'm like, god, you know? He thinks I'm an asshole, because of nothing I did.

**CHS-2**: Yeah. Did Brian handle the McMullen deal, and the discount and --

**CLARK**: No, I, I did. He called Brian, Brian got with me, he told me exactly what they were doin'. 'Cause any, any of Brian's accounts now, before I do anything, believe me, I check EVERYthing. 'Cause Brian has a lot of very shady accounts, varied deals, and I gotta watch what I do. 'Cause customers think they're gettin' one thing and they're gettin' a different thing, and we're showin' a different thing. And it gets real confusing. So....

**CHS-2**: Right. He told you what to do with McMullen as far as the --

**CLARK**: Yes.

**CHS-2**: -- sellin' the minus-3 and --

**CLARK**: Yeah, yeah. He said, "He'll never know." And I talked to Marty and Marty's just appreciative. And just I said, "Man, I know you're doin' 'bout 50,000 with Love's still, if you can give me as much of that as possible," he said he'd try to do whatever he could. So, we may actually pick up a little bit out of it but we're gettin' a ton of it already.
* * *

**CHS-2**: How many accounts did you get from Brian that he was doin' the manual rebate deal where he was, you know, tellin' 'em one thing and sendin' 'em another?

**CLARK**: Man, I know Moorehouse he was. Jacobson, he had -- I don't understand what the hell he had here -- Jacobson, he had a 3-cent rebate for everything over 250, I get that. They rarely ever went over 250 so it never hurt me. But on their owner/operator side, the owner/operators were gettin' a 5-cent point-of-sale discount that was passed on to them. But they were gettin' a 5-cent rebate on ALL gallons. And I cut that. I's like that's stupid, that's gone. So I cut that.

**CHS-2**: No, but what I'm sayin', what I'm sayin' is a deal like McMullen, though.

**CLARK**: Uh, man, I'd say there's probably five or six like that.

**CHS-2**: Oh, okay. I thought --

**CLARK**: But I've -- no, I think in this last round he gave me, the last round of, what, seven or eight accounts he gave me? some of 'em are pure optimizer straight out. But like Moorehouse, Moorehouse was an optimizer account but.... the dumb shit never checked it, I guess. I mean, this was an optimizer account, and Brian was tellin' me, "You're gettin' like cost-minus-1 but we were really givin' him like cost-plus-3." And the fucker never checked in the optimizer! To me, I felt like sayin' Well you're the moron

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

that didn't check it! You know, I didn't say that but I was like, I don't know. I don't know if accounts are stupid up there, but most of my accounts are smarter than that.

**CHS-2**: Oh, yeah. I mean, I, I've never done this stuff and I.... it just amazes me.

**CLARK**: I don't like doin' it because, yeah, I don't know how you get away with it.

**CHS-2**: Yeah, I'm not promoting it, so don't, don't feel any pressure to do it, trust me.

**CLARK**: Yeah. Yeah, now, on my manual rebates, I do it all day long. On my manual rebates, where there's absolutely no way for them to reconcile it, and we do a monthly average, every, at the end of every month Ashley calls me. And I'll say let's add a penny, let's add two pennies, you know. We try to keep it consistent but we're adding, you know, two or three cents on most of 'em.

**CHS-2**: Yeah. How many gallons, how many dollars a month is that?

**CLARK**: It, it doesn't add up to a whole lot. You know, like I got Alcatraz and Archer and, uh, I've only got like maybe five accounts that we do that to. N.K.C. over there and -- Kansas City, they're all restricted accounts gettin' a monthly rebate.

**CHS-2**: Yeah, so you've just got about five of 'em?

**CLARK**: Yeah, there's nothin' big like that.

**CHS-2**: Yeah, okay. Alright.


73.     From December 7, 2012, through December 8, 2012, CHS-2 attended a Pilot overnight event and meeting at Blackberry Farm in Walland, Tennessee. At approximately 12:17 a.m., on December 8, 2012, CHS-2 engaged in the following conversation with Ralenkotter and Mosher:

> **CHS-2**: Let me ask you something Arnie. How's it going with the Postal Service, cause I got about....
>
> **RALENKOTTER**: I'm killing it.
>
> **CHS-2**: Eight different...I got eight different accounts. What should we do?
>
> **RALENKOTTER**: Are you saying no discount...you should do nothing with them unless they are part of the program.
>
> **CHS-2**: And what's the program?
>
> **RALENKOTTER**: Uh..cost plus 6.
>
> **CHS-2**: What are we paying them?
>
> **RALENKOTTER**: Uhh...yea...something around there.
>
> **MOSHER:** ... ish
>
> **CHS-2**: Alright I mean so...so ...I get it.
>
> **MOSHER**: No...no...that's just two years ago. I mean we fucking did the sale two years ago. And if there in the Postal Service, we had a...fuck I had....
>
> **RALENKOTTER**: They're Postal contractors, [ ].

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

**CHS-2**: But you pay the Postal Service on behalf of all these carriers.

**RALENKOTTER**: Yes

**CHS-2**: And it's a manual...it's a manual rebate.

**RALENKOTTER**: It's a contractor. If they're a Postal contract carrier, they should be buying within our network.

**CHS-2**: And they're supposed to be getting cost plus 6-ish?

**RALENKOTTER**: Well yeah, were paying pretty good.

**MOSHER**: Well trust me, trust me, trust me.

**RALENKOTTER**: Actually, we're a legitimate cost plus 6. Cause you know why? I do not want to get thrown in jail.

**MOSHER**: That's a pretty good point.

\* \*\*

**RALENKOTTER**: Well, now I'm paying them fair. I'm paying them fair at cost plus six. I'm not going to fuck around with them because I'm not going to get thrown in jail.

74.     On December 17, 2012, CHS-2 advised that during a business trip to Washington to meet with Pilot Regional Sales Manager Scott Fenwick, Fenwick told CHS-2 that he was engaging in Rebate Fraud that was costing Customers a total of $70,000 to $90,000 in lost rebates each month.

75.     On December 18, 2012, CHS-2 engaged in the following consensually recorded telephone conversation with Karen Crutchman during which Crutchman stated that she was cutting discounts deals without Customers' knowledge, that she maintained spreadsheets that tracked her rebate and discount cutting activities, that if a Customer does not receive daily pricing information, the Customer would have difficulty detecting any rebate or discount reduction. Crutchman further indicated that historically, Chief Financial Officer Mitch Steenrod may have had to manually sign rebate checks, but now the accounting system has automated the issuance of rebate checks:

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

**CHS-2**: Yeah, but he's wantin' cost-plus, and thinks that it's gonna help drive, put drivers into our stops more. But will we have a way to send him a price fetch that had a cost-plus with a cap of so many cents?

**CRUTCHMAN**: Yeah, um-hum.

**CHS-2**: I wonder if I oughta try to run that buy him

**CRUTCHMAN**: Yeah, we can cap it whatever you want.

**CHS-2**: I mean, that's basically what Schneider's doin', right? Schneider program?

**CRUTCHMAN**: Yeah.

**CHS-2**: And then NASTIC does it but it's not as clear.

**CRUTCHMAN**: No. No, they don't define it as to where they're gonna cap it.

**CHS-2**: Alright. Okay.

**CRUTCHMAN**: I think the people that don't understand cost-plus, you can put anything in there. As long as you they know, they're getting cost, they don't care if it's a cost-plus-10....

**CHS-2**: Um-hum. Yeah, and as long as they're not gettin' the price fetch or backup --

**CRUTCHMAN**: Right.

**CHS-2**: Yeah. I mean, I sat in on Brian's thing, and it was kind of an eye-opener. I've kind of not, um, you know, done that, as you are well aware. So, but obviously --

**CRUTCHMAN**: Well, the accounts we used to have, there's no way we could do that.

**CHS-2**: Yeah.

**CRUTCHMAN**: I think he does it more for his regional, or did it with his regional accounts.

**CHS-2**: Right. Okay, well, you've got ours taken care of for the month, the few that we've got?

**CRUTCHMAN**: Um-hum. All done. It'll be in your packet, the amounts and everything, and who they were.

**CHS-2**: Yeah, okay. Alright, well I gotta figure out, I mean, I don't know, maybe it's just me, but I'm wonderin' if some of that, you know, since I haven't done a whole lot of that. I don't wanna say it's frowned upon, but, expected or what. John thinks, you know, we should be tryin' to do that where we can, the people don't, you know, even know what they're gettin'.

**CRUTCHMAN**: Well, I figured that, startin' in January, just start slowly cuttin' stuff down with the ones that don't get a backup, and.... and I think once you do that, it's easier to -- instead of cut it all at once. And what's bad, though, even if they're gettin' a daily price fetch, they can figure it out. That's what happened with Rader Express.

**CHS-2**: Um-hum.

**CRUTCHMAN**: I mean, they're gettin' a daily price fetch, she tells me to cut it, and then it was my fault because I sent 'em a price fetch, you know? Anyway.

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

**CHS-2**: Yeah, and that's what Brian --

**CRUTCHMAN**: But people, some people aren't stupid.

**CHS-2**: Right. I mean, that's what he said is, you know, if they're sophisticated they're gonna figure it out. But if you don't send 'em --

**CRUTCHMAN**: Well, yeah!

**CHS-2**: -- a price fetch, they got nowhere....

**CRUTCHMAN**: Yeah, they don't have a way. Unless they keep their daily pricing file, and they can do it that way.

**CHS-2**: Yeah. Yeah, I mean, like you said, Heather showed me all the ones that, you know, Brian had done and Cathy and those, and it's....

**CRUTCHMAN**: Um-hum. Oh it's, I'm sure it is, yeah.

**CHS-2**: Yeah. So, and you've got the same that she has, though, the spreadsheet, or does everybody do their own deal?

**CRUTCHMAN**: Yeah, I mean, it's just a spreadsheet, and it's got what it is. I try to put the deal on there so we know what it is and how much we cut it by and all that stuff. We got, like I said, most of 'em I can't cut.

**CHS-2**: Yeah, I know, I mean, people got smart.

**CRUTCHMAN**: I've either got busted on it and they said -- or they request a backup every month. Just check it to see if they're gettin' what they're supposed to get.

**CHS-2**: Right. I mean, even Bee said something last month. Did we ever get him satisfied or.... Neil?

**CRUTCHMAN**: Yeah, he, I cut theirs every month. I cut theirs probably between $7-and $10,000.

**CHS-2**: Um-hum.

**CRUTCHMAN**: And I don't send a backup.

**CHS-2**: Um-hum.

**CRUTCHMAN**: But I keep it around the same every month, so they know, you know --

**CHS-2**: Right.

**CRUTCHMAN**: -- so they don't ask questions.

**CHS-2**: Um-hum.

\* \* \*

**CHS-2**: Um-hum. So, I mean, you stick it in the portal and it just automatically cuts a check, Mitch doesn't have to sign off on any of these, does he?

**CRUTCHMAN**: No. No, not anymore.

**CHS-2**: Alright. Yeah.

**CRUTCHMAN**: And then that's how it's calculated on our, um, P&L.

**CHS-2**: So we stick it in the portal --

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

**CRUTCHMAN**: Direct-bill. If it goes through the portal it's, yeah, it comes off our commission.

76. On or about January 22, 2013, CHS-2 advised that Karen Crutchman sent him a list of accounts overseen by Chris Andrews for which Andrews was cutting the rebates.

77. On or about January 23, 2013, CHS-2 advised that the spreadsheet that he received from Karen Crutchman on or about January 22, 2013, was named "Restricted Network Spreadsheet 2013.xls" and contained tabs for the manually rebated accounts for all salesmen in the west region.

78. On or about January 24, 2013, CHS-2 advised that Vickie Borden forwarded him an e-mail that stated that Jimmy Haslam and John Freeman were looking carefully at every Customer's profit and loss report and consolidating duplicate entries. CHS-2 stated that the increased profit from Rebate Fraud would be clearly evident to Jimmy Haslam and John Freeman.

79. On or about January 24, 2013, CHS-2 also stated that when Jay Stinnett worked in direct diesel sales approximately three years ago, Stinnett maintained a list of accounts for which Stinnett shaved manual rebates amounts. CHS-2 advised that Stinnett told him that he had to keep the list so that Holly Radford could keep his shaved accounts straight.

80. From February 5, 2013, through February 6, 2013, CHS-2, John Freeman, and Chris Andrews made sales calls together in Oklahoma and Arkansas. At that time, Andrews had only recently transferred from Regional Sales Director Kevin Hancomb's region to CHS-2's region. On the evening of February 5, 2013, following a day of sales calls, CHS-2 and Andrews had the following consensually recorded conversation, in which Andrews stated that he was

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

deceiving some Customers in his old region about their price discount, that he agreed with the deceptive manual rebate practices that Brian Mosher taught on November 19, 2012 at the sales meeting at Pilot headquarters, that he inherited some manual rebate Customers from Jay Stinnett, and that he tries not to detail his manual rebate activities in e-mails based on his experience in testifying before the Federal Trade Commission in connection with the Pilot/Flying J merger:

> **CHS-2**: …. I'm not going to be a micro manager, trust me. You obviously know exactly what you're doing. I just kinda like to know what's going on, I mean from a broad base, basis and you know, I think I've learned a lot today like in Hoffman you guys are going in and do we really need to be sending the price fetch? Do we need to be sending doing the reflection? And you know does the customer really understand buying verses what we're selling? John went over that so you know
>
> **ANDREWS**: Right. Well from that perspective, I'm an absolute team player. I mean I have an opinion, like today I would have stopped the reflection and changed the deal and if the customer pushes, just like Karen said, to me when I talked to her earlier, she said what do I do if this customer says something to me? I said just defer it to me, I'll, I'll talk to the customer.
>
> **CHS-2**: What would you tell 'em?
>
> **ANDREWS**: I mean, I don't know. It depends on how the conversation goes, you know.
>
> **CHS-2**: Right, Right
>
> **ANDREWS**: At the end of the day I would take the fall if it were, you know if the customer feels like it got slighted. But if John's back here saying don't do it, freakin aye, we won't do it. And that's the same way with you. I mean if whatever direction you want to go, I mean, that's the direction we'll go.
>
> **CHS-2**: Yeah, but I mean John and Kevin and those guys are all about, you know, you know, I don't know how Brian put it, when he did the manual rebates, and how to sell, but, you know what I'm getting at. And John seems to be pretty adept at understanding, you know he sold for years and looking over his manual rebates and you know is this guy really needing to get $200,000 and doesn't even realize what's he doing? You maybe send him a 100,000 grand or whatever.
>
> **ANDREWS**: That's exactly what Brian's approach was to the group was. If the customers aren't smart enough to know what they're getting then they don't deserve the rebate.
>
> **CHS-2**: Right, I mean did you ever know

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

**ANDREWS**: I don't know if you can say that to a sales group, of a you know about a company doing what we're doing, but that is absolutely the right thing to say.
**CHS-2**: Right

**ANDREWS**: But when I took over for Jay, there were several accounts were Jay was saying I'm giving you this, but you think you're getting this. I mean it was just fucking confusing. And I got caught on two accounts where the customer thought this was the discount and this was actually the discount and it was just-

**CHS-2**: Did he have it in writing? Or they just had an understanding? Or

**ANDREWS**: It was all verbal and that's where I really went to that 5 line deal to say I want to know everything about that guy when I walk in.

**CHS-2**: Right

**ANDREWS**: I don't care if he thinks he's getting cost plus 0 and he's getting cost plus 10, I mean I'm not a moral compass, I mean all we can make we make and I want to know.

**CHS-2**: Yeah, so you don't get slapped in the face. Right, right

**ANDREWS**: I got some guys that are that way today in Florida. They think they're at cost plus 0, but they're really at cost plus 4.

**CHS-2**: But you don't send them a letter documenting any of that or

**ANDREWS**: No, it's a manual rebate deal they can never, there is no way they can ever reconcile it.

**CHS-2** : See my guys had always had to write letters so, you just tell a guy you're going to get cost plus 0, da a da da you don't send them an e-mail or nothing or

**ANDREWS**: It totally depends on the account. Like if it's a prospect and what I've tried to do is tie customers to a percentage of their business.

**CHS-2**: Yeah, yeah

**ANDREWS**: I've tried to say, "we're in a partnership with you, I want to be 90 to 95% of your over the road fuel purchases. If you have 50 trucks and the economy turns like it is now, and you go to 35 trucks and your gallons go from 120 to 95 I'm not going to cut your deal off, as long as I'm still getting 95% of your business. Same thing happens, now if you grow your business to 160,000 gallons, I'm still going to give it to. I'm going to be with you when you hurt and .."
\* \* \*

**ANDREWS**: Just like that deal with JT today. I don't know that I would have went cost negative 1, but he did the right thing in my mind from the stand point of saying here's what I want, and she couldn't deliver that. I mean the 55,000 gallons.
**CHS-2**: Right

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

**ANDREWS**: She didn't deliver that. So if she went back today and said my pricing changed. I feel very confident being able to say look, look here's what your offer letter says, you didn't deliver those gallons.

**CHS-2**: Right, why bother telling her to cause controversy and

**ANDREWS**: So it's all catered to the sophistication of the customer.

**CHS-2**: Kevin mentioned you got dinged a few times we were talking at our sales meeting at John's lake house. It was John I guess who is the king had to end up buying an airplane or something. I don't know if you ever heard that story at Western.

**ANDREWS**: Um um.

**CHS-2**: Western audited their bill and realized he had shorted them a million dollar. And they needed to get rid of an airplane and the guy said, "hey, instead of giving me the million bucks, just buy my airplane." You didn't hear this story?

**ANDREWS**: Nooo. (chuckles)

**CHS-2**: And then were at the..at the sales meeting and..and he,you know. Hanscomb speaks very highly of you, but we're going through it and he goes and then, you know um, Chris is so darn anal about his numbers and knowing exactly what it is and he said, "He's had to buy a few hang-gliders."

**ANDREWS**: (laughing)

**CHS-2**: (chuckles) What did he mean by that?

**ANDREWS**: Well, we had..I think what he's talking about, we had a customer called MSJ in

**CHS-2**: Who, MSJ?

**ANDREWS**: MSJ. Yeah, it was Kevin's account and I took over. It was our fault. Basically, we had committed in writing, we're going to give you this certain price where Loves competes.

**CHS-2**: Right.

**ANDREWS**: But Holly, I had Holly before Katy and they both got their own issues, but Holly is lazy.

**CHS-2**: Uh huh.

**ANDREWS**: She will take the absolute path of least resistance. So I'd gone in and said use the discounts for this particular customer where we match with Love's. Well, when she did the price fetch, she did the price fetch at the total discount. So let's say it was cost minus three at the Love's locations. Well, she got lazy and cost minus three at all the locations. So Love's going in doing the right thing, says look at UI, Alabama. Here's what you're getting paid and here's what your fetch is, and it was about an eight arch. So we were giving her cost plus five and knowin we didn't have any competition. So, she comes back and she says, "You're screwing me. You're giving me the daily fetch and here's what you're charging me." I went back and said well, if you look at…

**CHS-2**: Is she basing her buying decision off the fetch, though?

**ANDREWS**: That I don't know. Ultimately…

**CHS-2**: She probably figured hey, I was making buying decisions off the fetch at this price and you were actually…

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

**ANDREWS**: Yeah…yeah.

**CHS-2**: rebating me this.

**ANDREWS**: She..she says, according to the fetch this is what he owed me according to the direct bill, here's what you charged me. And when I went back and said, well here's your letter. In your letter you..we..we gave you the wrong price. We gave you the wrong fetch price. Which is our mistake.

**CHS-2**: Umm hmm.

**ANDREWS**: Here's what we're willing to do. We'll make you whole. I'll go back and give you whatever we owed you, was like fifty four thousand dollars, but at that point it was, she had made a decision to go to Love's and we lost the account. That..I think that's the one that got me probably..

**CHS-2**: What..did Mark or Jimmy ever find out about that?

**ANDREWS**: I mean if they did, I don't think UI.

**CHS-2**: Yeah, I didn't think they'd ever say anything. I mean how much on your manual rebates do you..when you…Who supports you now, Katy or Holly and..and…

**ANDREWS**: Katy now. After..when Tim Hampton came on they..John's philosophy was, Holly understood more of the business than Katy did. So, Holly should be with Tim Hampton. Tim was learning the field.

**CHS-2**: Right.

**ANDREWS**: That's when I moved over to Katy. And Katy's good, she'll do what you ask her to do.

**CHS-2**: But she'll…she'll calculate your manual rebates for you.

**ANDREWS**: She doesn't understand any of that.

**CHS-2**: She under…

**ANDREWS**: She could not tell you the difference between cost plus 2 and cost minus 2.
* * *

**CHS-2**: Well, you'll find Karen I mean is..is very knowledgeable, knows the clients um, on the spot as you've probably seen, you ask her to do something, she's very willing to do it.

**ANDREWS**: Yeah.

**CHS-2**: She's been calculating all the manual rebates and all that, so you know, she'll send you what ones we have. I haven't been doing a whole lot of that, so she'll have all that for you, or she's already sent it to you and you put it in your pipeline already, I'm assuming?

**ANDREWS**: Yeah, now I haven't seen the manual..I take it back. I did see the manual rebates for December. Of course, they were done. I haven't seen the manual rebates yet for January, but I get the feeling that Karen has gone in and adjusted where she's felt it was appropriate.

**CHS-2**: Right.

**ANDREWS**: I haven't second guessed anything she's done, but…

**CHS-2**: She's taking care of all that.

**ANDREWS**: I mean it's a hard conversation, when I guy gets twenty cent discount in January and in February he gets fifteen cent discount.

**CHS-2**: Right.

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

**ANDREWS**: I mean you..you got to kind of understand how the market works, because I got to be able to explain that to him.

**CHS-2**: How much do you typically adjust on the ones in the..in the accounts you're doing now?

**ANDREWS**: It all depends on the relationship. I got a company in uh, Florida called Honey Transport. They cannot grasp the concept of a rising market and shrinked margins. They say decelerated markets means greater margins so, I manage that account percent per gallon and I keep her at about..she thinks she's at a cost plus two and I keep her at about a twelve to thirteen cent discount. And when we blow it up, I trim her margins..I trim her rebate back. I mean, I've never given her more than she should, but I keep her within thirteen to fifteen cents.

**CHS-2**: That makes sense. What about the overall territory? I mean you got any..

**ANDREWS**: A lot of the territory, especially in the Miami deal, no one has really touched Miami from a competitor standpoint. The only competitor that's been in there is Fleet One. I mean, that's not even really a fuel competitor, but I mean we've got a lot of retail off type stuff.

**CHS-2**: That's manual rebate.

**ANDREWS**: Yes. I've tried to do anything that I could at the manual rebate. Katy hates it cause it's more work on her. She'd rather do it off the invoice,
\* \* \*

**CHS-2**: Right, but you sell them mostly cents off, not cost plus on the manual rebates.

**ANDREWS**: Pretty much.

**CHS-2**: So they can basically take the gallons times the cents off and figure that out.

**ANDREWS**: Yeah.

**CHS-2**: So what Mosher was saying is, do they really understand you're not doing..having..had to do a lot of the managing doing twelve cent discounts instead of the cost plus two, just so they don't flip out when the market blows out.

**ANDREWS**: Right.

**CHS-2**: And it comes off and they would get, you know thirty cents and then next month they get you know, six cents or five cents.

**ANDREWS**: Right. And that's what I tried to explain to all the guys that rode with me. I'm not encouraging you to change the discount, but you need to be able to explain to the customer when the margins drop and the rebate is less why that happens.

**CHS-2**: That makes sense.

**ANDREWS**: But I don't do a lot of adjustments.


\* \* \*

**CHS-2**: You said you had to testify to the FTC. So did I.

**ANDREWS**: Oh, did you?

**CHS-2**: Yeah.


\* \* \*

**ANDREWS**: Oh my god. That's..that's exactly right. As soon as the attorney's came in I said what is that book, she said that's every e-mail you've sent since you've been with

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

the company. And they had like nine or whatever it was earmarked and said this is what we what to ask you about.
\*\*\*
**ANDREWS**: Yep. That's why even today, if I do manual rebate adjustment, I'll never do it through an e-mail.
**CHS-2**: Yeah, you don't document it in UI, through Holly or Katy?
**ANDREWS**: Yeah, let's change this deal to this. ...
**CHS-2**: And then Cathy Geesick. You remember that name?
**ANDREWS**: Yep.
\*\*\*
**CHS-2**: (laughs) You know UI. And you know she was putting down phone calls as personal visits and you know, I mean and..and..and I don't look for that kind of shit. But you..you know.

81. On the evening of February 6, 2013, following a day of sales calls, CHS-2,

Freeman, Andrews had the following consensually recorded conversation, in which they

discussed a former Pilot employee named "Ben," who was trained under Freeman, and that Mark

Hazelwood and Jimmy Haslam were aware of Freeman's deceptive activity directed at

Customer Western Express :

**FREEMAN**: So, I'm not sayin' (UI) a bad guy, I'm sure he's a nice guy in his own world, but....
**CHS-2**: Right. Well, he's workin' at a 150-truck fleet, not the smallest in the world, but he ain't, you know, at a 2,000-truck fleet.
**FREEMAN**: I mean, at first I was tryin' to talk bullshit on the cost-minus-4 but he never fuckin' flinched. He really believes he's gettin' cost-minus-4. I'm not sayin' he's not, but I'm not sayin' he is either. I mean, for 120,000 gallons, he doesn't even know who his fuckin' Love's reps is?
**ANDREWS**: Well, what's funny about it is, knowing who his Love's rep is, you can tell him (unknown) he's not getting a fetch.
**FREEMAN**: Yeah.
**ANDREWS**: He's been told what his deal is, but there's no way he can verify that. Talkin' 'bout Ben, you know, obviously Ben worked for you, he understands --
**CHS-2**: Oh yeah.
**FREEMAN**: When to send it and when not to send it?
**ANDREWS**: Yeah, exactly.
\*\*\*

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

**CHS-2**: Well, I mean, again, there's some very, very obvious things that have popped up, and I, you know, shame on me for not sellin' a little bit different. Maybe I've been a little too honest, if you will, or just takin' people at their word, but, I mean, cutoff? You know, do not have to send a price fetch, cut off their reflection.

**FREEMAN**: Yeah.

**CHS-2**: You know, really double check and test what the accounts are gettin' and verify it, and see if the other guys are gettin' it.

**FREEMAN**: Sure.

**CHS-2**: So....

**FREEMAN**: All of the above, and one thing doesn't lead to another. But it, it creates the opportunities if you feel like you're gettin' fucked. Because if you're bein' lied to you don't -- I've always said, you know, it's fun as shit competing against your competitors, but when you're competing against your competitors AND you're competing against being lied to, you can fuckin' win. Its liar's poker. It's game on. Let's play.

**CHS-2**: Right, right. Who's a better liar. And then, you know, like I said, we could start movin' the price up and see whether they're actually reconciling or not.

**ANDREWS**: Well I love exactly what Brian Mosher said what he did, and I know you guys weren't there 'cause you were doin' your own thing, but he was talkin' 'bout the manual rebate. And he's like, "Make the customer earn the rebate, through their sophistication, through knowing what they're getting."

**FREEMAN**: Yeah, Chris had good exposure at Flying J and he's done a nice job in Miami. These guys, they're on cost-plus deals, he manages the manual back to a discount amount. So if a guy, you put 'em on cost-plus and you're sendin' 'em a check and you're sendin' 'em the reconciliation, you're showin' 'em an 8-cent discount. Well, if our margins blow out and the next month you send 'em a 38-cent discount, and then the next month the margins go back and you send 'em an 18-cent discount, they're pissed.

**CHS-2**: Right.

**FREEMAN**: It's like you're fuckin' me. So what Chris has done is, as he's set guys up on cost-plus and done the manual stuff, he's managed it to the discount amount. "Oh my god, we've had great margins, your discount's been 8 cents, but this month we've had a great margin, I'm sendin' you an 11-cent discount."

**ANDREWS**: Even on a direct-bill customer like the ladies today, put a cap in there. So when the margins blow out, just like you said, they don't need to know that.

**FREEMAN**: They don't have to know our margins. They don't fuckin understand.

**ANDREWS**: That's still a great discount.

**CHS-2**: Sure, sure. But what they don't know doesn't hurt 'em.

**FREEMAN**: That's exactly right. I mean, fuckin'? Give 'em a fuckin' 38-cent discount? There's no way.

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

\*\*\*

**CHS-2**: Here's the deal. Say we got an account, you know, that we'd been sendin' a price fetch to, reflecting we move off, and we start managin' the discount. And then, you know, say two years later they find out about it, it's $150,000. Whatda we do?

**FREEMAN**: Depends on how you move off and how you stop doin' what you do. I mean, the question is, you know, do you just stop doin' it? Do you convince them that they'd be better served to get a rebate check? I mean, I've heard Chris make that presentation, he started to with those ladies today, that we need -- be more happy to get a slight discount rather than --

**CHS-2**: That's what you led with.

**ANDREWS**: So much easier to manage.

**FREEMAN**: Whatever it is, we've all had cases where, you know, we've gotten busted. I mean, that's one thing that Kevin Clark has struggled with dealin' with some of Brian's accounts, 'cause Brian was tellin' 'em something he may've been doin' something else.

**CHS-2**: Right.

**FREEMAN**: And you gotta understand what he was doin' to understand how to keep playin' the same game. And that has not happened. Me and J.W., I know Jay had an account over in North Carolina, the guy was a fuckin' blowhard. I mean a fucking blowhard. 50,000 gallons, he was gettin' a cost-plus somethin', and Jay, "Oh yeah, I'm gonna give you a cost-plus." He says, "It needs to be 3," and Jay's like, "Sure I'll give you a cost-plus," and he was in at a cost-plus 8 on direct-bill but there's no way for the guy to know. Wasn't reflecting it, Wasn't sending a price fetch.

**CHS-2**: So he thought he was gettin' a 3?

**FREEMAN**: Yeah. So J.W. walks in one day, after Jay had specifically set down with him and said this guy thinks he's gettin' a cost-plus-3, he's gettin' a cost-plus 8. Pay attention here --

**CHS-2**: Right.

**FREEMAN**: J.W. wasn't paying attention,

**CHS-2**: swwwwuuuuu!

**FREEMAN**: Sits in front of the customer, he says, "Now listen, I'm at a cost-plus-3 now, I'm fixin' to grow by 20 trucks, I want to go to a cost-plus-2." JW flips open his P&L, says, "No, you're at a cost-plus-8."

**CHS-2**: How'd that go over?

**FREEMAN**: Oh, Jay called him and said, "Oh no no, J.W. doesn't know how to read a P&L, that was an 8-cent tax. You're gettin' a cost-plus-3."

**ANDREWS**: (Unknown)

**CHS-2**: Gee. (Laughter.)

**FREEMAN**: Guy has no business gettin' a cost-plus-3, or a cost-plus-2.

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

**ANDREWS**: Are you serious, man?

**FREEMAN**: And, he has no way to know what his deal is.

**CHS-2**: Right.

**FREEMAN**: Go get you an OPIS deal, find out what the tax table is --

**CHS-2**: Well what if you can't talk your way out of it? They figure out a way and they've got you nailed?

**FREEMAN**: You pay up.

**CHS-2**: Pay it?

**FREEMAN**: Yeah. Or you buy an airplane.

**CHS-2**: What does Mark and Jimmy say about shit like that? Do they even catch it or do they know?

**FREEMAN**: Fuckin' A. I mean, I called Jimmy and told him I got busted at Western Express.

**CHS-2**: What'd he say?

**FREEMAN**: Oh he knew it.

**CHS-2**: Oh did he?

**FREEMAN**: Absolutely. I mean, he knew all along that I was cost-plussin' this guy. He knew it all along. Loved it. We were makin' $450,000 a month on him --

**CHS-2**: Holy shit!

**FREEMAN**: -- why wouldn't he love it?

**CHS-2**: Yeah.

**FREEMAN**: Did it for five years, cost us a million bucks. I mean, we made $6 million on the guy, cost us a million bucks.

**CHS-2**: Great investment.

**FREEMAN**: I wasn't tryin' to fuck the guy but we were doin' the math. The guy had not wanted to be on direct-bill, he wanted a fuckin' check. And I ran his price fetch at cost-minus-4-1/2 every fuckin' month, or whatever the hell the deal was at the time. And if his discount was gonna end up bein' 38 cents? Shit, I'd make it 29 cents.

**CHS-2**: Um-hum.

**FREEMAN**: No fuckin' way. I was sendin' him a check for fuckin' $900,000.

**CHS-2**: Really.

**FREEMAN**: Plus, does he know it's supposed to be 1.2?

**CHS-2**: No. No way in hell.

**FREEMAN**: So, not until Dave Jackson got in there and started comparin'. And every month leading up to that three-month stretch, we were right in line with the comp. I wasn't fuckin' him bad, I mean, I wouldn't define fuckin' bad, I mean, I wasn't like beatin' the guy's ass. But it was that three-month stretch in from July, August and September

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

when crude went for $150 to $70 in three months. It wasn't me screwin' him, it was the actual average, the fact that you're lookin' at an average for a month versus day to day. **CHS-2**: Right.

**FREEMAN**: In a market like that, I mean it was 14 cents or something is what we, the average versus the actual day-to-day number that Dave Jackson said they owe you this much money. Now, Dave Jackson said it was a lot more than what I paid him. But....

**ANDREWS**: I think a lot of it too, and that's what I've tried to stress with the guys who've rode with me, like J.T. did and James Studor, James is probably the worst at this 'cause he was inside person, he kinda got presented with what our deals are --

**FREEMAN**: Want some more ice? (Comments.)

**CHS-2**: What'd Mark say durin' all that?

**FREEMAN**: To Wayne?

**CHS-2**: To Wayne Gibbs.

**FREEMAN**: He knew, I mean, he -- 'cause it wasn't a secret that Manuel -- that's what we call him, Manuel or the manual discounts -- it wasn't a secret that Manuel was playin' in some of that stuff. Again, the customer was happy as a fuckin' (unknown).

**CHS-2**: Right, 'cause he's seein' big checks?

**FREEMAN**: He's seein' a big check and he's gettin' a 32-cent discount and we had a fuckin' 51-cent margin.

**CHS-2**: Right. Scooter's not able to do a lot of that, though, with his guys, 'cause they're too sophisticated and know what's goin' on. Yeah, 'cause, I mean, when I had the national accounts, type of accounts, they knew down to the penny what they were supposed to be charged. So, again, I'm, I'm -- I gotta do a better job managin' this. And goin' through our accounts, I mean, obviously you, I don't need to help you with any of this stuff, but I need to be involved in the process. And then gettin' involved with Kevin Clark, um, you know, I've hounded on him for years to go through Roger and do the Roger reports. But, I see what you guys are saying now, maybe I've just been too honest the whole time. And not that we're bein' dishonest --

**FREEMAN**: Not a dishonest deal as much as it is just figuring out there's a thousand ways for us to sell it --

**CHS-2**: Right.

**FREEMAN**: -- a thousand ways for him to buy it, you gotta figure out how he wants to buy it and what strokes his cock.

**CHS-2**: Right.

**FREEMAN**: And then hit it as hard as you can hit it.

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

82.    From February 15, 2013, through February 18, 2013, CHS-2 advised that he

attended a Pilot event in Orlando, Florida. While at this event on February 15, 2013, CHS-2

spoke with Regional Sales Director Kevin Hanscomb about the ability to reduce discounts in the

south Florida area without much consequence due to the language barrier in that region:

> **HANSCOMB**: They're not stupid there is just…uh…there is a language barrier. So you
> can get away with a little bit more because they know that they are not going to
> understand everything that you say. So you can say cost minus, or cost plus 3, and it's
> cost plus 5 and they're not going to go oh well, he's screwing us…maybe I
> misunderstood. So there is some forgiveness there that probably isn't at other parts of the
> world.

83.    On February 18, 2013, CHS-2 advised that Mark Hazelwood, together with John

Freeman, Jay Stinnett, and Scott Wombold participated in a meeting that involved all of Pilot's

Regional and National Sales Directors, including Hanscomb, Ralenkotter, Mosher, and CHS-2.

During this consensually recorded meeting John Freeman and Mark Hazelwood discussed the

potential for a new internal Pilot two-tiered pricing structure that would impose higher prices on

less sophisticated Customers:

> **FREEMAN**: I tell you what would be great in our world internally, if we could have
> two-tier pricing. Have a set of racks for those companies that don't close-watch, don't
> optimize, and then another set of racks where you have to get in that optimizing close-
> watch game. There's a whole bunch of fuckin' guys that buy they're getting cost-plus
> today that have no fuckin' idea.
> **STINNETT**: Why don't we do that?
> **FREEMAN**: Okay. Can't we have two tiers? Like this'd be Tier-A, this is a Tier-A
> pricing
>
> * * *
>
> **HAZELWOOD**: What we're really talkin' 'bout is two-tiered customers.
> **MALE VOICE**: That's right.
> **HAZELWOOD**: Instead of two-tier pricing you're talkin' --

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

**RALENKOTTER**: Yeah, and really, what John said there, again, we have the one-price file, we have that, but, we oughta have the ability to call out Customer Bs if we're just gonna increase transport freight by a penny

**HAZELWOOD**: Sure. Customer A, Customer B. Customer A looks at every orifice you have, Customer B doesn't even know you have an orifice.

**RALNEKOTTER**: Lori hits one button and blows a penny on everybody in Customer B.

**MALE VOICE**: Yeah, but you shouldn't raise the rate on that guy (UI.)

**FREEMAN**: But you gotta know how your customer buys, right? (Unknown) buy, give him a cost-minus-32 and raise his freight rate to 40.

**MALE VOICE**: Right.

**FREEMAN**: That's part of the game, I mean, but if you don't know how they buy and what they understand, then you can't take advantage of these things. And it's our job to teach, manage, direct our regionals to understand all this stuff. And then Jay can get us set up to where we can have A and B buckets. Yeah, fuck 'em, just give 'em what they want.

**STINNETT**: And what'd

**FREEMAN**: You're exactly right.

**STINNETT**: And you take advantage of our advantage.

**RALENKOTTER**: Put it to 'em a way that

**MALE VOICE**: Our advantage is their ignorance

**STINNETT**: Yeah, A K A, we're fuckin' 'em. (Laughter.)

84.     Although, during the same February 18, 2013 conversation, Freeman and Stinnett

stated,

**FREEMAN**: some of these deals we cut. You know, if you have the hard conversation on the front end, "I'm gonna do this deal, and these are my expectations and this is the timeframe, sign this, Mister Sir," you gotta do it. And you walk back in, say, "We tried, folks, but what we tried to do didn't work."

**STINNETT**: Didn't work. And we need to make sure everybody, when they're doin' the letters, has the disclaimer that the Pilot Flyin J reserves the right to --

**FREEMAN**: Renegotiate.

**STINNETT**: Yeah, renegotiate.

**UKNOWN**: We always say it.

**FREEMAN**: Got to ...,

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

Freeman also stressed that the best way to put Pilot in the best position to "take advantage of its advantages" was to withhold information from its Customers, and to put the Customer on manual rebate, that is, "send'em a check":

> **FREEMAN**: But to the regional guys, no kidding, you guys work with 'em, talk with 'em, you know. And if you're havin' to get into a game, sending price fetches and reflecting through the billing part totally limits our ability to take advantage of our advantages. So, if you can sell what you sell, you know, the ultimate is send 'em a check, the next step is manage through the billing system, the next worser is to send 'em a price fetch and …

85. Shortly following the conclusion of this February 18, 2013 meeting, CHS-2 joined in a conversation in which Hazelwood was nicknaming the new two-tiered "A" and "B" pricing structure as "Aunt Bea," and comparing it to Pilot's "manual rebate" practices, which he referred to as "Manuel," just as Freeman had told CHS-2 how Hazelwood referred to Pilot's manual rebate practices on February 6, 2013:

> **HAZELWOOD**: Manuel, now we got Aunt Bea.
> **MOSHER**: Aunt Bea! (Laughter.)
> **HAZELWOOD**: Who does that pricing, Aunt Bea does that one! Aunt Bea. (Laughter.)
> * * *
> **HAZELWOOD**: Aunt Bea.
> **HAZELWOOD**: That's what we'll call this, Aunt Bea pricing.
> **MALE VOICE**: Opie and Aunt Bea.
> **HAZELWOOD**: We got Manuel, Manual does a hell of a job. Wonder what percent of our volume's on Aunt Bea? What do ya think,15%?

86. On February 20, 2013, CHS-2 advised that after the Orlando, Florida meeting, Freeman e-mailed a summary of the meeting to the meeting's participants. In reply to that e-mail, CHS-2 advised that Hazelwood sent an e-mail that stated that Freeman had provided a good recap and specifically requested that they get the cost-plus B plan going quickly. Then, in

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

reply to that e-mail, Freeman sent an e-mail that stated he had just met with "Joe" and something to the effect that the "opportunity is there."

87.     On February 22, 2013, CHS-2 had the following consensually recorded telephone conversation with Freeman during which CHS-2 asked Freeman's opinion on when Freeman recommended to change a Customer's price without the Customer's knowledge after the Customer stops receiving pricing information, and referred to an instance involving Customer Big Iron Trucking in which Freeman and Andrews stopped sending that customer pricing information for the purpose of changing that customer's price without its knowledge:

> **CHS-2** - and uh, you know, how long you know, if we were able to pull that away and, and get rid of the price fetch and the reflection, how long do you think normally we should wait before you know we change prices if we feel like we can do it without them knowing? How long
>
> **FREEMAN** - You know, I don't know that there's a set, I don't know that there's a set deal. I mean, I, I and I'm not, I'm not advocating changing the deal. I just, I want to know, I want everybody, I want all the sales guys to know what they are doing so then, if the opportunity presents, they can put our company in a better spot. So, you know, now he may give me an answer, he may know on every one of them and not, we may not do one thing with any of them. There may be ten of them that we're like, holy shit, we could, we could be doing this differently and, and be in a better spot. So, I don't think there's a time at all, I just want each guy to understand it and manage his bidess, business accordingly.
>
> **CHS-2** – Right, right. You know like when we were up in Big Iron, we realized Buffy wasn't keeping track so I mean you and Chris figured
>
> **FREEMAN** – Um hmm
>
> **CHS-2** – we could just do that immediately so that's just what I was getting at. So…
>
> **FREEMAN** – Yeah, I mean, after hearing what she said we felt like there was a chance then…
>
> **CHS-2** – Um hmm
>
> **FREEMAN** - …to put us in a better position. But, you know, you and I aren't in front of these guys like these regionals but we gotta, gotta get them to think that way. Make sure you not only know what we are doing but how we are doing what we are doing.
>
> **CHS-2** – Exactly.
>
> **FREEMAN** – and react accordingly.

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

88.     On February 22, 2013, CHS-2 consensually recorded a telephone conversation

with Ralenkotter during which Ralenkotter stated that Freeman had recently sent an e-mail in

which he stated that Jimmy Haslam "wanted us to sit down and make sure that the deals that are

out there are deals that we have to be providing ...[and] want[ed] to be fair."  During the same

telephone call, however, the following conversation occurred:

**CHS-2** – Freeman mentioned you did Spiewak's P&L review. Was that
**RALENKOTTER**- Yeah
**CHS-2** - Was that brutal? Or was he pretty open?
**RALENKOTTER**- No. No. Actually no, it was actually no it actually went really well.
I said maybe this is a real obvious statement, but you know the low hanging fruit is
PCTH, Tcheck and EFS you know where we are pushing the one price file, I mean the
first thing to do is arrive at a number where you're going to increase the cost plus number
in those markets, whether it's 1, 2, 3 or 4, whatever the number is. We are going to do
that right out of the get go.
**CHS-2** – Right
**RALENKOTTER** - And then we're going to look at the, you know, ComData accounts
were we may not be reflecting. Again, must list gets jacked. Um, if we are reflecting we
are going to look at trying if we can, if ComData does get it fixed, do the one price file
with ComData and jack it.
**CHS-2**- Right, just move theses and not tell the customers and they probably won't even
notice it, Right?
**RALENKOTTER** - Yeah, yeah, there is no reason to. I mean the price is the price.
**CHS-2** – Um, hum
**RALENKOTTER**- I mean, how are they going to tell me, how do they know if it's cost
plus 2 or cost plus 5? I'm giving them a fair price where there is no completion. I don't
feel bad about that.
**CHS-2** – Hell No. I mean that's the must list stuff, Right?
**RALENKOTTER**- Yeah, yeah, that's easy. And then you know there is some other
stuff.
**CHS-2**- And the rest of the stuff, you're just going by feel, by what you can get by with
and what the threshold of pain is, so to speak, (**RALENKOTTER** laughs) and moving it
without them knowing it.
**RALENKOTTER**- Yeah, the only thing brutal about it is the time that it takes.  We
started, we started at 4:00 on Tuesday and we, we worked through about 2.5 hours until
about 6:30 on Tuesday. We got up, got after it Wednesday morning about 7:30 and John
had really didn't have anything going on, he had a cancelation or something it took us
another 3 hours, you know, that's a 5, 6 hour deal with him. And I expect it will be the
same with Kevin Hite.  Um, Rob will probably be not quite as long and then Jackie and
James have smaller books of business so that shouldn't be too bad.

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

89. On March 7, 2013, CHS-2 advised that during a conversation with Regional Account Representative Ashley Judd, Judd told CHS-2 that she spoke with the Regional Sales Managers that she supports over the phone each month about their Customer deals and rebates, that she was reducing her Customers' rebate amounts, and the she did not send e-mails related to the rebate reductions, but kept a file in her desk drawer related to the rebate reductions. Judd told CHS-2 that if anyone ever came in the office that that file would be first one that Judd would burn.

90. On April 1, 2013, CHS-2, who had just returned from a week-long vacation, contacted Karen Crutchman for assistance in resolving a computer problem. During that conversation, Crutchman advised CHS-2 that Vickie Borden told Crutchman that Borden had been requested by Pilot CFO Mitch Steenrod and Pilot general counsel Kristen Seabrook to provide information about Pilot's direct sales manual rebate practices. Crutchman further advised CHS-2 that Borden requested that all Pilot Regional Account Representatives provide information to her regarding what Rebate Amounts had been paid to Customers as compared with what Rebate Amounts should have been paid to Customers. Crutchman also told CHS-2 that Borden told Crutchman that from that point forward Seabrook would be approving Rebate Amounts. After that initial call on April 1, 2013, CHS-2 called Crutchman back and recorded the following conversation:

**CHS-2**: I was just curious about, we were talking about on the manual rebates.
**CRUTCHMAN**: Mmhm.
**CHS-2**: It just kinda doesn't make sense.
**CRUTCHMAN**: Well, it didn't to me either but, I can't find out any more information.
**CHS-2**: Really?
**CRUTCHMAN**: Mmhm.
**CHS-2**: I mean, who's, who's collecting it all?

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

**CRUTCHMAN**: Kristen.

**CHS-2**: Geez, how? To go back a ways or just the most recent ones?

**CRUTCHMAN**: Umm. She requested, um, at least a year.

**CHS-2**: And so you sent ours in or –

**CRUTCHMAN**: Oh, yeah, it's not – but ours isn't bad. I, I really never, um, cause me and you had talked about it and…when I got bit a couple of times…with the customer, I just stopped doing it. Cause I'm like – [parties talk over each other] – yeah -

**CHS-2**: I've always been nervous about it, so.

**CRUTCHMAN**: Right. And Bee Trucking, they don't, they were just complaining that their rebate was late. That's all he ever was complaining about, cause I keep it around the same every month.

**CHS-2**: Mmhm.

**CRUTCHMAN**: So, I, I'm not worried about it –

**CHS-2**: Did you just give her a list or [parties talk over each other]

**CRUTCHMAN**: Well, they had –

**CHS-2**: Did you e-mail it to her?

**CRUTCHMAN**: No, we didn't. We had to mark it. No. Vicki printed them out team spec- or salesmen individually and you had to them off Ye, Y or N. And then, if you had a Y on either one of them, you had to have a letter.

**CHS-2**: Oh, so there was a documented deal in a letter?

**CRUTCHMAN**: Like, uhh, I'll scan in what I sent. Well, I don't know if I want it – well, Vicki e-mailed it to her so, I mean –

**CHS-2**: Oh, Vicki e-mailed it to Kristen. You guys just –

**CRUTCHMAN**: Yeah. Like, like Morris Transportation, I do adjustments on that one, it's, or Chris did this past month.

**CHS-2**: Mmhm, mmhmm.

**CRUTCHMAN**: And that was just a Flying J account that we inherited, um, back when we took Flying J over. I mean, I know about these accounts. And then, he did Texas Freight, that was the first time we ever, um, and Transway Transport.

**CHS-2**: Those are ones that are in the Texas territory?

**CRUTCHMAN**: It's Chris. And yours –

**CHS-2**: Yeah, in our territory though?

**CRUTCHMAN**: Yeah.

**CHS-2**: I mean, Mitch and Kristen just came down and talked to Vicki and Vicki told you or what?

**CRUTCHMAN**: Yeah, Vicki called us in, me, Karen Mann, and Janet, and said, "Here's what I need, I can't tell why, um, how, how do you think we should handle it? Should I call everybody in here as a group and." We're like, "Yeah, probably be best to just do it all at once."

**CHS-2**: Mmhmm.

**CRUTCHMAN**: And then she called everybody else in there, reckon UI we all been in there, and she was like, "Don't ask me questions cause I won't be able to answer them but here's what I need y'all to do for me, and I need by the end of the day, as quick as possible."

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

**CHS-2**: Mmhmm. So Mitch and Kristen didn't actually come down? It was just through Vicki?

**CRUTCHMAN**: Yes.

**CHS-2**: Yeah, wouldn't surprise me, yeah. Mitch would've – but Jonathan's doing this and done it for a long time, right?

**CRUTCHMAN**: Yeah.

**CHS-2**: So Mitch would know –

**CRUTCHMAN**: Well, it got brought up about Western Express.

**CHS-2**: What do you mean?

**CRUTCHMAN**: I guess whenever, that was the big one that John did and got caught. Remember? Dave Jackson went in there.

**CHS-2**: Oh, yeah. To Mitch you mean?

**CRUTCHMAN**: No, that was just kind of how it was, you know, you know, we've had these happen before, look at Western Express, that been the biggest one that we've gotten caught, or, had to go back and pay.

**CHS-2**: So Kristen finally learned about it?

**CRUTCHMAN**: I guess. I don't know if Mitch ever knew about – well, I know Mitch knew about Western Express, but I don't know – he had to have known that everybody was doing it. He's the CEO of the company, right? Or CFO?

**CHS-2**: CFO. Yeah, cause I remember one time when, when Jonathan started working for Brian and –

**CRUTCHMAN**: Right –

**CHS-2**: Scott was talking about it, and he said, you know, the only thing Mitch is worried about is how much, that, Brian operates in the black –

**CRUTCHMAN**: Mmhm.

**CHS-2**: So –

**CRUTCHMAN**: And see, and that's the bad is, these poor guys that inherited all of Brian's regional accounts –

**CHS-2**: Mmhmm.

**CRUTCHMAN**: - inherited the manual rebates.

**CHS-2**: I mean, he had the most by far, I'm sure.

**CRUTCHMAN**: Oh, God, yeah. But Holly, Holly had a whole bunch too though.

**CHS-2**: From John or Jay or who?

**CRUTCHMAN**: I think all of them.

**CHS-2**: Mmhmm.

**CRUTCHMAN**: And see, I know Chris did it – mm,hmm – I know Chris did it. And those are all inherited to the new guy John Scott. So-

**CHS-2**: I think Arnie's into it too.

**CRUTCHMAN**: Mmmhmm. But I think Janet does all his.

**CHS-2**: Mmmhmm. I think he's doing the post office too, from what he was telling me-

**CRUTCHMAN**: Oh, I'm sure he is. Mmmhmm.

**CHS-2**: Yeah.

**CRUTCHMAN**: I mean, we only had, out of our, well, I don't know about Ashley but, one, two, three, four, five, six. I mean, you only have one on here and that's that Bee

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

Trucking. And that's because the gallons, I, I'm, I've, cut it every day, you know, ever since –

**CHS-2**: Mmhmm.

**CRUTCHMAN**: And then on, San Antonio, um, Royal Freight, I, I've always cut him by at least ten grand, because of no gallons, you know, he's not giving us the gallons, that he's, that we offered that cost-minus deal to.

**CHS-2**: But he thinks he's getting the full deal?

**CRUTCHMAN**: I don't know that he knows what he's getting.

**CHS-2**: I don't think he does either.

**CRUTCHMAN**: To be honest, I mean, he's not looking at it, as long as he gets that, cause the check goes to, uh, the owner, cause the owner's wife called me. Yeah.

**CHS-2**: Mmmhmm.

**CRUTCHMAN**: She called me and wanted to get it, um, sent to a different, like to the PO box or something.

**CHS-2**: How many accounts total do you think there was, did you guys ever count them?

**CRUTCHMAN**: God! No. See, we didn't see all that. But I know Heather had a ton.

**CHS-2**: Yeah. I thought so.

**CRUTCHMAN**: I'd say it, it's a lot. But I knew it would end up coming back and biting somebody on the butt.

**CHS-2**: Uh, maybe not.

**CRUTCHMAN**: Me and you talked about it. You just can't do stuff like this and it not come back on you.

**CHS-2**: We talked about that for years.

**CRUTCHMAN**: I know. And it may not be no big deal, maybe they are just doing an internal audit. But why all of the sudden?

**CHS-2**: That is weird.

**CRUTCHMAN**: Is that not weird? Talk about it, we were on, we were just like, holy cow, what the heck happened, what's going on? If I'm not mistaken, when did we start, a lot of people doing those, back in 2008? Was it?

**CHS-2**: I don't remember doing it, I mean, I really didn't even know you were cutting a bunch of these for sure because you and I have never sat down –

**CRUTCHMAN**: We didn't.

**CHS-2**: - like everybody.

**CRUTCHMAN**: We didn't.

**CHS-2**: Yeah.

**CRUTCHMAN**: Like I said, I just started recently doing it when the margins went up, to like, really high. And I'm just like, this guy's only doing this much, you know, business, I'm not going to give him a twenty-thousand dollar check. And that's the only reason I did it.

**CHS-2**: I didn't really, I didn't even know we were doing any of them until Cathy got busted by Raider.

**CRUTCHMAN**: Right, right.

**CHS-2**: And then I'm like, whoa. What's going on here?

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

**CRUTCHMAN**: Well, we weren't until she started. Mmmhmm.

**CHS-2**: Yeah, and then you sent me a list. I wonder if Vicki's nervous too.

**CRUTCHMAN**: Well, she wasn't in a very good mood last week. But she told us not to worry, she said, "Don't worry, there's nothing to worry about, I just can't tell you what's going on."

**CHS-2**: And usually she lets you guys know what's going on.

**CRUTCHMAN**: Usually she does if, if she can. So evidently it's probably something legally she can't disclose any, I mean, it could just be, who knows, it could be a customer. We could be getting audited by the F, um, what is it, the, it could be anything. Or it could just be that Kristen wants to do this. From Chris says, cause when I told Chris about it, he called me back, I told him Thursday, I think it was Thursday, and evidently he called John or something, and he called me back and he was like, "I just want you to know not to worry, John said it was just internal stuff."

**CHS-2**: Mmhmm.

**CRUTCHMAN**: So, I don't, I'm guessing that's all it is.

**CHS-2**: Yeah, maybe they're, uh, put some parameters around it or something.

**CRUTCHMAN**: Right.

**CHS-2**: You know, put a policy or procedure to it.

**CRUTCHMAN**: Yeah. I mean, I was just really surprised that we had to, we had to put them, what, what the actual price fetch ran as, what the customer's audit was, what he was going to get versus what we were actually going to pay him and then Kristen's going to make the decision.

**CHS-2**: So you're talking manual rebates and if you changed the price fetch too?

**CRUTCHMAN**: Just manual rebate.

**CHS-2**: Yeah. You know who was a little nervous about it at the sales meeting was, uh, Jason Holland.

**CRUTCHMAN**: Who?

**CHS-2**: Jason Holland, the guy that's in Nashville working for –

**CRUTCHMAN**: Oh, I'm sure. Mmmhmm.

**CHS-2**: Cause I remember him going, "Wait a minute. What are you telling me here?"

**CRUTCHMAN**: Mmhmm.

**CHS-2**: And then he says, "You know, at Com-Data everything's black and white." I think somebody said, "Well, we operate in the gray a little bit." I think it was Hol, or, yeah, Holly.

**CRUTCHMAN**: Well, I think it's, I think the greed, people being greedy and trying to make themselves look good is probably going to come back. I just don't see how you can do this and get by with it. That's just my opinion. I, I mean I guess maybe, I'm, looking at it a different way.

**CHS-2**: It's always scared me to death. You know? But that's what we're expected to do, we gotta do it, you know?

**CRUTCHMAN**: Yeah, I know.

**CHS-2**: I mean, pretty much, I mean, isn't that, you know, John hasn't come and said it but kind of the impression you get?

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

**CRUTCHMAN**: Yeah, he'd rather put, that's why Chris puts everybody on restricted and does the manual rebate.

**CHS-2**: I mean, Chris was telling me how much Jay did too.

**CRUTCHMAN**: Mmhmm.

**CHS-2**: And Jay kept his all in his head. And they had to go back and figure out what he was doing.

**CRUTCHMAN**: Yeah, see that's where it comes back and bites you, I don't know.

**CHS-2**: Mmmhmm.

**CRUTCHMAN**: I'm just curious at how Chris is gonna approach it now. Once I tell him that Kristen, I don't think he, that anyone's going to have control over it anymore.

**CHS-2**: Really?

**CRUTCHMAN**: I mean, I don't know, I don't know if it's just for this month doing them for, or if she's going to do them, approval, make them, get them approved every month from here on out.

**CHS-2**: You said they had a conference call last Saturday?

**CRUTCHMAN**: No. Mitch just sent a meeting request on Saturday morning. And I don't know who all was in it. It may have just been him and Kristen and Vicki.

**CHS-2**: This Saturday the thirtieth or the twenty-third?

**CRUTCHMAN**: Last Saturday cause it happened last week. She called us in there Monday.

**CHS-2**: Oh, so it was the twenty-third.

**CRUTCHMAN**: Yeah. But it was weird cause, you know, how Love's was out showing Don Doak the spread of versus what he was having, I, I just wonder, you just, it makes you wonder.

**CHS-2**: Mmmhmm.

**CRUTCHMAN**: Is somebody checking see who if, if we cut any they don't, they don't get a backup or they shouldn't have a daily pr, you know, price file, cause people can keep those.

**CHS-2**: I mean Doak was dead on to this shit. So somebody was tell, somebody was schooling him.

**CRUTCHMAN**: That's what I was wondering. And it's weird that that happened, and we had to pay back $110,000 last, you know, the week before. And then next thing, you know, we're having the, uh, internal audit of manual rebates.

**CHS-2**: Well –

**CRUTCHMAN**: I don't think it had anything to do with Triple D, you know what I'm saying? But I think it-

**CHS-2**: But it's kind of weird, isn't it?

**CRUTCHMAN**: Yeah. I wonder if Love's –

**CHS-2**: -thought about that-

**CRUTCHMAN**: Well, Ben knows, Ben, Danny knew that we did it, Ben knew we did it. And they're, if they're scurrying around to get business, they, all they gotta do is tell these people. All they gotta do is tell the customer, "You better check your rebate cause they're probably screwin' you."

**CHS-2**: I mean, what does John tell his people how to defend it? UI

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

**CRUTCHMAN**: I have no idea. I have no idea. I mean, I, you know I've always said it was a miscalculation on the, you know, with the, price fetch. And just paid them the difference. But I've, that's only happened to me twice so, that's why I don't do it. Cause you don't know how peoples keeping up with this stuff.

**CHS-2**: You mean our clients?

**CRUTCHMAN**: Yeah. I mean, they could get a report from Com-Data, you know what I'm saying?

**CHS-2**: I mean, oh, oh, oh, from somebody else.

**CRUTCHMAN**: Yeah.

**CHS-2**: I thought you meant from us.

**CRUTCHMAN**: No.

**CHS-2**: I mean, cause all they get from us is a check.

**CRUTCHMAN**: Right. And if they don't want backup, they just get a check and that's it.

**CHS-2**: But a lot of times, they, if there's backup, then the girl's kind of back into the number that they guy's telling them to pay, isn't that right?

**CRUTCHMAN**: Right. But I don't know that they send that to the customer. The customer wouldn't know what the price would be anyway unless he's getting a daily file. And he can pull it and say, "Well, this, my thirty day average is this, and you're saying that it's five cent more?"

**CHS-2**: Mmhmm.

**CRUTCHMAN**: You know? Or ten cent more or whatever. So, but if he, I mean, I'm just concerned that what if their billing card service is providing them pricing.

**CHS-2**: Yeah, I mean, that's why they want to do a reflection.

**CRUTCHMAN**: Right. That's why John and them don't do reflect, they're not big on that.

**CHS-2**: Yeah, cause it's one more piece to kind of audit it.

**CRUTCHMAN**: Right.

**CHS-2**: Or reconcile it. Yeah.
* * *

**CHS-2**: Well, I UI mean the manual rebates are going to have to be, you know, set in two weeks

**CRUTCHMAN**: Mmmhmm.

**CHS-2**: -so somebody's going to have to do something.

**CRUTCHMAN**: Well, Chris, I mean, we have to get a, we have to, like I said, put a spread sheet together and send it, and uh, she's gonna approve them or, or not approve them. Cause we're not supposed to put anything in the portal unless we don't, if we don't finagle it, we go ahead and pay it, you know what I'm saying? But if it, if we are, then we have to put it on the spread sheet and get it approved.

**CHS-2**: So you can't put any, any changed rebates into the portal? She's –

**CRUTCHMAN**: MmmMmm.

**CHS-2**: - gonna have to approve them?

**CRUTCHMAN**: Yup.
* * *

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

**CRUTCHMAN**: I mean, you can run a report and say here's all the checks that went out and here are the customers, um, but I think the only people that are in the portal are manual rebate customers. So, yeah, he would know. He could run a report and know what we paid them. But he wouldn't know whether it was accurate or not.

**CHS-2**: Yeah, but his name's on all the checks, right?

**CRUTCHMAN**: Yes.

**CHS-2**: So, he should know what's going on.

**CRUTCHMAN**: Liability. From what she says is they want to know how much liability we're looking at.

**CHS-2**: That's what Vicki said?

**CRUTCHMAN**: Mmmhmm.

**CHS-2**: Mmm. What do you think it is?

**CRUTCHMAN**: Ahh, God, I, what, dollar wise?

**CHS-2**: Yeah.

**CRUTCHMAN**: Whew. I mean, high margin month, I mean, think about it, I mean, peoples cut it probably ten, twenty, thirty thousand dollars some of them. Some of them even more than that.

**CHS-2**: Yeah.

**CRUTCHMAN**: There's gotta be, I'd say they, there's probably a hundred manual rebates or more.

**CHS-2**: Mmmhmm.

**CRUTCHMAN**: And we've only got a few. We've only got a few. But I can't, I, I mean, I can only imagine. Let me look here and see if I can, here's BM manual rebate, one, two, three, four, five, six, seven, eight, nine, ten, eleven, twelve, thirteen, fourteen, fifteen, sixteen, seventeen, eighteen, nineteen, twenty, twenty-one, twenty-two, twenty-three, twenty-four, twenty-five, twenty-six, twenty-seven, twenty-eight. Just, Mosher's old one, there's twenty-eight.

**CHS-2**: What do you mean Mosher's old ones?

**CRUTCHMAN**: I guess his regionals that he had, the manual rebates. Oh, dear Lord. Jacqui Pearl's got (counting), fifty, fifty-one.

**CHS-2**: Jacqui's got fifty-one?

**CRUTCHMAN**: Yeah. About fifty, mmhmm.

**CHS-2**: Brian's old regional was thirty-six?

**CRUTCHMAN**: Yeah, something like, like thirty. Mmhmm.

**CHS-2**: So you gotta figure John's old territory, and Kevin and Jay's-

**CRUTCHMAN**: Mmhmm.

**CHS-2**: -gotta be equal per territory, so yeah, you're right, it's probably 150.

**CRUTCHMAN**: Yeah, it just depends on – yeah, and then you think about any, well, Canada, they do some, but I don't know that they mess with the U.S. portion but they do some, but theirs is not anything like ours, which I think Kevin and Scott, I think, Kevin and Scott probably got, I don't know, he, I think she's got one page of, no, they're together, that's maybe combined, they've got 20, 25.

**CHS-2**: Mmhmm.

**CRUTCHMAN**: We just couldn't do them, that was the thing, I mean, our customers-

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

**CHS-2**: Our people-

**CRUTCHMAN**: -yeah. Our customers just, they, they, they want it, you know, there's only a few that want the check, and that's the ones like, in San Antonio, like JTM cause you know they keep the money. The ones that want a rebate check.

**CHS-2**: Yeah. And you got, you got a list of what you sent?

**CRUTCHMAN**: Mmmhmm.

**CHS-2**: Or a list of the whole thing?

**CRUTCHMAN**: Yeah, ours is, Chris only has four manual rebates, you only have four, which is not really manual rebates, it's just rebates.

**CHS-2**: Mmhmm.

**CRUTCHMAN**: And then San Antonio has (counting) seven, that's it.

**CHS-2**: Hmm. I'd be curious-

**CRUTCHMAN**: Yeah, me, too.

**CHS-2**: -what, what it looks like. What it looks like, though you said so, uh, "Yes" next to it if there was an offer letter?

**CRUTCHMAN**: No, uh, no, if, if, uh, it just says, "Adjust Deal in Price Fetch Y or N," "Adjust Dollar on Rebate Y or N," and if, "If Y, provide written agreement letter." So if you answered Y, which is "Yes," to either one of those you had to provide a letter.

**CHS-2**: Just gotta think most of these guys did send some kind of letter or e-mail.

**CRUTCHMAN**: Mmm. Well, they were actually going to scan, if you couldn't find the letter, they were going to the e-mail to try to find it. They were going to scan the company name.

**CHS-2**: Mmmhmm. So I betcha Kristen worked on this all week.

**CRUTCHMAN**: I bet so. I had all, I had letters to all mine so –

**CHS-2**: What did the other girls say, I mean? Brian –

**CRUTCHMAN**: I don't think he had any.

**CHS-2**: When I was, uh, when I was riding with Rob. Rob had nuth, nothing.

**CRUTCHMAN**: MmMm.

**CHS-2**: But Heather knew what they were supposed to be.

**CRUTCHMAN**: Right.

**CHS-2**: So he must've just, he told her verbally and she wrote it in the spread sheet I think is what she told me.

**CRUTCHMAN**: Yeah, she did.

**CHS-2**: Rob came to me and said, "What do you want me to do with these manual rebates?" And I'm like, "What the hell are you talking about?" And he goes, "Well, Brian, you know, has got a ton of manual rebates." I was like, "Well, I guess you and Heather need to figure that out cause I got no idea."

**CRUTCHMAN**: That ain't good UI. I don't know if you want to have that, backup list UI.

**CHS-2**: What's that?

**CRUTCHMAN**: I was just looking to see if I could find, like in the shared manual rebates. Oh yeah, she keeps a spread sheet, Rob's Manual Rebates.

**CHS-2**: Are these on the shared drive?

**CRUTCHMAN**: Yeah.

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

**CHS-2**: She showed it to me one time.

**CRUTCHMAN**: (counting) Rob's got 26 just for him. I, I don't know, it, yeah, she keeps them all in the spread sheet.

**CHS-2**: UI tell what's going on, by just looking at it?

**CRUTCHMAN**: She wasn't here, um, she was on a cruise last week. And Janet had to get her stuff together for her.

**CHS-2**: Mmhmm.

**CRUTCHMAN**: Cause, I think she has what, Rob which is under Arnie now and then James, what, no, Jacqui, which is under Arnie, right?

**CHS-2**: Mmhmm. James and -

**CRUTCHMAN**: And James [parties talking over each other]

**CHS-2**: And Kevin Hite?

**CRUTCHMAN**: Mmhmm.

**CHS-2**: I, Kevin, Hite doesn't seem like he'd be doing a bunch of those, maybe he is.

**CRUTCHMAN**: I don't think he, I don't think he is from what Campbell said. I think John Scott was the one that she was most con, cause she was like, "We, we haven't touched these," so I don't know.

**CHS-2**: What do you mean?

**CRUTCHMAN**: Like he inherited from Chris.

**CHS-2**: Oh, cause John Scott hadn't had to go through a manual rebate cycle yet?

**CRUTCHMAN**: MmMm.

**CHS-2**: What did, what did Janet say about Arnie's though? I mean, from hearing him talk he's got a bunch of them too.

**CRUTCHMAN**: Yeah, I mean, she didn't, nobody really said much. I think everybody was, nervous.

**CHS-2**: Mmhmm. I don't know why Kristen didn't just go to the share drive and say everybody keeps a file.

**CRUTCHMAN**: Well, I get, I don't know.

**CHS-2**: Or she had you put it in the specific spread sheet?

**CRUTCHMAN**: Well, yeah, that's what she, uh, had asked Vicki to do. And then we marked it. Manually marked it.

**CHS-2**: You mean printed it out and marked it?

**CRUTCHMAN**: Yes.

**CHS-2**: Oh, so Vicki had to just hand deliver it to her, she didn't e-mail it to her. I'd be surprised if she did that.

**CRUTCHMAN**: I think she filled the spread sheet in and then printed it and took it her.

**CHS-2**: Yeah.

**CRUTCHMAN**: And she had a lot of stuff printed and took it down to her the day she left that Tuesday. And then she was off the rest of the week, so.

**CHS-2**: Oh, Vicki was?

**CRUTCHMAN**: Mmhmm.

**CHS-2**: Yeah, good for her.

**CRUTCHMAN**: Yeah, so, I don't know –

**CHS-2**: Alright, well –

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

**CRUTCHMAN**: Maybe it's, maybe it's nothing, I don't, like I said, maybe, like you said they're just, trying to see how much liability we might have. I just don't know why –

**CHS-2**: Yeah –

**CRUTCHMAN**: -all of the sudden, you know?

**CHS-2**: Yeah, it seems odd.

**CRUTCHMAN**: Yeah, it does, doesn't it? We thought so too.

**CHS-2**: Well, around Don Doak. But maybe I'm just making something out of nothing.

**CRUTCHMAN**: I thought the same thing. I thought, well, this might, have stirred up something with the cust, the mutual customer that's getting the manual rebate check. And they audit, you know, you never know, you never know.

**CHS-2**: Yeah.

**CRUTCHMAN**: Like, like, like I said, Ben knew, Ben knew we did it –

**CHS-2**: Mmhmm.

**CRUTCHMAN**: Danny did. And we've got a lot of mutual customers. Don't know how many are on manual rebates, but.

**CHS-2**: And, again, when I talked to Don Doak, and I, I'm not saying that he said anything, but it, you knew Love's was telling him exactly what to ask, and then he was dead on.

**CRUTCHMAN**: Oh, I know, cause he would not have known all that stuff.

**CHS-2**: Mmhmm.

**CRUTCHMAN**: You've known him a long time.

**CHS-2**: Yeah, he had no way to know to ask those questions, I mean –

**CRUTCHMAN**: MmMm.

91. On April 2, 2013, in a consensually recorded telephone call, Freeman advised

CHS-2 that Pilot was shelving the idea for the two-tier pricing structure that was hatched during

the February 18, 2013, Orlando, Florida meeting.

92. On April 9, 2013, CHS-2 advised that he had spoken with Crutchman that day and

Crutchman told him that Kristen Seabrook has requested that she and every other Regional

Account Representative supply Seabrook by the end of the day on Friday, April 12, 2013, with

all information necessary for Seabrook to review, calculate and approve Rebate Amounts to

Customers that are scheduled to go out the week of April 15, 2013, any document that states

what Rebate Amount a Customer should have been paid by Pilot compared with what Pilot

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

actually paid the Customer; any pricing information that was sent to a Customer, and any document that evidences an agreed upon diesel discount price for a Customer.

93.     In short, there is probable cause to believe from 2008 through 2013, Pilot employees engaged in a conspiracy and scheme to defraud by deceptively withholding diesel fuel price rebates and discounts from Pilot customers, without the knowledge or approval of the customer, for the dual purposes of increasing the profitability of Pilot and increasing the diesel sales commissions of the Pilot employees participating in the fraud, in violation of 18 U.S.C. §§ 371 (conspiracy), 1341 (mail fraud), 1343 (wire fraud), and 1349 (conspiracy).

## V.     There is probable cause to believe that documents related to the conspiracy and scheme to defraud are located at the 5508 Lonas Drive Property.

94.     CHS-2 has advised that the following Pilot employees, who are referenced above, presently work on the top floor of the 5508 Lonas Drive Property: Vicki Borden, Karen Crutchman, Campbell Dillon, John Freeman, Wendy Hamilton, Mark Hazelwood, Jimmy Haslam, Lexie Holden, Heather Jones, Lexie Holden, Ashley Judd, Karen Mann, Holly Radford, Katy Bibee, and Janet Welch.

95.     CHS-2 has advised that every member of Pilot's diesel sales force is issued a computer device to work with, whether it be a desktop computer, laptop computer, or tablet computer. CHS-2 has personally observed monitors and keyboards in the top floor cubicles and offices of the 5508 Lonas Property where Pilot's diesel sales force works.

96.     CHS-2 has advised and the consensual recordings tend to show that some of the above-named Pilot employees who work inside the 5508 Lonas Drive Property have used their computers to send e-mails related to Rebate Fraud and Discount Fraud, including e-mails that

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

attach spreadsheets that track deceptively reduced Customer rebates. Moreover, CHS-2 has advised that some the above-named Pilot employees who work inside the 5508 Lonas Drive Property have used their computers to generate spreadsheets that track deceptively reduced Customer rebates. Indeed, Pilot National Sales Director Brian Mosher taught break-out sessions during Pilot's November 2012 sales meeting in which he encouraged Pilot employees to use a spreadsheet to determine when to cut a Customer's rebate without the Customer's knowledge. Additionally, the consensual recordings involving CHS-2 indicate that some of the above-named Pilot employees who work inside the 5508 Lonas Drive Property send e-mails to Customers related to the diesel price they are supposed to be paying on a daily basis, referred to as Price Fetch, and such information would be helpful to law enforcement in determining the actual rebate or discount a defrauded Customer should have received. Furthermore, CHS-2 has advised and the consensual recordings tend to show that e-mail communication is regularly used by the above-named Pilot diesel sales force employees to communicate with each other about Pilot's diesel sales-related activities; although, to be sure, some of the above-named Pilot diesel sales employees have attempted to limit their e-mail communication related to fraudulent conduct. Also, CHS-2 has advised and the consensual recordings tend to show that various reports, including diesel sales profitability reports are sent by e-mail to senior members of Pilot's management structure, including Pilot CEO Jimmy Haslam. Accordingly, there is probable cause to believe that documents related to the conspiracy and scheme to defraud that is described in this affidavit will be contained in computers devices, including desktops, laptops, or tablets, found inside the 5508 Lonas Drive Property that are used by Pilot's diesel sales force employees who work inside the 5508 Lonas Drive Property. Similarly, there is probable cause to believe

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

that documents related to the conspiracy and scheme to defraud that is described in this affidavit will be contained in computers, including desktops, laptops, or tablets, found inside the 5508 Lonas Drive Property that are used by Pilot CEO Jimmy Haslam, Pilot President Mark Hazelwood, Pilot CFO Mitch Steenrod, Pilot employee Jay Stinnett.

97.    On April 8, 2013, the receptionist at the 5508 Lonas Drive Property advised Special Agent Kevin McCord, IRS-CI, that the entire 5508 Lonas Drive Property is dedicated to conducting Pilot business.

98.    Although it is believed that most of the items listed in Attachment B2 will likely be found on the top floor of the 5508 Lonas Drive Property, within the workspaces, cubicles, and offices of Katy Bibee, Vickie Borden, Karen Crutchman, Campbell Dillion, John Freeman, Wendy Hamilton, Jimmy Haslam, Mark Hazelwood, Kevin Herman, Lexie Holden, Heather Jones, Karen Mann, Holly Radford, Mitch Steenrod, Janet Welch, Scott Wombold, and Andrea Woodall, from your affiant's training and experience, your affiant is aware that documents as defined in this affidavit can be stored in any filing cabinet, storage closet, or electronic storage device within the 5508 Lonas Drive Property. Additionally, CHS-2 has advised that he does not believe that Kristen Seabrook's office is located on the top floor, but believes it is somewhere else in the 5508 Lonas Drive Property.

99.    Accordingly, your affiant is requesting a warrant to search the entire 5508 Lonas Drive Property for the items listed in Attachment B2, subject to the conditions set forth in Attachment H.

100.    For all the reasons above, your affiant believes that there is probable cause to believe that items listed on Attachment B2 will be found in the 5508 Lonas Drive Property.

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

Accordingly, your affiant respectfully requests the issuance of a warrant authorizing a search of the entire building located at 5508 Lonas Drive, Knoxville, Tennessee, for the items listed in B2, subject to the special conditions set forth in Attachment H.

**VI.    There is probable cause to believe that documents related to the conspiracy and scheme to defraud are located at the 5500 Lonas Drive Property.**

101.    CHS-2 advised that on April 4, 2013, he confirmed with Pilot accounting employee Bradley Blair that Pilot Discount Coordinator Lori McFarland and all of Pilot's accounts payable staff still work on the ground floor inside the 5500 Lonas Drive Property.

102.    As noted above, the Pilot Regional Account Representatives who work in the 5508 Lonas Drive Property regularly correspond and share documents with Lori McFarland. The Regional Account Representatives also cause accounts payable to issue rebate checks to Customers. Accordingly, there is probable cause to believe that the items listed in Attachment A2 are contained in the 5500 Lonas Drive Property.

103.    On April 8, 2013, in addition to stating that the entire 5508 Lonas Drive Property is dedicated to conducting Pilot business, the receptionist at the 5508 Lonas Drive Property advised Special Agent Kevin McCord, IRS-CI, that the entire 5500 Lonas Drive Property is also dedicated to conducting Pilot business.

104.    Accordingly, your affiant respectfully requests the issuance of a warrant authorizing a search of the entire building located at 5500 Lonas Drive, Knoxville, Tennessee, for the items listed in A2, subject to the special conditions set forth in Attachment H.

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

**VII.    There is probable cause to believe that documents related to the conspiracy and scheme to defraud are located at the 1339 E. Weisgarber Property.**

105.    On October 24, 2012, CHS-2 recorded a conversation in which a Pilot information technology employee stated that Pilot's servers have been moved to a new building "on Weisgarber." This employee told CHS-2 that the Pilot Weisgarber location has a number of regular physical servers and a high-powered server containing as many as twenty virtual machines. This Pilot employee further told CHS-2 that everything at Weisgarber is backed up to a regular disk on the same site. This Pilot employee also told CHS-2 that there are back-up generators on site.

106.    On April 4, 2013, CHS-2 recorded a telephone conversation with Pilot information technology employee Aron Mast, who advised CHS-2 that all of Pilot's servers are located at its Weisgarber facility, stating "servers, are, uh, another location totally, on Weisgarber."

107.    On August 1, 2011, the Knoxville News Sentinel published an article entitled "Pilot converting Sears site to business center." The article identified the former Sears appliance repair center located on Weisgarber Road as Pilot's new business service center. The article also provided a photograph of the entrance to Pilot's new E. Weisgarber Road business service center.

108.    On August 1, 2011, the Knoxville News Sentinel published another article entitled "Knoxville building permits: Aug. 1" which provided the following, "BU11-1028, 1339 E. Weisgarber Road, Bralico Commercial, Inc., $2,000,000, Pilot Travel Centers, interior remodel to former Sears repair building to be Pilot Travel data center."

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

109. On April 5, 2013, through law enforcement surveillance, license plate tag information was obtained from four vehicles parked in the parking area for 1339 E. Weisgarber Road Property, and registration information for those vehicles was obtained. Internet searches using the website LinkedIn revealed that registered owners of the vehicles included a "Database Administrator at Pilot Travel Centers, LLC," and a "Network Builder at PilotFlyingJ."

110. Law enforcement surveillance and photography also shows that the entrance to the 1339 E. Weisgarber Property matched the building entrance photograph included in the Knoxville News Sentinel's August 1, 2011 article.

111. Law enforcement surveillance and photography also revealed that Pilot fuel pumps are stored on the exterior of the 1339 E. Weisgarber Property, as depicted in Attachment C1. Additionally, law enforcement surveillance and photography also revealed redundant back-up generators next to, and apparently connected to, the building located at 1339 E. Weisgarber Road, Knoxville, Tennessee, as depicted in Attachment C1, which is consistent with the description of the Pilot Weisgarber server location that was provided to CHS-2 on October 24, 2012, by a Pilot information technology employee. Additionally, as depicted in Attachment C1, there are large air handlers apparently connected to the E. Weisgarber Road Property. Based on my training and experience, these large handlers are used to keep areas cool that house numerous servers.

112. Based on the information stated above, your affiant believes that there is probable cause to conclude that the 1339 E. Weisgarber Property is the "Weisgarber" location referenced by the Pilot information technology employees who told CHS-2 on October 24, 2012 and April 4, 2013 that Pilot houses its servers at a Weisgarber location.

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

113.     On April 5, 2013, CHS-2 advised that when Karen Crutchman was verbally reviewing the number of manual rebate accounts managed by various Pilot diesel direct sales employees, she was viewing that information by accessing a shared drive or shared folder that he believed was entitled "direct sales." CHS-2 has advised that he can also access that folder remotely from Pilot headquarters through a virtual private network, called a VPN. Based on my training and experience, access to a shared drive or shared folder is supported by a file server that allows multiple users to access the same files from multiple computer devices. Because there is probable cause to believe that the 1339 E. Weisgarber Property houses all of Pilot's servers, there is also probable cause to believe the 1339 E. Weisgarber Property also houses the file server that contains the shared drive or shared folder that Crutchman was accessing to obtain the information that she provided to CHS-2 over the phone on April 5, 2013, regarding the number of manual rebate accounts currently managed by various Pilot diesel direct sales employees. Similarly, because there is probable cause to believe that the 1339 E. Weisgarber Property houses all of Pilot's servers, there is also probable cause to believe the 1339 E. Weisgarber Property also houses the e-mail server that contains e-mails and e-mail attachments sought in Attachment C2. Additionally, because the 1339 E. Weisgarber Property contains servers that are backed up, there is probable cause to believe that the 1339 E. Weisgarber Property contains all the electronic documents identified in Attachment C2.

114.     Law enforcement surveillance has determined that the 1339 E. Weisgarber Property is a very secure, privately owned facility, exclusively controlled by Pilot for Pilot's exclusive use, and that requires card access for entry. Based on my training and experience, because this is a secure privately owned facility, containing privately owned servers, it is not

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

possible to know which server inside the 1339 E. Weisgarber Property contains the file and e-mail servers that contain the documents listed in Attachment C2 without either searching every server in the 1339 E. Weisgarber Property or obtaining the assistance of a Pilot information technology employee.

115.    Accordingly, your affiant is requesting that the Court issue a warrant that authorizes the search, seizure, imaging, or otherwise copying of computer devices as defined below under the heading "**Computers, Electronic Storage, and Forensic Analysis,**" including servers and back-up disks, in the 1339 E. Weisgarber Road Property that reasonably appear to contain the items listed in Attachment C2, subject to the special conditions set forth in Attachment H.

## VIII.    There is probable cause to believe that documents related to the conspiracy and scheme to defraud are located at the 2211 Blair Drive Property.

116.    On February 16, 2013, CHS-2 engaged in the following consensually recorded conversation with Arnie Ralenkotter and Brian Mosher during a Pilot event in Orlando, Florida:

**CHS-2**: You guys all work out of your house, right? I mean your physical house.
**CHS-2**: Yeah, I'm working out of my Mom's and I was thinking about maybe going back to the house.
**RALENKOTTER**: Always have. Working out of the house for almost 25 years.
**MOSHER**: I get the best office attire known to man, a pair shorts and a t-shirt
**RALENKOTTER**: Sometimes on Fridays it's no shower until lunch day
**MOSHER**: Oh yeah many days I don't shower.

117.    As of April 9, 2013 Lexis-Nexus Accurint law enforcement database records show that the 2211 Blair Drive Property is owned by Arnold L. Ralenkotter and R. Ralenkotter. Additionally, Ralenkotter's Kentucky driver's license lists the 2211 Blair Drive Property address.

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

118. On April 8, 2013, pursuant to a subpoena, a representative of interstate commercial carrier FedEx advised your affiant that since April 2012, more than 50 packages have been delivered to the 2211 Blair Drive Property from the 5508 Lonas Drive Property, where Pilot's diesel direct sales team works.

119. CHS-2 has advised that Pilot has issued a computer device, including a laptop and Ipad, to all Regional Sales Directors, which would include Ralenkotter.

120. As noted above, there is probable cause to believe that Ralenkotter has corresponded with Regional Account Representative Janet Welch regarding the reduction of Rebate Amounts to Customers.

121. Additionally, the delivery of more than 50 FedEx packages from the 5508 Lonas Drive Property shows that there is probable cause to believe that the 2211 Blair Drive property contains Pilot documents.

122. Because Ralenkotter may store Pilot documents in any storage container within the 2211 Blair Drive Property, and because Ralenkotter's Pilot-issued laptop and Ipad are portable, there is probable cause to believe the documents listed in Attachment E2 could be located anywhere within the 2211 Blair Drive Property.

123. Accordingly, your affidavit respectfully requests that the Court issue a warrant that authorizes the search of the entire 2211 Blair Drive Property for the items listed in Attachment E2.

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

**IX.** **There is probable cause to believe that documents related to the conspiracy and scheme to defraud are located at 4302 Dakota Avenue Property.**

124. As of April 9, 2013 Lexis-Nexus Accurint law enforcement database records show that the 4302 Dakota Avenue Property is owned by Kevin Hanscomb. Additionally, Hanscomb's Tennessee driver's license lists the 4302 Dakota Avenue Property.

125. On April 8, 2013, pursuant to a subpoena, a representative of interstate commercial carrier FedEx advised your affiant that since April 2012, more than 50 packages have been delivered to the 4302 Dakota Avenue Property from the 5508 Lonas Drive Property, where Pilot's diesel direct sales team works.

126. CHS-2 has advised that Pilot has issued a computer device, including a laptop and Ipad, to all Regional Sales Directors, which would include Hanscomb.

127. As noted above, there is probable cause to believe that Hanscomb has communicated with Regional Sales Manager Chris Andrews regarding the reduction of Rebate Amounts to Customers.

128. Additionally, the delivery of more than 50 FedEx packages from the 5508 Lonas Drive Property shows that there is probable cause to believe that the 4302 Dakota Avenue Property contains Pilot documents.

129. Because Hanscomb may store Pilot documents in any storage container within the 4302 Dakota Avenue Property, and because Hanscomb's Pilot-issued laptop and Ipad are portable, there is probable cause to believe the documents listed in Attachment D2 could be located anywhere within the 4302 Dakota Avenue Property.

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

130. Accordingly, your affidavit respectfully requests that the Court issue a warrant that authorizes the search of the entire 4302 Dakota Avenue Property for the items listed in Attachment D2.

## X. There is probable cause to believe that documents related to the conspiracy and scheme to defraud are located at 3317 Westminster Road, Bettendorf, Iowa.

131. On February 16, 2013, CHS-2 engaged in the following consensually recorded conversation with Arnie Ralenkotter and Brian Mosher during a Pilot event in Orlando, Florida:

**CHS-2**: You guys all work out of your house, right? I mean your physical house.
**CHS-2**:Yeah, I'm working out of my Mom's and I was thinking about maybe going back to the house.
**RALENKOTTER**: Always have. Working out of the house for almost 25 years.
**MOSHER**: I get the best office attire known to man, a pair shorts and a t-shirt
**RALENKOTTER**: Sometimes on Fridays it's no shower until lunch day
**MOSHER**: Oh yeah many days I don't shower.

132. As of April 5, 2013, Scott County, Iowa, real estate records show that the 3317 Westminster Road Property is owned by Brian M. Mosher and L. M. Mosher. Additionally, Mosher's Iowa driver's license lists the 3317 Westminster Road, Bettendorf, Iowa address.

133. On April 8, 2013, pursuant to a subpoena, a representative of interstate commercial carrier FedEx advised your affiant that since April 2012, more than 20 packages have been delivered to the 3317 Westminster Road Property from the 5508 Lonas Drive Property, where Pilot's diesel direct sales team works.

134. CHS-2 has advised that Pilot has issued a computer device, including a laptop and Ipad, to all Regional Sales Directors, which would include Mosher.

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

135.    As noted above, there is probable cause to believe that Mosher has corresponded with Regional Account Representative Heather Jones and Regional Sales Managers Rob Yuronich and Cathy Giesick regarding the reduction of Rebate Amounts to Customers.

136.    Additionally, the delivery of more than 20 FedEx packages from the 5508 Lonas Drive Property shows that there is probable cause to believe that the 3317 Westminster Road Property contains Pilot documents.

137.    Because Mosher may store Pilot documents in any storage container within the 3317 Westminster Road Property, and because Mosher's Pilot-issued laptop and Ipad are portable, there is probable cause to believe that the documents listed in Attachment F2 could be located anywhere within the 3317 Westminster Road Property.

138.    Accordingly, your affidavit respectfully requests that the Court issue a warrant that authorizes the search of the entire 3317 Westminster Road Property for the items listed in Attachment F2.

## XI.    Computers, Electronic Storage, and Forensic Analysis

139.    As described above, and in Attachments A2, B2, C2, D2, E2, and F2, I seek permission to search for documents that might be found on the properties described in Attachment A1, B1, C1, D1, E1, and F1, in whatever form the records are found. One form in which the records might be found is on computers or other electronic storage media, including desktop computers, laptop computers, file servers, e-mail servers, and backup disks (hereinafter collectively referred to, and further defined below, as "computer devices"). Additionally, based on my training and experience, I know electronically stored information and data related to a

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

single document can reside at multiple locations, such as on multiple servers. Thus, the warrants I seek would authorize the search and seizure (including the potential creation of image copies) of the entirety of any computer devices found on any of the properties to be searched, described in A1, B1, C1, D1, E1, and F1, if they reasonably appear to contain the documents listed the corresponding attachments for each property, as listed in A2, B2, C2, D2, E2, and F2, all in accordance with Federal Rule of Criminal Procedure 41(e)(2)(B).

140. I respectfully submit that if computer devices are found in any of the properties to be searched, there is probable cause to believe that documents described in Attachments A2, B2, C2, D2, E2, and F2 may be stored on such computer devices. My belief in that regard is based on my training and experience, as well as my investigation in this case which has revealed that computer devices are actively used by Pilot and their employees to generate documents and records relating to the fraudulent scheme being investigated.

141. From my training, experience, as well as discussions with other law enforcement officers who are skilled in computer forensics, I am aware of the following information:

> a. Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a computer device, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer device, the data contained in the file does

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

not actually disappear; rather, that data remains on the computer devices until it is overwritten by new data.

b.     Deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the computer devices that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.     Wholly apart from user-generated files, computer devices contain electronic evidence of how a computer device has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer device users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

d.     Perpetrators of criminal activity who use computer devices do not always store incriminating documents on their computer devices in clearly labeled file structures. To the contrary, perpetrators of criminal activity who use computer devices in the commission of their crimes often use file and folder names

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

completely unrelated to the criminal activity solely for the purpose of hiding those documents and files. Accordingly, in criminal investigations involving electronically stored information, it is often necessary to open every file on a computer device to determine whether the computer device contains relevant information.

142. As explained previously in this affidavit, the investigation in this case has established probable cause to believe that computer devices were used to generate, store, and print documents used in the fraudulent scheme. I also respectfully submit that there is probable cause to believe that there are computer devices currently located on each of the properties to be searched.

143. As further described in Attachments A2, B2, C2, D2, E2, and F2, I seek permission to locate not only computer files that might serve as direct evidence of the crimes identified in the warrant, but also for forensic electronic evidence that establishes how computer devices were used, the purpose of their use, who used them, and when. From my discussions with other law enforcement officers skilled in computer forensics, I am aware that there is reason to believe that this forensic electronic evidence will be on any computer device found on the premises to be searched because:

> a. Data on a computer device can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the computer

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

device that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage medium, and the times the computer device was in use. Computer device file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. Forensic evidence on a computer device can also indicate who has used or controlled the computer device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer device at a relevant time.

c. A person with appropriate familiarity with how a computer device works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

d.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a computer device that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer device is evidence may depend on other information stored on the computer device and the application of knowledge about how a computer device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.     Further, in finding evidence of how a computer device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a computer device. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

144.     In most cases, a thorough search of the premises for information that might be stored on computer devices often requires the seizure of the physical computer device and later off-site review consistent with the warrant. In lieu of removing computer devices from the premises, it is sometimes possible to make an image copy of such computer devices. Generally speaking, imaging is the taking of a complete electronic picture of the computer device's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

ensure the accuracy and completeness of data recorded on the computer device, and to prevent the loss of the data either from accidental or intentional destruction.

145.    From my training and experience, I know that not all evidence takes the form of documents and files that can be easily viewed on site. Further, I know from my experience and from discussions with other law enforcement officers skilled in the area of computer forensics that analyzing evidence on computer devices often requires considerable time, and taking that much time on the premises to be searched could be unreasonable. Given the facts and circumstances of this case, it is likely that it will be necessary to thoroughly examine computer devices to obtain some of the evidence sought by the warrant. Computer devices can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

146.    Computer devices can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises to be searched. However, taking the computer devices off-site (and/or creating image copies of such devices) will allow for examination in a controlled environment by individuals with the proper tools and knowledge.

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

147. Records sought under this warrant could be stored in a variety of formats that may require off-site reviewing with specialized forensic tools.

148. Thus, based on the foregoing, and consistent with Federal Rule of Criminal Procedure 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying computer devices, in part or in their entirety, that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later off-site review of the information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire computer device, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## XII. Specific Search Procedures for the 1339 E. Weisgarber Road Property, the 5508 Lonas Drive Property, and the 5500 Lonas Drive Property.

149. As noted above, your affiant recognizes that the scheme and conspiracy to defraud referenced in this affidavit is not directed at all of Pilot's Customers. Moreover, your affiant recognizes that Pilot is one of the largest suppliers of diesel fuel to over-the-road truck carriers in the United States. The execution of warrants may have the unintended and undesired effect of limiting Pilot's ability to provide services to its Customers. In response to these concerns, the agents who execute the search will take an incremental approach to minimize the inconvenience to Pilot's business operations. This incremental approach, which will be explained to all of the agents on the search team at each location before the search is executed, will proceed as follows:

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

A. The 1339 E. Weisgarber Road Property

150. Upon arriving at the 1339 E. Weisgarber Road Property, the Computer Analysis Response Team agents and Digital Evidence Technicians will attempt to identify a Pilot system administrator of the network of servers contained in at the 1339 E. Weisgarber Road Property (or other knowledgeable employee) who will be willing to assist law enforcement in the identification, imaging or otherwise copying of the computer devices, as defined in this affidavit that contain the items listed in Attachment C2. If the agents succeed at locating such an employee and are able to obtain copies of the evidence sought in that way, the agents will not conduct any additional search or seizure of the 1339 E. Weisgarber Road Property.

151. If the Pilot employees choose not to assist the agents, or such a procedure proves impractical, and the agents cannot execute the warrant successfully without themselves examining the computing devices located in the 1339 Weisgarber Road Property, the Computer Analysis Response Team agents and Digital Evidence Technicians themselves will attempt to locate the computing device files containing the evidence to be seized, and will attempt to search for and seize the documents contained on the computer devices in the 1339 Weisgarber Road Property in a manner consistent with the warrant. If the Pilot employees choose not to cooperate, and this approach is required, as with any search warrant, this warrant will be executed reasonably. Reasonable execution will likely involve conducting an investigation on the scene of what computer devices must be seized or copied, and what computer devices need not be seized or copied. Where appropriate, law enforcement officers will copy data, rather than physically seize computer devices, to reduce the extent of disruption. If employees so request, law

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

enforcement officers will, to the extent practicable, attempt to provide the employees with copies of data that may be necessary or important to the continuing function of the Pilot's legitimate business. If, after inspecting any seized computer devices, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, it will be returned by law enforcement.

152. Additionally, your affiant recognizes that many servers located at the 1339 E. Weisgarber Road Property may support credit card transactions at Pilot travel centers around the country. To minimize any potential for disruption to any credit card transactions supported by the servers located at the 1339 E. Weisgarber Road Property, if Pilot employees located at the 1339 E. Weisgarber Road Property choose to assist the agents in the identification, imaging or otherwise copying of the computer devices located at the 1339 E. Weisgarber Road Property, the Pilot employees who have been determined, based on information provided by the on-site supervising Pilot employee, to be essential to the operation of Pilot's servers at the 1339 E. Weisgarber Property will be permitted to return to their duties, if it is determined that their presence will not affect the ability of the searching and seizing agents to preserve and seize evidence.

B. The 5508 Lonas Drive Property and the 5500 Lonas Drive Property

153. Upon arriving at the 5508 Lonas Drive Property and the 5500 Lonas Drive Property agents will attempt to identify a Pilot senior management employee responsible for operations. To be specific, at the 5508 Lonas Drive Property, agents will attempt to identify Ken Parent, Pilot's Senior Vice President for Operations, or his immediate subordinate (or other

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.

knowledgeable employee) who will be willing to assist law enforcement in the identification of Pilot personnel essential to Pilot's operation of its numerous travel plazas and fueling stations around the country. Once both the 5508 Lonas Drive Property and 5500 Lonas Drive Properties have been secured, Pilot employees who have been determined to be essential to Pilot's operation of his travel plazas and fueling stations will be permitted to return to their duties, if it is determined that their presence will not affect the ability of the searching and seizing agents to preserve and seize evidence.

## XIII. REQUEST FOR SEALING

154. It is respectfully requested that this Court order that all papers in support of this application, including the affidavit, search warrant, and application be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to the targets of the investigation. Release of the information at this time could jeopardize the integrity of that ongoing investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Robert H. Root, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
this **ll** day of April, 2013:

HONORABLE H. BRUCE GUYTON
UNITED STATES MAGISTRATE JUDGE

Affidavit of Special Agent Robert H. Root, FBI, in support of search warrant applications for the following:
the office building located at 5500 Lonas Drive, Knoxville, Tennessee;
the office building located at 5508 Lonas Drive, Knoxville, Tennessee;
the commercial building located at 1339 E. Weisgarber Road, Knoxville, Tennessee
the residence located at 4302 Dakota Avenue, Nashville, Tennessee;
the residence located at 2211 Blair Drive, Hebron, Kentucky; and
the residence located at 3317 Westminster Road, Bettendorf, Iowa.